Nos. 17-3299, 17-3309, 17-3304, 17-3306, 17-3302, 17-3308,
17-3289, 17-3297, 17-3290

In the

# United States Court of Appeals
## for the Sixth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROBERT LEDBETTER, CHRISTOPHER HARRIS,
RASHAD LISTON, DEOUNTE USSURY,
CLIFFORD ROBINSON

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:14-cr-127 (Marbley, J.)

## BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES

For the Appellee:

BENJAMIN C. GLASSMAN
United States Attorney

MARY BETH YOUNG
KIMBERLY ROBINSON
Assistant United States Attorneys
303 Marconi Blvd, Suite 200
Columbus, Ohio 43215
(614) 469-5715

# TABLE OF CONTENTS

Table of Authorities...............................................................................vii

Statement Regarding Oral Argument .................................................. xix

Statement of Jurisdiction.........................................................................1

Issues Presented.......................................................................................2

Statement of the Case ..............................................................................6

    A. Introduction and Overview.........................................................6

    B. Procedural Background ...............................................................8

    C. Trial Evidence...........................................................................13

        1.   The Short North Posse and its Associates .......................13

        2.   Evidence of Acts other than the Charged
            Murders..............................................................................20

        3.   The Charged Murders........................................................27

            a. Murder of Alan Johnson, April 16, 2006
              (Count 4, Ledbetter) ....................................................27

            b. Murder of Marschell Brumfield, Jr., April 22, 2007
              (Joined Counts 1 and 2, Ledbetter, Harris, Liston,
              Ussury) ........................................................................28

            c. Murder of Donathan Moon, August 19, 2007 (Counts
              5 and 6, Robinson and Harris) .....................................29

            d. Murder of Dante Hill, December 12, 2007 (Count 11,
               Ussury) ........................................................................30

i

    e. Murder of Marcus Peters, October 6, 2007 (Counts 7 and 8, Harris and Ussury) ........................................... 31

    f. Murder of Rodriccos Williams, November 3, 2007 (Counts 9 and 10, Ledbetter, Harris, Liston) .............. 32

    g. Murder of Tyrell Davis, April 25, 2008 (Counts 15 and 16, Liston) ............................................................ 33

    h. Murder of Crystal Fyffe, October 19, 2011 (Counts 29, 30, and 31, Ledbetter) ........................................... 35

Summary of the Argument ................................................. 37

Argument .......................................................................... 46

    Challenges to the Sufficiency of Evidence or Charged Offenses ..... 46

    I.    Sufficient evidence supported Ledbetter's convictions of Counts 1, 4, 9, 10, 29, 30, 31, and Joined Counts 1 and 2. (*responding to Ledbetter's sixth issue*) ................................... 47

    A. The evidence supported Ledbetter's conviction for the RICO conspiracy (Count 1) ................................................. 47

    B.  The evidence supported Ledbetter's conviction for murder in aid of racketeering as to the death of Alan Johnson (Count 4) ............................................................................ 50

    C.  The evidence supported Ledbetter's conviction for murder in aid of racketeering and murder with a firearm during a drug trafficking crime as to the death of Rodriccos Williams (Counts 9 and 10) ................................................ 54

    D.  The evidence supported Ledbetter's convictions for murder in aid of racketeering, conspiracy to murder a witness, and discharge of a firearm during a crime of violence as to the death of Crystal Fyffe (Counts 29, 30 and 31) ........ 60

E. The evidence supported Ledbetter's conviction for murder in aid of racketeering and murder with a firearm during a drug trafficking crime as to the death of Marschell Brumfield (Joined Counts 1 and 2) ........................................................ 67

II.   Sufficient evidence supported Ussury's Count 11 conviction for the murder of Dante Hill in aid of racketeering. (*responding to Ussury's second issue*) ................................... 70

A.   There was sufficient evidence Ussury committed the murder................................................................................ 70

B.   There was sufficient evidence of the purposes required by 18 U.S.C. § 1959(a)(1) ................................................... 74

III.   Sufficient evidence supported the purpose element for Harris's and Robinson's Count 5 convictions for the murder of Donathan Moon in aid of racketeering. (*responding to Harris's second issue and Robinson's first issue*)................. 81

A.   The evidence was sufficient to support a conclusion that both Harris and Robinson committed the offense for a pecuniary purpose ................................................... 82

B.   The evidence was also sufficient to support a conclusion that Harris committed the offense to maintain or increase his position in the enterprise ............................ 89

IV.   Sufficient evidence supported the interstate commerce element for Harris's and Robinson's Count 6 convictions for the murder of Donathan Moon with a firearm during conspiracy to commit Hobbs Act robbery. (*responding to Harris's fourth issue and Robinson's second issue*) .............. 91

V.   There was sufficient evidence of Robinson's identity as to Counts 5 and 6. (*responding to Robinson's fourth issue*).... 103

VI.  The definition of crime of violence in § 924(c)(3)(B) is not
     unconstitutionally vague, and Harris's and Robinson's
     arguments to the contrary regarding their Count 6 convictions
     do not require reversal. (*responding to Harris's third issue
     and Robinson's third issue*) ................................................. 108

     A.  This Court previously held that § 924(c)(3)(B) is not
         unconstitutionally vague, and that conclusion
         remains correct ............................................................... 109

     B.  The Supreme Court's Decision in *Dimaya* did not render
         § 924(c)(3)(B) vague nor did it require a categorical
         approach ......................................................................... 114

     C.  § 924(c)(3)(B) should be interpreted to require a
         case-specific approach ...................................................... 117

         1.  The text of section 924(c)(3)(B) is consistent with
             a case-specific approach  ............................................ 118

         2.  The context of § 924(c)(3)(B) supports a case-specific
             approach .................................................................. 122

         3.  The reasons for applying the categorical approach
             to other statutes do not apply to § 924(c)(3)(B) ......... 124

         4.  Principles of constitutional avoidance support
             construing § 924(c)(3)(B) to require a case-specific
             approach .................................................................. 130

     D.  Although the district court did not require the jury to
         find that the predicate for Count 6 was a crime of
         violence, as would be necessary under a case-specific
         interpretation of § 924(c)(3)(B), that omission was
         harmless in this case ...................................................... 131

iv

Trial and Pretrial Issues ............................................................... 133

VII.  The district court did not err in denying Ledbetter's
      motion to suppress evidence. (*responding to Ledbetter's
      first issue*) ........................................................................ 133

VIII. The district court did not err in denying Ussury's and
      Robinson's motions for severance. (*responding
      to Robinson's fifth issue and Ussury's third issue*) ............ 143

      A.  Joinder was proper under Rule 8 ................................... 145

      B.  Severance was not required under Rule 14 ................... 147

IX.   The district court did not plainly err in permitting testimony
      by Detective Caffey and Lieutenant Weir regarding gangs.
      (*responding to Liston's second issue, Harris's fifth issue,
      and Ussury's fourth issue*) .................................................. 152

      A. The district court did not plainly err in allowing
         Detective Caffey's opinion testimony ............................. 153

      B. The district court did not plainly err in allowing
         Lieutenant Weir's testimony regarding gangs............... 159

X.    The district court did not err in denying a mistrial based
      on testimony relating to Ledbetter's defense attorney.
      (responding to Ledbetter's third issue and Liston's
      third issue)......................................................................... 161

XI.   The district court did not err in its handling of evidence
      and prosecutorial statements regarding Liston's tattoos.
      (*responding to Liston's fourth issue*).................................. 170

      A. The district court did not abuse its discretion by
         allowing evidence of Liston's visible tattoos ................. 170

B. The prosecutor's unintentional misstatement in closing
    regarding the evidence of Liston's tattoos does not
    require new trial ............................................................. 176

XII. This Court should not address Ledbetter's ineffective
     assistance claim on direct appeal, and to the extent that
     it does, the claim fails. (*responding to Ledbetter's
     second issue*) ...................................................................... 184

XIII. The due process right to unanimity was not violated
      as to the verdict forms for Harris's, Liston's and Ussury's
      murder in aid of racketeering counts. (*responding to
      Harris's first issue, Liston's first issue, and Ussury's
      first issue*) ....................................................................... 187

XIV. There was no cumulative error rendering the trial
     fundamentally unfair. (*responding to Ledbetter's seventh
     issue and Liston's fifth issue*) ............................................ 191

Sentencing Issues ............................................................................ 192

XV. Ledbetter did not receive multiple punishments for
    the same conduct in violation of double jeopardy.
    (*responding to Ledbetter's fourth issue*) .............................. 192

XVI. Ledbetter's sentence was procedurally reasonable.
     (*responding to Ledbetter's fifth issue*).................................. 196

Conclusion ......................................................................................... 201

Certificate of Compliance ................................................................ 202

Designation of Relevant District Court Records ............................... 203

Certificate of Service ........................................................................ 208

# TABLE OF AUTHORITIES

<u>Cases:</u>

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................ 128, 129

*Arizona v. Johnson*, 555 U.S. 323 (2009). ............................................... 135

*Blockburger v. United States*, 284 U.S. 299 (1932).......... 192-93, 194, 195

*Bonner v. Perry*, 564 F.3d 424 (6th Cir. 2009) ..................................... 110

*Clark v. Martinez*, 543 U.S. 371 (2005).................................................. 131

*Corley v. United States*, 556 U.S. 303 (2009) ........................................ 123

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469 (1992) ............. 120

*Gall v. United States*, 552 U.S. 38 (2007) .............................................. 196

*Gor v. Holder*, 607 F.3d 180 (6th Cir. 2010) ......................................... 111

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ................................. 75

*In re Irby*, 858 F.3d 231 (4th Cir. 2017) ................................................ 113

*INS v. St. Cyr*, 533 U.S. 289 (2001) ............................................... 116, 130

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................ 46

*James v. United States*, 550 U.S. 192 (2007) ......................................... 125

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ....................................... 130

*Johnson v. United States*, 135 S. Ct. 2551 (2015)......... 114, 115, 119, 123

*Krist v. Folz*, 804 F.2d 944 (6th Cir. 1986) ........................................... 186

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) .................................................... 126

*Massaro v. United States*, 538 U.S. 500 (2003) ..................................... 185

*Mathis v. United States*, 136 S. Ct. 2243 (2016). ........................... 119, 123

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) .................................... 126, 127

*Murr v. United States*, 200 F.3d 895 (6th Cir. 2000) ............................ 195

*Neder v. United States*, 527 U.S. 1 (1999) ............................................ 132

*Nijhawan v. Holder*, 557 U.S. 29 (2009) .................................. 118-19, 126

*Ne. Ohio Coal. for the Homeless v. Husted,* 831 F.3d 686
    (6th Cir. 2016) ..................................................................... 111, 112

*Old Chief v. United States*, 519 U.S. 172 (1997) ................................... 175

*Ovalles v. United States*, –F.3d–, No. 17-10172, 2018 WL 4830079
    (11th Cir. Oct. 4, 2018) (en banc) ................................. 113, 117, 132

*Pandelli v. United States*, 635 F.2d 533 (6th Cir. 1980) ...................... 193

*Rashad v. Burt*, 108 F.3d 677 (6th Cir. 1997) .............................. 194, 195

*Richardson v. United States*, 526 U.S. 813 (1999) ................................ 187

*Schad v. Arizona*, 501 U.S. 624 (1991) ................................................. 187

*Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232 (1957) ........................... 121

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ................................... passim

*Shepard v. United States*, 544 U.S. 13 (2005) .............................. 126, 128

*Shuti v. Lynch*, 828 F.3d 440, 449-50 (6th Cir. 2016), *cert. denied*
    *sub nom. Sessions v. Shuti*, 138 S. Ct. 1977 (2018) ............... passim

*Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985).........................75

*Stirone v. United States*, 361 U.S. 212 (1960)..........................................92

*Strickland v. Washington*, 466 U.S. 668 (1984)....................................186

*Taylor v. United States*, 136 S. Ct. 2074 (2016).....................................92

*Taylor v. United States*, 495 U.S. 575, 600 (1990)..........................*passim*

*Terry v. Ohio*, 392 U.S. 1 (1968)............................................................135

*United States v. Allen*, 160 F.3d 1096 (6th Cir. 1998)...........................145

*United States v. Arvizu*, 534 U.S. 266 (2002) ......................................135

*United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018) ....................*passim*

*United States v. Baylor*, 517 F.3d 899 (6th Cir. 2008)............................93

*United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985) ........................47

*United States v. Blackwell*, 459 F.3d 739 (6th Cir. 2006) ............188, 191

*United States v. Bracy*, 67 F.3d 1421 (9th Cir. 1995)..............................87

*United States v. Bradley*, 400 F.3d 459 (6th Cir. 2005).......................185

*United States v. Brady*, 26 F.3d 282 (2d Cir. 1994)................................80

*United States v. Bost*, 606 F. App'x 821 (6th Cir. 2015) ......................140

*United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015) ......................46

*United States v. Caraway*, 534 F.3d 1290 (10th Cir. 2008).................191

*United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006).................*passim*

*United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994)........................ 162

*United States v. Carter*, 236 F.3d 777 (6th Cir. 2001).................... *passim*

*United States v. Chance*, 306 F.3d 356 (6th Cir. 2002) ................. *passim*

*United States v. Chavis*, 296 F.3d 450 (6th Cir. 2002) ........................ 145

*United States v. Ciampaglia*, 628 F.2d 632 (1st Cir. 1980)................. 149

*United States v. Clausen*, 328 F.3d 708 (3rd Cir. 2003) ........................ 94

*United States v. Clemons*, No. 93-2347, 1994 WL 589649
   (6th Cir. Oct. 21, 1994)................................................................ 137

*United States v. Cobb*, 397 F. App'x 128 (6th Cir 2010)...................... 156

*United States v. Collins,* 40 F.3d 95 (5th Cir. 1994)........................... 101

*United States v. Combs*, 253 F. App'x 532 (6th Cir. 2007) .................. 187

*United States v. Conception*, 983 F.2d 369 (2d Cir. 1992)............. passim

*United States v. Coss*, 677 F.3d 278 (6th Cir. 2012)............................ 109

*United States v. Culbert*, 435 U.S. 371 (1978) ......................................... 93

*United States v. Dale*, 178 F.3d 429 (6th Cir. 1999)............................ 190

*United States v. Davis*, 473 F.3d 680 (6th Cir. 2007) ............................ 93

*United States v. Davis*, 514 F.3d 596 (6th Cir. 2008) .......................... 158

*United States v. Davis*, 707 F.2d 880 (6th Cir. 1983) .......................... 146

*United States v. Davis*, 903 F.3d 483 (5th Cir. 2017), *petition for cert.
   pending* No. 18-431 (filed Oct. 3, 2018)........................................ 113

*United States v. Dawkins*, 419 F. App'x 224 (3d Cir. 2011) ................ 138

*United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980) .......................... 73

*United States v. Derenak*, Nos. 98-1380, 98-1381, 210 F.3d 373,
2000 WL 331982 (6th Cir. March 24, 2000) ............................... 157

*United States v. DiCarlantonio*, 870 F.2d 1058 (6th Cir. 1989) ............ 97

*United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992) ........................ 148

*United States v. Diomande*, 40 F. App'x 120 (6th Cir. 2002) .............. 166

*United States v. Dixon*, 901 F.3d 3122 (11th Cir. 2018) .................. 80, 85

*United States v. Douglas*, No. 18-1129, 2018 WL 4941132
(1st Cir. Oct. 12, 2018) ........................................................ *passim*

*United States v. Dupree*, 323 F.3d 480 (6th Cir. 2003) .......................... 93

*United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001) .............. 178

*United States v. Eshetu*, 898 F.3d 36, 37-38 (D.C. Cir.), *petition for
reh'g pending*, No. 15-3020 (D.C. Cir. filed Aug. 31, 2018). ........ 113

*United States v. Evans*, 848 F.3d 242 (4th Cir. 2017) .......................... 122

*United States v. Farah*, 766 F.3d 599 (6th Cir. 2014) .......................... 195

*United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000) .................. 80, 85

*United States v. Ferguson*, 49 F. Supp. 2d 321 (S.D.N.Y. 1999) .......... 189

*United States v. Fields*, 763 F.3d 443 (6th Cir. 2014). ........................ 145

*United States v. Fisher*, 745 F.3d 200 (6th Cir. 2014). ........................ 135

*United States v. Franklin*, 415 F.3d 537 (6th Cir. 2005) ..................... 150

*United States v. Gallo*, 763 F.2d 1504 (6th Cir. 1985) ................. 147, 150

*United States v. Garcia*, 496 F.3d 495 (6th Cir. 2007) ........................ 141

*United States v. Gardiner*, 463 F.3d 445 (6th Cir. 2006) ..................... 47

*United States v. Garrido*, 467 F.3d 971 (6th Cir. 2006) ...................... 135

*United States v. Gaudin*, 515 U.S. 506 (1995) .............................. 118, 124

*United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999) .......................... 174

*United States v. Gills*, 702 F. App'x 367 (6th Cir. 2017) ....................... 81

*United States v. Godwin*, 765 F.3d 1306 (11th Cir. 2014) ..................... 86

*United States v. Griffin*, 437 F.3d 767 (8th Cir. 2006) ........................ 170

*United States v. Guthrie*, 557 F.3d 243 (6th Cir. 2009) ....................... 170

*United States v. Hackett*, 762 F.3d 493 (6th Cir. 2014) ................. *passim*

*United States v. Harding*, 563 F.2d 299 (6th Cir. 1977) ....................... 94

*United States v. Harris*, 598 F. App'x 44 (2d Cir. 2015) ..................... 188

*United States v. Hatcher*, 680 F.2d 438 (6th Cir. 1982). ..................... 145

*United States v. Hayes*, 555 U.S. 415 (2009) ....................................... 119

*United States v. Henry*, 545 F.3d 367 (6th Cir. 2008) ......................... 165

*United States v. Hines*, 398 F.3d 713 (6th Cir. 2005) .......................... 186

*United States v. Howard*, 621 F.3d 433 (6th Cir. 2010) ...................... 160

*United States v. Jackson*, 663 F. App'x 426 (6th Cir. 2016) ............ 135-36

*United States v. James*, 239 F.3d 120 (2d Cir. 2000) .......................... 194

*United States v. Jemison*, 310 F. App'x 866 (6th Cir. 2009) ................ 154

*United States v. Jeross*, 521 F.3d 562 (6th Cir. 2008). ......................... 194

*United States v. Johnson*, 219 F.3d 349 (4th Cir. 2000) ...................... 188

*United States v. Johnson*, 488 F.3d 690 (6th Cir. 2007) ................. *passim*

*United States v. Kuehne*, 547 F.3d 667 (6th Cir. 2008) ....................... 127

*United States v. Lane*, 474 U.S. 438 (1986) .................................. 137, 146

*United States v. Lane,* 909 F.2d 895 (6th Cir. 1990) ........................... 132

*United States v. Lawson*, 535 F.3d 434 (6th Cir. 2008) ......................... 86

*United States v. Lee*, 660 F. App'x 8 (2d Cir. 2016) .......................... 81, 91

*United States v. Lombardo*, 582 F. App'x 601 (6th Cir. 2014). ............ 192

*United States v. Lopez–Medina*, 461 F.3d 724 (6th Cir. 2006) ............. 179

*United States v. Lugo*, No. 01-CR-022, 2005 WL 1412137,
    (E.D.N.Y. June 15, 2005) ............................................................. 85

*United States v. Lyons*, 733 F.3d 777 (7th Cir. 2013) .......................... 138

*United States v. Mack*, 258 F.3d 548 (6th Cir. 2001) .......................... 173

*United States v. Manjate*, 327 F. App'x 562 (6th Cir. 2009) ................ 170

*United States v. Maples*, 60 F.3d 244 (6th Cir. 1995) .......................... 153

*United States v. Mapp*, 170 F.3d 328 (2nd Cir. 1999) ........................... 76

*United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005)...................... 179

*United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016) ........................ 75

*United States v. Mercado*, 270 F. App'x 23 (2nd Cir. 2008)................... 72

*United States v. Montgomery*, 377 F.3d 582 (6th Cir. 2004) ............... 135

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011)............................ 80

*United States v. Morris*, 533 F. App'x 538 (6th Cir. 2013). .................. 194

*United States v. Murphy*, 530 F. App'x 522 (6th Cir. 2013) ................ 193

*United States v. Muyet*, 994 F. Supp. 501 (S.D.N.Y. 1998) ................... 81

*United States v. Myers*, 854 F.3d 341 (6th Cir. 2017)...................... 187-88

*United States v. Neeley,* 308 F. App'x 870 (6th Cir. 2009)................... 151

*United States v. Neuhausser*, 241 F.3d 460 (6th Cir. 2001) ................ 184

*United States v. Nixon*, 694 F.3d 623 (6th Cir. 2012)................... 148, 152

*United States v. Nguyen*, 155 F.3d 1219 (10th Cir. 1998) ..................... 95

*United States v. Odom*, 13 F.3d 949 (6th Cir. 1994).............................. 67

*United States v. Odum*, 878 F.3d 508 (6th Cir. 2017) ................... passim

*United States v. Orozco-Prada*, 732 F.2d 1076 (2d Cir. 1984)............. 185

*United States v. Ostrander*, 411 F.3d 684 (6th Cir. 2005)............... 87, 95

*United States v. Owens*, 426 F.3d 800 (6th Cir. 2005)........................... 41

*United States v. Pacheco*, 841 F.3d 384 (6th Cir. 2016) ...................... 130

xiv

*United States v. Peete*, 919 F.2d 1168 (6th Cir. 1990) ........................... 88

*United States v. Pierce*, 479 F.3d 546 (8th Cir. 2007).......................... 183

*United States v. Prickett*, 830 F.3d 760 (8th Cir.), vacated, 839
    F.3d 697 (8th Cir. 2016), *cert. denied*, 138 S. Ct. 1976 (2018) .... 108

*United States v. Rafidi*, 829 F.3d 437 (6th Cir. 2016) ........................ 107

*United States v. Ramirez,* 537 F.3d 1075 (9th Cir. 2008).................... 183

*United States v. Reid*, 764 F.3d 528 (6th Cir. 2014) ........................... 180

*United States v. Rios*, 830 F.3d 403 (6th Cir. 2016) ...................... *passim*

*United States v. Robinson*, 844 F.3d 137,
    (3d Cir. 2016) ........................................................................ *passim*

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ................... 112

*United States v. Saadey*, 393 F.3d 669 (6th Cir. 2005). .............. 142, 145

*United States v. Salas*, 889 F.3d 681 (10th Cir.),
    *petition for cert. pending* No. 18-428 (filed Oct. 3, 2018)............. 108

*United States v. Sanderson*, 966 F.2d 184 (6th Cir. 1992) .................. 182

*United States v. Saunders*, 501 F.3d 384 (4th Cir. 2007)............. 183, 184

*United States v. Seymour*, 468 F.3d 378 (6th Cir. 2006) ..................... 167

*United States v. Scaife*, 749 F.2d 338 (6th Cir. 1984.......................... 142

*United States v. Schrock*, 855 F.2d 327 (6th Cir. 1988) ...................... 167

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ................... 133

*United States v. Simms,* No. 15-4640
   (4th Cir. argued en banc Sept. 26, 2018) ..................................... 108

*United States v. Smith,* 182 F.3d 452 (6th Cir. 1999) ............................ 87

*United States v. Smith*, 601 F.3d 530 (6th Cir. 2010) ......................... 160

*United States v. Spires,* 514 F. App'x 569 (6th Cir. 2013) .................... 165

*United States v. St. Hubert*, 883 F.3d 1319 (11th Cir. 2018) 108, 118, 119

*United States v. Stonefish*, 402 F.3d 691 (6th Cir. 2005) .................... 183

*United States v. Stover*, 474 F.3d 904 (6th Cir. 2007) ................... *passim*

*United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008) ..................... 188

*United States v. Tate*, 34 F. App'x 502 (8th Cir. 2002) ........................ 133

*United States v. Taylor*, 176 F.3d 331 (6th Cir. 1999) .......................... 107

*United States v. Taylor*, 800 F.3d 701 (6th Cir. 2015) .......................... 191

*United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016) ................. 109, 111

*United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000). .......................... 154

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004) ...................... 191

*United States v. Turkette*, 452 U.S. 576 (1981) ...................................... 75

*United States v. Turner,* 272 F.3d 380 (6th Cir. 2001) ........................... 98

*United States v. Underwood*, 859 F.3d 386 (6th Cir. 2017) ................. 191

*United States v. Vichitvongsa*, 819 F.3d 260 (6th Cir. 2016) ....... 100, 187

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ........................ 197

*United States v. Wang,* 222 F.3d 234 (6th Cir. 2000) ..................... passim

*United States v. Warner*, 971 F.2d 1189 (6th Cir. 1992) .............. 142, 143

*United States v. Washington*, 318 F.3d 845 (8th Cir. 2003) .................. 72

*United States v. Washington*, 715 F.3d 975 (6th Cir. 2013) ................ 192

*United States v. Watkins,* 509 F.3d 277 (6th Cir. 2007) ......................... 88

*United States v. Watkins*, 691 F.3d 841 (6th Cir. 2012) ........................ 92

*United States v. Wilson*, 493 F. Supp. 2d 491 (E.D.N.Y. 2007) ........ 74, 79

*United States v. Wilson*, 579 F. App'x 338 (6th Cir. 2014) .................. 185

*United States v. Wilson*, 634 F. App'x 718 (11th Cir. 2015) ................ 149

*United States v. York*, 572 F.3d 415 (7th Cir. 2009) ............................ 148

*United States v. Young*, 470 U.S. 1 (1985) ............................................ 173

*United States v. Young*, 847 F.3d 328 (6th Cir. 2017) ......................... 155

*United States ex rel. Attorney Gen. v. Delaware & Hudson Co.,*
     213 U.S. 366 (1909) .................................................................... 125

*Volpe v. Trim*, 708 F.3d 688 (6th Cir. 2013) ........................................ 191

*Zafiro v. United States*, 506 U.S. 534 (1993) ................................ 142, 145

*Zuern v. Tate*, 336 F.3d 478 (6th Cir. 2003) ............................ 160-61, 163

Statutes:

8 U.S.C. § 1101 ............................................................................ 109, 114

8 U.S.C. § 1326 .................................................................. 123

18 U.S.C. § 16 .............................................. 105, 109, 110, 123

18 U.S.C. § 921 ............................................................... 114

18 U.S.C. § 924 .......................................................... passim

18 U.S.C. § 1512 ......................................................... 55, 189

18 U.S.C. § 1951 .................................... 87, 91, 127, 128

18 U.S.C. § 1958 ............................................................... 72

18 U.S.C. § 1959 ........................................................ passim

18 U.S.C. § 1961 ............................................................... 42

18 U.S.C. § 1962 .................................................. 42, 69, 82

18 U.S.C. § 3231 ................................................................. 1

18 U.S.C. § 3553(a)(1) ...................................................... 116

18 U.S.C. § 3742 ................................................................. 1

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 2255 ............................................................. 180

Other Authority:

Armed Career Criminal Act of 1984 (ACCA)........................ 109

Comprehensive Crime Control Act of 1984 ......................... 114

Fed. R. Crim. P. 8 ................................................... 140, 141

Fed. R. Crim. P. 14 ....................................................................... 142, 146

Fed. R. Crim. P. 16 ..........................................................................152-53

Fed. R. Crim. P. 32 ............................................................................ 192

Fed. R. Evid. 403 ................................................................ 164, 167, 170

Fed. R. Evid. 702(a). ......................................................................... 150

Immigration and Nationality Act (INA) .............................................. 109

Pub. L. No. 98-473 (Oct. 12, 1984) ...................................................114-15

Oxford Dictionary of English 1183 (3d ed. 2010)................................. 116

U.S.S.G. § 3B1.1(a)....................................................................... 191, 192

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument, as the facts and legal arguments of the parties are adequately presented in the briefs and the record. However, given the number of parties and issues, the United States does not oppose Appellants' request for argument if the Court would find it helpful.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the underlying criminal case under 18 U.S.C. § 3231 because Appellants were charged with federal crimes. A jury found them guilty of all charges. The district court entered judgment against Robinson and Ussury on March 17, 2017; each of them filed a timely notice of appeal on March 23, 2017. The court entered judgment against Harris on March 23, 2017 and an amended judgment on March 29, 2017. It entered judgment against Ledbetter and Liston on March 24, 2017. Harris, Ledbetter, and Liston each filed a timely notice of appeal on March 24, 2017, and a corrected notice of appeal on March 27, 2017. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# ISSUES PRESENTED

## Challenges to the Sufficiency of Evidence or Charged Offenses

I.    Was there sufficient evidence to support Ledbetter's convictions
      for (*responding to Ledbetter's sixth issue*)

   a. RICO conspiracy (Count 1),

   b. murder in aid of racketeering as to the death of Alan
      Johnson (Count 4),

   c. murder in aid of racketeering and murder with a firearm
      during a drug trafficking crime as to the death of
      Rodriccos Williams (Counts 9 and 10),

   d. murder in aid of racketeering, conspiracy to murder a
      witness, and discharge of a firearm during a crime of
      violence as to the death of Crystal Fyffe (Counts 29, 30
      and 31),

   e. murder in aid of racketeering and murder with a firearm
      during a drug trafficking crime as to the death of
      Marschell Brumfield (Joined Counts 1 and 2)?

II.   Was there sufficient evidence to support  (*responding to
      Ussury's second issue*)

2

    a. the jury's conclusion that Ussury committed the murder of Dante Hill charged in Count 11, and

    b. the jury's conclusion that the purpose element of 18 U.S.C. § 1959(a)(1) was satisfied for Ussury's conviction on Count 11 for murder in aid of racketeering as to the death of Dante Hill?

III.  Was there sufficient evidence of the purpose element for Harris's and Robinson's convictions for murder in aid of racketeering as to the death of Donathan Moon (Count 5)? (*responding to Harris's second issue and Robinson's first issue*)

IV.  Was there sufficient evidence of the interstate commerce element for Harris's and Robinson's convictions for the murder of Donathan Moon through use of a firearm during and in relation to conspiracy to commit Hobbs Act robbery (Count 6)? (*responding to Harris's fourth issue and Robinson's second issue*)

V.  Was there sufficient evidence of Robinson's identity as to Counts 5 and 6? (*responding to Robinson's fourth issue*)

VI.    Is the definition of crime of violence in § 924(c)(3)(B) unconstitutionally vague, and do Harris's and Robinson's arguments on this ground regarding their Count 6 convictions require reversal? (*responding to Harris's third issue and Robinson's third issue*)

**Trial and Pre-Trial Issues**

VII.    Did the district court err in denying Ledbetter's motion to suppress evidence? (*responding to Ledbetter's first issue*)

VIII.    Did the district court err in denying Ussury's and Robinson's motions for severance? (*responding to Robinson's fifth issue and Ussury's third issue*)

IX.    Did the district court plainly err in permitting testimony by Detective Caffey and Lieutenant Weir regarding gangs? (*responding to Liston's second issue, Harris's fifth issue, and Ussury's fourth issue*)

X.    Did the district court err in denying Ledbetter or Liston a mistrial based on testimony relating to Ledbetter's defense attorney? (*responding to Ledbetter's third issue and Liston's third issue*)

4

XI. Did the district court err in its handling of evidence and prosecutorial statements regarding Liston's tattoos? (*responding to Liston's fourth issue*)

XII. Was Ledbetter's trial counsel constitutionally ineffective? (*responding to Ledbetter's second issue*)

XIII. Was the due process right to unanimity plainly violated by the verdict forms for Harris's, Liston's and Ussury's murder in aid of racketeering counts? (*responding to Harris's first issue, Liston's first issue, and Ussury's first issue*)

XIV. Did cumulative error render the trial fundamentally unfair as to Ledbetter or Liston? (*responding to Ledbetter's seventh issue and Liston's fifth issue*)

## **Sentencing Issues**

XV. Did Ledbetter receive multiple punishments for the same conduct in violation of double jeopardy? (*responding to Ledbetter's fourth issue*)

XVI. Was Ledbetter's sentence procedurally unreasonable? (*responding to Ledbetter's fifth issue*)

# STATEMENT OF THE CASE

A. *Introduction and Overview*

These consolidated appeals by five defendants arise from the activities of a violent criminal enterprise centered in the Short North neighborhood of Columbus, Ohio. (*See* R. 300, superseding indictment, 1152-58.)[1] The enterprise, comprised of members and associates of a gang called the "Short North," "Short North Posse," or "SNP" (*see* R. 1074, trial tr., 5843-44 (Wright)),[2] for years used violence and threats to protect the enterprise's ability to conduct drug sales and other criminal activity within its territory, to expand the enterprise's influence and operations, to deter retaliation and cooperation with law enforcement, and to retaliate when actions were taken against group members. (*See,*

---

[1] Citations to those parts of the record that have been electronically filed include the entry number, a brief description, and the PAGE ID#. Appeal Nos. 17-3302, 17-3304, 17-3289, 17-3290 and 17-3299 are from judgments in S.D. Oh. No. 2:14-cr-127; while Appeal Nos. 17-3306, 17-3308, 17-3309 and 17-3297 are from judgments in the joined case, S.D. Oh. No. 2:15-cr-080. Unless otherwise indicated, record citations herein are to the record in No. 2:14-cr-127.

[2] *See generally United States v. Gibbs*, 182 F.3d 408, 418 (6th Cir. 1999) (discussing initial formation of Short North Posse in 1990); *see also United States v. Williams*, 176 F.3d 301 (6th Cir. 1999); (R. 1074, trial tr., 5844-45 (Wright)) (discussing "roundup" of Short North Posse by law enforcement in the 1990s and evolving terminology for the group).

*e.g.,* R. 1074, trial tr., 5897, 5917-18 (Wright); R. 1082, trial tr., 8004 (Slaughter)); (R. 1115, trial tr., 9008, 9017-22 (Patterson); R. 1119, trial tr., 9971, 9975 (Jones).) The acts of violence committed by members and associates included numerous murders that for years went unsolved. (R. 1125, trial tr., 11560-62, 11661 (Lauber); R. 1084, trial tr., 8498 (Barbuto).)

Following coordinated investigative efforts by federal, state, and local law enforcement (R. 1125, trial tr., 11561-62 (Lauber)), federal indictments were filed against twenty defendants. (R. 300, superseding indictment, 1150; R. 1, indictment in 2:15-cr-80, 1.) The indictments included counts charging a conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and murders of thirteen people in aid of racketeering. (*Id.*) The five appellants herein were convicted following a joint jury trial of numerous charges, including, between the five of them, charges relating to the murders of eight people. (R. 1141, verdict, 12717.) They were all sentenced to life in prison, and now appeal.

B. *Procedural Background*

In 2014, a federal grand jury in the Southern District of Ohio returned an indictment in Case No. 2:14-cr-127 against seventeen defendants including the five appellants herein. (R. 14, indictment, 104.) The first count alleged a RICO conspiracy from 2005 until 2014, in which the enterprise, the Short North Posse and its associates, committed overt acts including murder, attempted murder, robbery, distribution of controlled substances, and tampering with witnesses. (*Id.* at 111-28.) The indictment further alleged eleven counts of murder in aid of racketeering, *see* 18 U.S.C. § 1959(a)(1), one count of murder through use of a firearm during and in relation to a crime of violence, *see* 18 U.S.C. § 924(j), four counts of murder through use of a firearm during and in relation to a drug trafficking crime, *see* 18 U.S.C. § 924(j), one count of conspiracy to murder a witness, *see* 18 U.S.C. § 1512(k), and various other drug and firearm offenses. (R. 14, indictment, 133-156.) A superseding indictment in October 2014 added three new defendants and thirteen counts, including an additional count of murder in aid of racketeering. (R. 300, superseding indictment, 1150-1243.) Fourteen of the twenty indicted defendants were charged with

8

the RICO conspiracy count. (*Id.*) The six defendants not included in the RICO conspiracy count each faced at least one count of murder in aid of racketeering. (*Id.*)

In 2015, the grand jury for the Southern District of Ohio returned another indictment assigned Case No. 2:15-cr-080. This indictment named four of the defendants also charged in No. 2:14-cr-127 (Appellants Ledbetter, Harris, Liston, and Ussury), and included one count of murder in aid of racketeering and one count of murder through use of a firearm during and in relation to a drug trafficking crime. (R. 1, indictment in 2:15-cr-80, 1.) The district court joined the two cases under Federal Rule of Criminal Procedure 13. (R. 595, order, 2470.) Together, the two cases included charges for thirteen murders. (R. 300, superseding indictment, 1150; R. 1, indictment in 2:15-cr-80, 1.)

Numerous pretrial motions were filed, two of which are relevant to this appeal. First, Ledbetter moved to suppress evidence seized following a 2007 traffic stop. (R. 600, motion to suppress, 2503.) That motion was denied. (R. 790, order, 3642-46, 3650-63, 71.) Second, after the United States submitted a proposed grouping of the twenty defendants into three trials, several defendants, including Robinson and

9

Ussury, moved for severance. (*See* R. 727, opinion and order, 3337 n.1 (summarizing motions and responses).) Those severance motions were denied (*id.* at 3337), as were Ussury's renewed motion during trial (R. 1123, trial tr., 11158) and Robinson's renewed motion at the close of the government's evidence (R. 1131, order, 12647).

Of the twenty charged defendants, thirteen eventually entered guilty pleas.[3] One died. (R. 1013, order, 5352.) One was convicted after being tried alone (*see* R. 1413, judgment, 14397, *appeal pending, United States v. Holt*, No. 17-3111). Five defendants—the appellants here—were tried in a joint two-month jury trial that included charges in both No. 2:14-cr-127 and No. 2:15-cr-80.

After the close of evidence by the United States, Appellants each moved for a judgment of acquittal under Rule 29. (R. 1126, trial tr., 11709 (Ledbetter); 11709-10 (Harris); 11711-25 (Robinson); 11710-11

---

[3] (*See* R. 1240, Gordon judgment, 13617; R. 1418, Wright judgment, 14441; R. 1440, Coates judgment, 14536; R. 1444, Johnson judgment, 14561; R. 1446, Wilson judgment, 14571; R. 1450, Wharton judgment, 14604; R. 1452, Hill judgment, 14615; R. 1454, Bowers judgment, 14626; R. 1457, Reynolds judgment, 14640; R. 1461, Brown judgment, 14661; R. 1463, Smith judgment, 14672; R. 1466, Patterson judgment, 14695; R. 1532, Green judgment, 16417.) Three of the defendants who pled guilty (Andre Brown, Troy Patterson, and Allen Wright) were government witnesses during Appellants' trial.

(Ussury); 11710 (Liston).) The court denied each of the motions. (R.

1126, trial tr., 11741-42 (denying motions by Ledbetter, Harris, Liston,

and Ussury); R. 1548, trial tr., 17144-59 (denying Robinson motion); R.

1137, opinion and order, 12695.) The motions were renewed, and again

denied, at the close of defendants' evidence. (R. 1126, trial tr., 11767; R.

1548, trial tr., 17178-79.)

The jury entered a verdict of guilty on all counts. (R. 1141, verdict,

12717.) Appellants herein were charged and convicted as follows:[4]

### No. 2:14cr127

| Count | Date | Victim | Offense | Defendant |
|-------|------|--------|---------|-----------|
| 1 | 2005-2014 | | RICO conspiracy | Ledbetter, Harris, Liston, Ussury |
| 4 | April 16, 2006 | Alan Johnson | Murder in aid of racketeering | Ledbetter |
| 5 | August 19, 2007 | Donathan Moon | Murder in aid of racketeering | Harris, Robinson |
| 6 | August 19, 2007 | Donathan Moon | Murder through use of a firearm during a crime of violence | Harris, Robinson |
| 7 | October 6, 2007 | Marcus Peters | Murder in aid of racketeering | Harris, Ussury |

[4] (*See* R. 1, 2:15-cr-080 indictment, 1; R. 300, superseding indictment, 1150; R. 1472, Robinson judgment, 14735; R. 1474, Ussury judgment, 14746; R. 1478. Ledbetter judgment, 14759; R. 1480, Liston judgment, 14770; R. 1482, Harris judgment, 14781.)

| 8 | October 6, 2007 | Marcus Peters | Murder through use of a firearm during a drug trafficking crime | Harris, Ussury |
| 9 | November 3, 2007 | Rodriccos Williams | Murder in aid of racketeering | Ledbetter, Harris, Liston |
| 10 | November 3, 2007 | Rodriccos Williams | Murder through use of a firearm during a drug trafficking crime | Ledbetter, Harris, Liston |
| 11 | December 12, 2007 | Dante Hill | Murder in aid of racketeering | Ussury |
| 15 | April 25, 2008 | Tyrell Davis | Murder in aid of racketeering | Liston |
| 16 | April 25, 2008 | Tyrell Davis | Murder through use of a firearm during a drug trafficking crime | Liston |
| 29 | October 19, 2011 | Crystal Fyffe | Murder in aid of racketeering | Ledbetter |
| 30 | October 19, 2011 | Crystal Fyffe | Conspiracy to murder a witness | Ledbetter |
| 31 | October 19, 2011 | Crystal Fyffe | Discharge of a firearm during a crime of violence | Ledbetter |

**No. 2:15-cr-080**

| Count | Date | Victim | Offense | Defendant |
| --- | --- | --- | --- | --- |
| 1 | April 22, 2007 | Marschell Brumfield, Jr. | Murder in aid of racketeering | Ledbetter, Harris, Liston, Ussury |
| 2 | April 22, 2007 | Marschell Brumfield, Jr. | Murder through use of a firearm during a drug trafficking crime | Ledbetter, Harris, Liston, Ussury |

Each of the five Appellants was sentenced to, *inter alia*, one or more mandatory sentences of life pursuant to 18 U.S.C. § 1959. (R.

12

1472, Robinson judgment, 14735-41; R. 1474, Ussury judgment, 14746-52; R. 1478, Ledbetter judgment, 14759-65; R. 1480, Liston judgment, 14770-76; R. 1482, Harris judgment, 14781-87; R. 1493, Harris amended judgment, 14805-11.)

C. *Trial Evidence*

1. The Short North Posse and its Associates

At trial, the United States presented testimony by over a hundred witnesses, including law enforcement, victims, and members and associates of the Short North Posse.

Evidence showed that during the time of the charged offenses, the enterprise was engaged in buying, selling, and distributing narcotics including cocaine base and marijuana. (R. 1115, trial tr., 9007-08, 9011-12 (Patterson); R. 1082, trial tr., 8004 (Slaughter); R. 1074, trial tr., 5827 (Wright).). The income of group members, and the group's violent image, was supplemented through robberies, often accompanied by the use of firearms. (R. 1115, trial tr., 9013-32 (Patterson); R. 1074, trial tr., 5827-28 (Wright).)  Short North Posse members and associates frequently traveled outside the Short North neighborhood to find

robbery targets. (R. 1123, trial tr., 10955-65, 10984 (Williams); R. 1115, trial tr., 9016-17 (Patterson); R. 1074, trial tr., 5850, 5859-60 (Wright).)

The SNP had an informal structure. Some members had mentor-mentee type relationships: members would refer to having "sons" in the Short North Posse, or a newer member being "up under" a more experienced member. (R. 1082, trial tr., 8005-06 (Slaughter); R. 1115, trial tr., 8988-89 (Patterson).) The Short North Posse also had associates who were not themselves members but regularly associated with members and participated in the group's activities. (R. 1074, trial tr., 5832-33, 5906, 5938-41 (Wright); R. 1119, trial tr., 9957-58 (Jones); *see generally* R. 1074, trial tr., 6075-76 (Caffey).) Certain members and associates were at times relied on for particular roles. (R. 1115, trial tr., 9063 (Patterson); R. 1081, trial tr., 7916-17 (Ward)).

Members were expected to provide support when other members were in trouble. Financial assistance was sometimes required to help members who were in jail.  (*See* R. 1119, trial tr., 10235-39 (Cooper).) Andre Brown testified that he had fired off a gun to disrupt a jury view in a fellow Short North member's trial. (R. 1122, trial testimony, 10782-83 (Brown).) Troy Patterson recounted that a Short North member had

14

at one time fallen short in his responsibility for making sure witnesses didn't show up to court. (R. 1115, trial tr., 8998 (Patterson).)

Most members of the Short North Posse lived in or had other connections to the Short North neighborhood, which was the enterprise's primary base of operation. (R. 1082, trial tr., 7998, 8003, 8062-63 (Slaughter); R. 1120, trial tr., 10253 (Cooper); R. 1118, trial tr., 9817 (Weir); R. 1119, trial tr., 9952-53 (Jones).) The geographic hub of the group was Fourth Street and Eighth Avenue, and group members were sometimes identified with "Fourth Street." (R. 1118, trial tr., 9779, 9836, 9838 (Weir); R. 1075, trial tr., 6137, 6140-41(Haley); R. 1079, trial tr., 7242-43 (Nguyen); R. 1079, trial tr., 7345-46 (Canter); R. 1123, trial tr., 10968, 10977 (Williams).) The Short North Posse identified nationally with the "Crips" street gang. (R. 1074, trial tr., 5800-04 (Wright); R. 1075, trial tr., 6140, 6144 (Haley); R. 1079, trial tr., 7224 (Nguyen); R. 1118, trial tr., 9778, 9842 (Weir); R. 1119, trial tr., 10086 (Jones); R. 1120, trial tr., 10242 (Cooper).)

SNP had a reputation of being dangerous. (R. 1082, trial tr., 8003-04 (Slaughter).) Consistent with that reputation, members and associates responded with violence and intimidation against individuals

who intruded on their territory or who committed acts of violence or disrespect against them or against other members and associates or their families. (*Id.*; R. 1074, trial tr., 5878-79, 5896-97, 5899 (Wright); R. 1115, trial tr., 9017-22 (Patterson); R. 1119, trial tr., 9971, 9975 (Jones).)

Over time, affiliations within the enterprise evolved—some people began to identify as members of sub-groups called "Cut Throat Committee" and "Homicide Squad." (R. 1115, trial tr., 8980-81 (Patterson); R. 1074, trial tr., 5831 (Wright); R. 1082, trial tr., 8002-03 (Slaughter); R. 1122, trial tr., 10751 (Brown); R. 1118, trial tr., 9832-33 (Weir).) These subgroups specialized in murders and robberies of rival gangs, other drug dealers, and targets thought to have large sums of cash or drugs. (R. 1115, trial tr., 8982, 8984 (Patterson); R. 1074, trial tr., 5864-5873 (Wright); R. 1079, trial tr., 7351 (Canter).) Members and associates involved would divide the narcotics and currency obtained during robberies and home invasions. (R. 1123, trial tr., 10957, 10997 (Williams); R. 1074, trial tr., 5862-63 (Wright); R. 1119, trial tr., 9978-79, 10090 (Jones).)  A member who provided a lead on a robbery target

could receive a cut of the proceeds.  (R. 1123, trial tr., 10957 (Williams); R. 1115, trial tr., 9040-41 (Patterson).)

The Homicide Squad consisted primarily of younger SNP members. (R. 1123, trial tr., 10977 (Williams); R. 1082, trial tr., 8002-03 (Slaughter).) Witnesses identified Ledbetter, Liston, Harris, and Ussury as members or associates of the Homicide Squad. (R. 1115, trial tr., 8982 (Patterson); R. 1074, trial tr., 5905-06 (Wright); R. 1120, trial tr., 10242 (Cooper); R. 1122, trial tr., 10752 (Brown); R. 1079, trial tr., 7238-39 (Nguyen); R. 1119, trial tr., 9957-58, 10152 (Jones).)

The jury was presented with a variety of evidence confirming the enterprise's existence and membership. Evidence included photos of neighborhood graffiti referencing the Short North and its subgroups. (R. 1074, trial tr., 5811, 5816, 5829, 5843-44 (Wright); R. 1075, trial tr. 6140-6146 (Haley); R. 1074, trial tr., 6092-93 (Caffey); R. 1604, notice, 19270 (Exh. 1-2-27), 19271 (Exh. 1-2-45), 19272 (Exh. 1-2-56), 19273 (Exh. 1-2-57).) The jury heard testimony regarding various gang hand signs. (R. 1115, trial tr., 8985, 8995 (Patterson) (H hand sign for Homicide Squad); (R.1074, trial tr., 5820-21 (Wright) (4 hand sign for Fourth Street, C hand sign for Cut Throat); (R. 1118, trial tr., 9777-79

17

(Weir) (Rollin 20s Crips, Fourth Street); R. 1079, trial tr., 7239

(Nguyen) (4 hand sign); R. 1079, trial tr., 7347 (Canter) (4 for Fourth

Street; single finger as a directional compass indicating "North").)

Photos showed defendants and their companions "throwing" hand signs.

(R. 1074, trial tr., 5933 (Wright); R. 1604, notice, 19274 (Exh. 1-2-65

(Harris)), 19275 (Exh. 1-2-66 (Liston)), 19276 (Exh. 1-2-79 (Harris and

Liston)), 19279 (Exh. 1-2-112 (Ledbetter)), 19268 (Exh. 1-2-15

(Ussury)).) Other photos showed group members posing together with

large amounts of cash. (*See* R. 1604, notice, 19269 (Exh. 1-2-18 (Harris

and Liston)), 19275 (Exh. 1-2-66 (Liston)), 19276 (Exh. 1-2-79 (Harris

and Liston)), 19277 (Exh. 1-2-100 (Harris, Liston, and Ussury)), 19278

(Exh. 1-2-107 (Ussury)); *see also* R. 1074, trial tr., 5936 (Wright); R.

1118, trial tr., 9790, 9799-9801(Weir).) Trial evidence also revealed that

SNP members and associates were in one other's telephone contact

lists. (R. 1122, trial tr., 10875-10906 (Gill).)

Many group members had tattoos signifying their affiliation with

the Short North and Homicide Squad. (R. 1116, trial tr., 9367-68

(Patterson) (Ledbetter had "Short North" and "Killer B" tattooed on his

chest); R. 1604, notice, 19280-19287 (Exh. 1-5-1 through 1-5-8) (photos

showing Chris Harris's tattoos, including a "Short North" tattoo on his hands); R. 1604, notice, 19293 (Exh. 1-6-6) (photo showing homicide poem tattooed on Rashad Liston's arm); R. 1074, trial tr., 5803, 5809 (witness Allen Wright describing his "Short North," "Crip," and "Homicide" tattoos); R. 1115, trial tr., 8984-85 (witness Troy Patterson testifying that he had "Short North" tattooed on his stomach, and "HM" for "Homicide" tattooed on his neck, along with the street names of other SNP members including Harris and Liston); R. 1119, trial tr., 9952, 9958, 10183 (witness Anthony Jones testifying that he had tattoos of Homicide Squad and names of other participants including Harris, Patterson, and Liston); *see also* R. 1125, trial tr., 11686.)

Evidence revealed that the enterprise had a strong "no-snitching" code. Witnesses testified that there was an understanding that if people within the group talk to the police or testify, they get "dealt with." (R. 1074, trial tr., 5918 (Wright); *accord* R. 1076, trial tr., 6459 (Murphy); R. 1077, trial tr., 6788 (White) ("Snitches get stiches."); *see also* R. 1125, trial tr., 11610 (Lauber).) In fact, several witnesses testified regarding the killing of a Short North member, Nutty, who "told on" other SNP members regarding a murder. (R. 1074, trial tr., 5917-18, 5954

19

(Wright); R. 1115, trial tr., 9109-10 (Patterson); R. 1119, trial tr., 10013-14 (Jones); R. 1120, trial tr., 10240-41 (Cooper); R. 1123, trial tr., 11020 (Williams).) Allen Wright explained that he had himself arranged for someone to get "beat up, fucked up, or something" while in prison because the person was suspected of snitching on other SNP members. (R. 1074, trial tr., 5926-27 (Wright).) Samantha Murphy explained her failure to report various crimes she was aware of by observing that snitches "get hurt," "get killed," or "family gets hurt." (R. 1076, trial tr., 6552 (Murphy).) And the jury heard a variety of evidence regarding the charged killing of Crystal Fyffe directed by her long-time boyfriend Ledbetter (at issue in Counts 29, 30, and 31) after it was suspected she was cooperating with law enforcement. *See post* at 58-62.

### 2.  Evidence of Acts other than the Charged Murders

In addition to several murders that were charged not only as part of the Count 1 RICO conspiracy but in separate counts (which are discussed below), the jury heard abundant evidence regarding other

alleged acts of the conspiracy, including the following acts directly

involving one or more of Appellants herein:

- In 2006, in the area of Joyce Park in Columbus, members of

    SNP engaged in a shootout with members of another gang, D-

    Block. (R. 1081, trial tr., 7955-7962 (Jenkins); R. 1119, trial tr.,

    10075 (Patterson).) Over a hundred rounds were fired. (R.

    1077, trial tr., 6662 (Burton).) Several people were shot and

    wounded. (R. 1081, trial tr., 7960-62 (Jenkins).) Ussury's

    fingerprint was found on the magazine of a .40 caliber Smith

    and Wesson found in the neighborhood. (R. 1125, trial tr.,

    11597-98 (Lauber); R. 1118, trial tr., 9905 (Lawson).) Shell

    casings found at the scene matched that weapon. (R. 1125,

    trial tr., 11597-98; *see* R. 300, superseding indictment, 1165

    (overt act 31).)

- In 2007, Rashad Liston and two other SNP members or

    associates confronted Quincy White on a street in the Short

    North. When White tried to walk away, he was shot in the

    thigh. (R. 1077, trial tr., 6769-71, 6776-77, 6793 (White); R.

1115, trial tr., 9017-18 (Patterson); *see* R. 300, superseding

indictment, 1166 (overt act 35).)

- In 2007, Harris used a .9mm firearm to shoot into a car

  belonging to a Short North resident with whom he had an

  earlier confrontation. (R. 1078, trial tr., 7151-55 (Turner); R.

  1075, trial tr., 6107-09 (Robison); *see* R. 300, superseding

  indictment, 1166 (overt act 36).)

- In 2007, the same .9mm firearm was used to fire shots at a

  man in his home during a robbery by three men in hoodies. (R.

  1125, trial tr., 11598 (Lauber); R. 1078, trial tr., 7078-80

  (Parnell).) The victim, an elderly man who sold liquor out of

  his residence, was critically injured. (R. 1080, trial tr., 7501-04

  (O'Connor); R. 1077, trial tr., 6833-6840 (Bruce); *see* R. 300,

  superseding indictment, 1166 (overt act 38).)

- In 2007, Harris attempted to murder a rival gang member by

  shooting him with a firearm. (R. 1115, trial tr., 9021-22

(Patterson); *see* R. 300, superseding indictment, 1167 (overt act 39).)

- In 2007, Harris shot at a restaurant owner and shot out the windows of the restaurant because the owner had confronted SNP members loitering outside his business. (R. 1115, trial tr., 9053-54 (Patterson); *see also* R. 1116, trial tr., 9432-34 (Chapman); R. 1125, trial tr., 11599 (Lauber); *see* R. 300, superseding indictment, 1167 (overt act 40).)

- In 2007, Liston and another man used a firearm to rob Gregory Gray on a street in the Short North after he inquired about a marijuana purchase. (R. 1116, trial tr., 9404-07 (Gray).) Liston pled guilty to robbery. (R. 1116, trial tr., 9410 (stipulation); *see* R. 300, superseding indictment, 1167 (overt act 41).)

- In 2008, Harris, together with other SNP members and associates, conducted a home invasion in Canal Winchester, Ohio. (R. 1115, trial tr., 9095-104 (Patterson); R. 1122, trial tr., 10760-63 (Brown).) The victim was chosen because he was known to have a lot of money and drugs. (R. 1115, trial tr., 9096.) The men shot at a male occupant, and they cut a female

23

occupant's hair and placed a gun on her vagina as a "torture

tactic" because she would not tell them where any money was.

(R. 1115, trial tr., 9095-104 (Patterson).) Harris was arrested

after the incident while fleeing on foot. (R. 1122, trial tr.,

10764-65 (Brown); R. 1115, trial tr., 9101-02 (Patterson); *see* R.

300, superseding indictment, 1170 (overt act 58).)

- In 2008, Liston and other SNP members or associates

  approached Anthony Hackney on the street and asked him for

  money to assist Harris (who had recently been arrested) in

  getting out of jail. (R. 1120, trial tr., 10235-36 (Cooper).)

  Hackney refused, and he was shot and killed later that day.

  (*Id.* at 10237-39.) Liston pled guilty to involuntary

  manslaughter in state court. (R. 1119, trial tr., 10214

  (stipulation); *see* R. 300, superseding indictment, 1170 (overt

  act 59).)

- In 2008, Ledbetter offered SNP associate Earl Williams

  $50,000 to kill Andre Brown after learning Brown had planned

  to rob Ledbetter's house. (R. 1123, trial tr., 11005-06

  (Williams).) Williams attempted to carry out the murder, but

24

was shot multiple times by Brown. (*Id*. at 11007-15; R. 1122, trial tr., 10777 (Brown).) Taron Colvin and Chad Ayers were killed during the incident. (R. 1080, trial tr., 7445 (Jackson); *see also* (R. 1117, trial tr., 9609-13 (Griffin); *see* R. 300, superseding indictment, 1171 (overt act 60).)

- In 2010, a traffic stop was initiated in which Ussury was a passenger. (R. 1116, trial tr., 9440-41 (Bare).) When the officer attempted to conduct a search of Ussury, he pushed away from the officer and fled on foot. (*Id*. at 9441.) He was eventually placed into custody, and officers recovered from his person cocaine and a pistol loaded with a fourteen-round magazine. (*Id*.) Ussury pled guilty and was convicted of possession with intent to distribute cocaine and carrying a firearm in relation to a drug trafficking crime. (*Id*. at 9449 (stipulation); *see* R. 300, superseding indictment, 1173 (overt act 73).)

- In 2011, Ledbetter fled from police near the intersection of Goodale Street and North High Street in Columbus, breaking off the drop arm at a parking lot in the process. (R. 1120, trial tr., 10299-10307 (David); R. 1120, trial tr., 10268-84 (Truax).

25

He pled guilty to felony fleeing. (*Id.* at 10285.) A firearm was found on the side of the road in the vicinity of the incident. (R. 1120, trial tr., 10321 (Jones); *see* R. 300, superseding indictment, 1174 (overt act 77).)

- In 2011, the DEA in Columbus, Ohio, was informed that a member of a drug trafficking organization in Mexico had given an undercover agent 960 kilograms of marijuana for delivery to the Columbus, Ohio area. (R. 1122, trial tr., 10707 (Reagan).) DEA transported the marijuana to Columbus to complete a controlled delivery. (*Id.* at 10708.) Ledbetter arrived at the arranged meeting place and took control of the delivery. (*Id.* at 10709-10.) After fleeing, he was apprehended and arrested by DEA agents and pled guilty to federal drug offenses. (*Id.* at 10710-11; *id.* at 10722, 10724-25 (Thissen); *see* R. 300, superseding indictment, 1174) (overt act 78).)

### 3. The Charged Murders

At trial, the government's witnesses provided evidence regarding the following eight murders for which one or more of Appellants herein were charged[5]:

> a. Murder of Alan Johnson, April 16, 2006 (Count 4, Ledbetter)

In early 2006, SNP member Elijah Ledbetter, Appellant Ledbetter's brother, was murdered. (R. 1123, trial tr., 10975 (Williams); R. 1082, trial tr., 8011-12 (Slaughter); R. 1115, trial tr., 9004 (Patterson); R. 1074, trial tr., 5908-09, 5911 (Wright); R. 1076, trial tr., 6471 (Murphy).) It was believed in the neighborhood that Alan Johnson was responsible. (R. 1082, trial tr., 8010 (Slaughter); R. 1115, trial tr., 9003-04 (Patterson).) Two weeks later, Ledbetter, Harris,[6] Marcus Peters (now deceased), and cooperating witness Anthony Jones traveled to a residence where Alan Johnson was thought to be present. (R. 1119, trial tr., 9965-71 (Jones); R. 1123, trial tr., 10975 (Williams).) Peters

---

[5] This section provides a summary of each of the eight murders for which one or more Appellants were charged and convicted. For the counts as to which a sufficiency of the evidence challenge is raised on appeal, additional facts are detailed in the relevant Argument sections.
[6] While the trial evidence indicated Harris's participation in this offense, Harris was not charged in this Count.

and Harris went inside and shot Alan Johnson while Ledbetter stood at the door. (R. 1082, trial tr., 8011-12 (Slaughter); R. 1115, trial tr., 9006 (Patterson); R. 1074, trial tr., 5910 (Wright); (R. 1119, trial tr., 9965-71 (Jones).)

  b. Murder of Marschell Brumfield, Jr., April 22, 2007 (Joined Counts 1 and 2, Ledbetter, Harris, Liston, Ussury)

After seeing Marschell Brumfield participate in a large-scale drug deal, Ledbetter followed him and observed where he lived. (R. 1115, trial tr., 9052 (Patterson).) Later, Ledbetter arranged a robbery at that location. (*Id.* at 9046, 9052.) Ledbetter met up with Harris, Ussury, Liston, codefendant Troy Patterson, and an unindicted coconspirator. (*Id.* at 9045-46.) Ledbetter directed the others to the location. (*Id.* at 9046, 48.) Harris and Patterson knocked on the door. (*Id.* at 9046.) Liston and Ussury saw Brumfield coming and escorted him to the apartment at gunpoint. (*Id.* at 9049.) Liston smacked the victim on the head with his gun and instructed the victim to strip. (*Id.* at 9049-50.) Brumfield stated, "If you all going to kill me, kill me." (*Id.* at 9050.) After Brumfield took a swing at Liston, Liston and Ussury shot Brumfield. (*Id.*)

c. Murder of Donathan Moon, August 19, 2007 (Counts 5 and 6, Harris and Robinson)

Greg Cunningham ran a business, Tap Out Entertainment, that provided exotic dancers for clubs and private parties. (R. 1082, trial tr., 8070-71 (Cunningham).) Cunningham often had large amounts of cash, sometimes carrying up to $2,500 in one dollar bills in order to give change for dancers' "tips." (R. 1082, trial tr., 8073, 8092 (Cunningham).) In addition to supplying dancers for clubs and third-party locations, Cunningham had outfitted his home as a venue he made available for private parties, complete with pool table, bar, hot tub, an extensive camera system, and poles for dancers. (R. 1082, trial tr., 8072, 8075, 8104 (Cunningham); *see also* R. 1082, trial tr., 8189 (Steele).)

In August 2007, Cunningham hosted a party for 60-70 guests in this venue at his east Columbus home. (R. 1082, trial tr., 8074-75 (Cunningham); R. 1082, trial tr., 8186-87 (Steele).)  The party continued well into the early morning hours. (R. 1082, trial tr., 8075 (Cunningham).)

The next evening, Harris, Robinson and others conducted an armed invasion of the residence. Harris broke down the door. (R. 1081, trial tr., 7919 (Ward).) A dancer's boyfriend, Donathan Moon, was in

29

one of the bedrooms. (R. 1082, trial tr., 8194-95 (Steele).) He saw the

men coming and shut the door from the bedroom to the hallway. (*Id.* at

8195.) Robinson fired three rounds from the AK-47 through the door

that Moon had closed. (R. 1081, trial tr., 7919 (Ward); R. 1081, trial tr.,

7845-49 (Hatfield).)  Codefendant R.J. Wilson followed up by going into

the bedroom Donathan Moon had entered and shooting and killing him

with a .45 handgun. (R. 1081, trial tr., 7920 (Ward); R. 1081, trial tr.,

7845-46, 52 (Hatfield); *see also* R. 1119, trial tr., 9991 (Jones); R. 1115,

trial tr., 9032-33 (Patterson).) Robinson, Harris and the others looked

through the house but did not locate the cash they were hoping for. (R.

1081, trial tr., 7921 (Ward).)

> ### d. Murder of Dante Hill, December 12, 2007 (Count 11, Ussury)

Dante Hill, his girlfriend, and an infant child traveled to the

residence of Tabby Broomfield in Columbus to buy marijuana after Hill

and Broomfield spoke by telephone. (R. 1078, trial tr., 6992

(Broomfield); *see also* R. 1079, trial tr., 7324-26 (Martin).) Broomfield

had also been in touch with Ussury by telephone, arranging for him to

come handle the drug deal, as Broomfield was out of marijuana. (R.

1078, trial tr., 6993-95 (Broomfield); *see* R. 1604, notice, 19303 (Exh. 49-

12 at 7); R. 1125, trial tr., 11508-12 (Moledor).) At Broomfield's

residence, Hill walked between a car and the house and disappeared

from his girlfriend's view. (R. 1079, trial tr., 7329 (Martin).)  Almost

immediately, his girlfriend saw Hill running back toward the vehicle

followed by another man. (*Id*. at 7329-31.) The men struggled, Hill's

girlfriend heard a "thud," and Hill fell to the ground. (*Id*. at 7329-30.)

Then the other man ran across the street and fled in a vehicle. (*Id*. at

7331.) Hill had been shot in the chest. (*Id*. at 7332.)

Broomfield, who had been down the block at a neighbor's, went to

the Short North to speak with Ussury after the fact about what

happened, and Ussury indicated that "everything went bad." (R. 1078,

trial tr., 7010 (Broomfield).)

> e.  Murder of Marcus Peters, October 6, 2007 (Counts 7 and 8,
>     Harris and Ussury)

Harris, Ussury, and Marcus Peters traveled to Bridgestone Drive

in Columbus to break into a drug dealer's residence. (R. 1115, trial tr.,

9066-68 (Patterson); R. 1123, trial tr., 10980 (Williams); *see also* R.

1125, trial tr., 11502 (Moledor) (discussing cell phone tower locations);

R. 1116, trial tr., 9419 (Jones) (resident a drug dealer).) The resident's

nephew returned and attempted to open the door while the men were

31

inside. (R. 1118, trial tr., 9745 (McNeil); R. 1116, trial tr., 9411-12 (Jones).) Peters held the door closed and fired through it, whereupon the resident's nephew fled. (R. 1118, trial tr., 9745, 9751 (McNeil); R. 1116, trial tr., 9412-14 (Jones); *see also* R. 1082, trial tr., 8229-8230 (Goudy).) Harris and Ussury began shooting in the direction of the front door, killing their cohort Marcus Peters. (R. 1123, trial tr., 10980 (Williams); R. 1115, trial tr., 9065-67 (Patterson); *see* R. 1079, trial tr., 7420-25 (Jackson); R. 1125, trial tr., 11599 (Lauber).) Harris and Ussury left Marcus Peters at the scene. (R. 1079, trial tr., 7420-25 (Jackson); R. 1082, trial tr., 8229 (Goudy).)

> f.  Murder of Rodriccos Williams, November 3, 2007 (Counts 9 and 10, Ledbetter, Harris, Liston)

In November 2007, Ledbetter contacted cooperating witness Earl Williams and asked for help with a robbery. (R. 1123, trial tr., 10982-84, 11130 (Williams).) Ledbetter, Harris, Liston, codefendant R.J. Wilson, and Earl Williams met at Ledbetter's aunt's house. (*Id.* at 10984.) The five men dressed in black, with ski masks and gloves, and traveled in a rental car to the Pickerington, Ohio, residence of Rodriccos Williams, a large-scale marijuana dealer. (*Id.* at 10985.) Ledbetter had been on the phone with his former girlfriend Latonia—then the wife of Rodriccos

32

Williams—and determined that Williams was not home. (*Id*. at 10986; *see also* R. 1080, trial tr., 7538-7541 (Boyce).)

When Rodriccos Williams approached the front door, several of the men attacked him and entered the house. (*Id*. at 10988; R. 1080, trial tr., 7543-44 (Boyce).) Rodriccos attempted to flee, and was shot. (R. 1080, trial tr., 7684 (Boyce); *see also* R. 1078, trial tr., 7097-7104 (Vacca); R. 1123, trial tr., 10995 (Williams).)

The men went back to Ledbetter's aunt's house and split up the robbery proceeds, including about $60,000 in cash and a small amount of marijuana. (*Id*. at 10996-98.) R.J. Wilson had also taken the man's jewelry, including a necklace engraved with his initials. (*Id*. at 10997.) A week later, Ledbetter asked Earl Williams to kill R.J. Wilson because he was indiscreetly wearing that engraved necklace. (*Id*. at 10998, 11020.)

g. Murder of Tyrell Davis, April 25, 2008 (Counts 15 and 16, Liston)

Liston, codefendant Troy Patterson, codefendant R.J. Wilson, and cooperating witness Anthony Jones went to Tyrell Davis's apartment for the stated purpose of buying marijuana. (R. 1119, trial tr., 9999-10003 (Jones); R. 1115, trial tr., 9084-95 (Patterson).) In fact, they

33

planned to rob Davis of his money and drugs. (R. 1119, trial tr., 9999 (Jones); R. 1115, trial tr., 9084 (Patterson).) All four men had firearms. (R. 1119, trial tr., 10004 (Jones); R. 1115, trial tr., 9090-91 (Patterson).) Davis was not home when they arrived so they waited outside with another of Davis's marijuana customers. (R. 1119, trial tr., 10003 (Jones); R. 1115, trial tr., 9087-88 (Patterson); R. 1117, trial tr., 9572 (Summerville).)

Eventually, Davis returned and all of the men entered. (R. 1119, trial tr., 10003-04 (Jones); R. 1115, trial tr., 9087-90 (Patterson); R. 1117, trial tr., 9573 (Summerville).) Liston and his companions waited until the other customer left. (R. 1119, trial tr., 10003-04 (Jones); R. 1115, trial tr., 9087-88 (Patterson); R. 1117, trial tr., 9575 (Summerville).)

As soon as he did, they pulled out their firearms and Liston, Jones, and Patterson all shot at Davis. (R. 1115, trial tr., 9090-91 (Patterson); *see also* R. 1119, trial tr., 10004-05 (Jones); R. 1117, trial tr., 9576 (Summerville); R. 1083, trial tr., 8405-06 (Carmichael).) Jones, at least, was motivated in part by a belief that Davis had previously set up the killing of another Short North member. (R. 1119, trial tr., 9997

34

(Jones).) The men then drove the rental vehicle they had used to R.J.'s sister's residence to be cleaned up. (R. 1119, trial tr., 10005-07 (Jones); R. 1115, trial tr., 9094 (Patterson); R. 1117, trial tr., 9552-54 (Patterson); *see also* R. 1117, trial tr., 9503-05 (Patterson).) They collected and hid the firearms used in the shooting so that they could later be destroyed. (R. 1119, trial tr., 10005-07 (Jones); R. 1115, trial tr., 9094 (Patterson).)

> h. Murder of Crystal Fyffe, October 19, 2011 (Counts 29, 30, and 31, Ledbetter)

Crystal Fyffe was Ledbetter's longtime girlfriend, and there was a history of domestic violence between the two, including Ledbetter shooting Fyffe in the hand in 2009 and sending her threatening text messages. (R. 1123, trial tr., 11043 (Williams); R. 1125, trial tr., 11617-35 (Lauber); R. 1604, notice, 19333 (Exh. 84-13 at 301).) In 2011, Crystal Fyffe had been questioned by law enforcement regarding the murder of Rodriccos Williams, for which Ledbetter was a suspect. (R. 1121, trial tr., 10538 (Palmer).)

Ledbetter, who was incarcerated for another offense, told a coconspirator that Crystal "had to go" because she was cooperating. (R. 1115, trial tr., 9079-80 (Patterson).) A letter from Ledbetter to Fyffe

reflects his belief that she was "throw[ing him] to the wolves," and contains both express and veiled threats on her life. (R. 1125, trial tr., 11635-38 (Lauber).) After expressing to both her mother and her attorney that she was afraid Ledbetter was going to have her killed (R. 1121, trial tr., 10536-42 (Palmer); *id.* at 10660-66 (Fyffe)), Fyffe was shot in the back of the head outside her home while returning to the residence with a pizza in the early evening. (R. 1121, trial tr., 10479-80 (Maclellan); *id.* at 10669-70 (Fyffe).) Although she had keys and phones on her person, they were not taken. (R. 1121, trial tr., 10481, 10485 (Maclellan).)

## SUMMARY OF THE ARGUMENT

(**Issue I**)  Sufficient evidence supported Ledbetter's convictions for Counts 1, 4, 9, 10, 29, 30, 31, and Joined Counts 1 and 2.  The trial evidence placed Ledbetter at the center of the RICO conspiracy charged in Count 1.  And there was more than sufficient evidence to permit a rational jury to conclude that he committed each of the offenses charged in connection with the murders of Alan Johnson (Count 4), Rodriccos Williams (Counts 9 and 10), Crystal Fyffe (Counts 29, 30, and 31) and Marschell Brumfield (Joined Counts 1 and 2).

(**Issue IIa**) Sufficient evidence supported Ussury's conviction in Count 11 for the murder of Dante Hill in aid of racketeering in violation of 18 U.S.C. § 1959(a).  First, there was sufficient evidence that Ussury committed the murder.  Homeowner Tabib Broomfield testified that he had arranged a drug transaction between Ussury and Dante Hill at his home, and arrived home to find Hill dead in his driveway.  When he confronted Ussury after the fact, Ussury said things "went bad."  Consistent with that, two cooperating witnesses testified that Ussury told them after the fact that he had ended up shooting his would-be

37

customer.  Ussury's travel to and from the area at the relevant time was also confirmed by phone location data.

**(Issue IIb)** There was also sufficient evidence to support the jury's conclusion that the purpose element of § 1959(a) was satisfied as to the Hill murder. The jury could certainly have concluded that Ussury had a purpose of obtaining "pecuniary value," *see* § 1959(a)(1), as the evidence supported a conclusion that the killing resulted from a robbery gone bad.  Moreover, given that such robberies of drug-related targets were the stock in trade of the Homicide Squad, of which Ussury was a part, the jury could have concluded that the hoped for pecuniary value represented "pecuniary value from an enterprise engaged in racketeering activity."  § 1959(a)(1). In addition, particularly given the evidence that violence was part of the SNP's (and Ussury's) culture and that Ussury related the offense to other SNP members and associates after the fact, the jury could also have rationally concluded that Ussury committed the offense for the alternative purpose of "maintaining or increasing his position in an enterprise engaged in racketeering activity." § 1959(a)(1).

38

**(Issue III)**  The evidence was similarly sufficient to show that the § 1959(a) purpose requirement was met as to Harris's and Robinson's Count 5 convictions for the murder of Donathan Moon.  The evidence supported a conclusion that both Harris and Robinson conspired to commit the robbery leading to Moon's death as consideration for something of "pecuniary value"—a share of the anticipated proceeds. And given evidence that two Homicide Squad members (Harris and R.J. Wilson) were enlisted to effectuate the offense (which was just the type of violent robbery of a cash-rich target that Homicide Squad was known for), the jury could also have rationally concluded that the anticipated proceeds represented pecuniary value "from [the] enterprise." In addition, as to Harris, the jury could alternatively have concluded that he committed the offense to maintain or increase his position in the enterprise, in which he was a violent repeat player.

**(Issue IV)**  The jury convicted Harris and Robinson in Count 6 of murdering Donathan Moon during and in relation to a conspiracy to commit Hobbs Act robbery.  The evidence was sufficient to support the interstate-commerce nexus for the predicate Hobbs Act conspiracy.  The target of the robbery was an in-home commercial entertainment venue

used to host parties featuring exotic dancers.  "Tap Out
Entertainment"'s use of out-of-state dancers, and its service of out-of-
state customers, satisfies the de minimis standard necessary to
demonstrate interstate nexus under the Hobbs Act.  The *Wang*
standard applicable to robberies of "private citizens in a private
residence" does not apply here given that this location was not simply a
"private residence," but a commercial entertainment venue.  Moreover,
even applying *Wang*, the necessary nexus was present given that the
conspirators targeted the location because they knew the intended
victim "owned a strip club."

**(Issue V)**  Robinson incorrectly argues that there was insufficient
evidence that he was the same "Tink" involved in the Donathan Moon
murder (Counts 5 and 6).  Robinson was identified in court as "that
Tink" by David Hurt (another participant in Moon offense), as well as
Ashley Ward (the girlfriend of a now-deceased participant).  Those in-
court identifications were supported by a variety of other evidence,
including the fact that when initially questioned by law enforcement in
2012, Hurt not only described "Tink's" participation in the offense but

described where "Tink's" mother lived—which location proved to match the residence of Robinson's mother.

**(Issue VI)**  Citing *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), Harris and Robinson raise a vagueness challenge to the residual clause of 18 U.S.C. § 924(c)(3)(B), and thus their convictions on Count 6.  This Court previously upheld the residual clause against a vagueness challenge in *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016). Although *Dimaya*—which addressed not § 924(c) but 18 U.S.C. § 16(b)— rejects certain aspects of the reasoning of that decision, *Taylor*'s conclusion remains correct. As suggested by *Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016), unlike § 16(b), § 924(c)(3)(B) should be interpreted as making the classification of an offense as a crime of violence turn on a case-specific approach, not a categorical approach. That interpretation is supported by the section's text, context, and function, as well as principles of constitutional avoidance.  Although the district court did not instruct the jury as necessary under a case-specific approach, that omission was harmless given the facts of the Count 6 offense.

**(Issue VII)**  The district court did not err in denying Ledbetter's motion to suppress evidence obtained from a warrantless traffic stop.

The district court correctly concluded that the challenged patdown was lawful based on the totality of the circumstances, including Ledbetter's failure to immediately pull over when signaled and his nervous behavior and furtive movements.  Moreover, the evidence obtained as a result of the stop played a minimal role in a lengthy trial, such that any error in the denial of suppression was harmless.

(Issue VIII)  The district court did not err in denying Ussury's and Robinson's motions for severance.  The district court correctly rejected Ussury's Rule 8 challenge, concluding that joinder of defendants was proper under Rule 8(b) because the five defendants tried together (Appellants here) were alleged to have committed at least one murder in furtherance of the same racketeering enterprise.  And the court did not abuse its discretion in denying severance under Rule 14.  Given that each defendant was charged with murder in aid of the same racketeering enterprise, the crimes of each codefendant were relevant to all defendants.  In addition, both Robinson and Ussury were charged with murders together with other codefendants, so that identical evidence of those murders would have been required in separate trials.

**(Issue IX)**  The district court did not err, much less plainly err, in permitting testimony by Detective Caffey and Lieutenant Weir regarding gangs.  Testimony regarding gang culture is an appropriate topic of expert opinion, and Detective Caffey's qualifications were obvious, and there was no preserved objection on that score.  While Appellants note that they did not have the opportunity to voir dire Detective Caffey, no such opportunity was requested. There was also no objection to any of Lieutenant Weir's testimony as improper opinion, and for good reason:  his testimony regarding gangs was fact testimony based on his investigation in this case; to the extent it included opinion testimony, it was permissible lay opinion based on his investigation.

**(Issue X)** The district court did not err in denying a mistrial based on testimony relating to Ledbetter's defense attorney.  The primary argument for mistrial was based on nonresponsive testimony by a government witness on cross examination.  The testimony was stricken and the district gave an appropriate curative instruction.  Neither this stricken testimony nor other testimony cited provided a basis for mistrial.

**(Issue XI)**  The district court did not abuse its discretion by allowing evidence of Liston's visible tattoos.  Liston claims the evidence should have been excluded as unduly prejudicial.  This Court has recognized, however, that gang tattoos can be highly probative, and Liston points to nothing about the tattoos that resulted in unfair prejudice.  Liston also argues that new trial is necessary based on the prosecutor's misdescription of testimony regarding his tattoos during closing argument.  Even if improper, however, the misdescription was isolated and unintentional, and the court appropriately instructed the jury to rely on its own collective recollection of the testimony.

**(Issue XII)**  Consistent with its standard practice, this Court should not address Ledbetter's ineffective assistance claim on direct appeal, as the record is not sufficiently developed.  Moreover, to the extent the record permits the claim to be addressed at this time, it fails: even assuming any of counsel's cited actions were deficient, Ledbetter cannot show prejudice.

**(Issue XIII)**  The verdict forms for Harris's, Liston's, and Ussury's murder in aid of racketeering counts did not plainly violate the due process right to unanimity. Because the district court instructed

44

jurors that they were required to unanimously agree on the VICAR motive under 18 U.S.C. § 1959, and because no authority requires the jury to identify the motive on a special verdict form, Appellants cannot show error, let alone plain error.

**(Issue XIV)**  Cumulative error did not render the trial fundamentally unfair.  First, the claims of trial error lack merit, so the argument fails at the outset.  Moreover, even if the court identified more than one error in this lengthy trial, given the strength of the evidence, reversal is unwarranted.

**(Issue XV)**  Ledbetter did not receive multiple punishments for the same conduct.  Each of the three sets of charges he points to satisfies the applicable *Blockburger* test.  His effort to evade that test is unfounded.

**(Issue XVI)** Ledbetter's sentence was procedurally reasonable. The district court did not err in applying a leadership enhancement under Guideline 3B1.1.  Moreover, any error in application of that enhancement would be harmless given the statutorily mandated life sentence.

# ARGUMENT

This brief groups the issues into three categories, addressed in the following order:  appellants' arguments pertaining to sufficiency of the evidence or the charged offenses, then arguments claiming pretrial or trial-related errors, then sentencing issues.

## Challenges to the Sufficiency of Evidence or Charged Offenses

In Parts I, II, III, IV, and V below, Appellants claim that the evidence was insufficient to support various counts of conviction. This Court reviews sufficiency of the evidence de novo. *United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005). The evidence is sufficient to support a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A defendant claiming insufficiency of the evidence "bears a very heavy burden." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).

I. **Sufficient evidence supported Ledbetter's convictions of Counts 1, 4, 9, 10, 29, 30, 31, and Joined Counts 1 and 2.** *(responding to Ledbetter's sixth issue)*

A. *The evidence supported Ledbetter's conviction for the RICO conspiracy (Count 1).*

Count 1 charged Ledbetter and others with a RICO conspiracy in violation of 18 U.S.C. § 1962(d). (R. 300, superseding indictment, 1159.) In particular, Count 1 alleged that the Short North Posse and its associates constituted an enterprise as defined in 18 U.S.C. 1961(1) and (5), and that the defendants conspired to violate 18 U.S.C. § 1962(c). (*Id.*)

Ledbetter argues that there was insufficient evidence to convict him on Count 1 because proof was lacking that he agreed to form a conspiracy. (Ledbetter Br. at 50-51.) A defendant's agreement to participate in a RICO conspiracy "may be inferred from his acts." *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006). The government "need not prove a formal agreement, because a tacit or mutual understanding among the parties is sufficient to show a conspiratorial agreement." *Id.* (quoting *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985)).

Here, Ledbetter challenges the jury's conclusion that he agreed to participate in the conspiracy by claiming he had "no presence in the Short North area" and that there was "no mention of Mr. Ledbetter doing street crimes." (Ledbetter Br. at 51.) In explanation, he notes that he was "large-scale drug dealer" such that street level crime "did not forward [his] agenda." (*Id.* at 53.) He asserts that "nothing substantive was presented" to show he was aware of the objectives of the enterprise or voluntarily associated with it. (*Id.* at 54.)

Contrary to Ledbetter's arguments, the trial evidence placed him at the center of the charged RICO conspiracy. To begin, despite Ledbetter's attempt on appeal to distance himself from the Short North, the jury saw evidence that Ledbetter had "Short North" tattooed on his chest. (R. 1116, trial tr., 9367-68 (Patterson).) And unfortunately for the Short North neighborhood, Ledbetter's relationship to the area was not just cosmetic. The evidence showed that Ledbetter was a primary supplier of drugs for others to sell in the Short North. (R. 1082, trial tr., 7985-86 (Slaughter); R. 1115, trial tr., 9010-13 (Patterson); *see also* R. 1122, trial tr., 10710-11 (Reagan); *id.* at 10722, 10724-25 (Thissen).)

48

He was also central to many of the enterprise's violent crimes, regularly recruiting other members and associates of the enterprise to commit murders and robberies. (R. 1123, trial tr., 10956-65, 10970, 10973, 10983-84, 10998, 11003, 11104, 11164-65 (Williams); R. 1115, trial tr., 8992, 9005, 9045-46, 9052, 9077-78 (Patterson).) Ledbetter often managed to stay on the periphery, while using others to do his bidding. (R. 1123, trial tr., 10970, 11104 (Williams); R. 1115, trial tr., 9005, 9037, 9048, 9077 (Patterson). He provided a profit to those members who committed the acts he directed, while also keeping a share of proceeds himself. (R. 1123, trial tr., 10956-58, 10962-63 (Williams); R. 1115, trial tr., 9005, 9040-41 (Patterson); *see also* R. 1119, trial tr., 9971 (Jones).) He directed retaliation for acts of violence against members of the Short North. (R. 1115, trial tr., 9004-06 (Patterson); R. 1076, trial tr., 6472 (Murphy).) And if the enterprise's activities were put at risk by bragging or "snitching," Ledbetter took action to stop it. (R. 1074, trial tr., 5926-27 (Wright); R. 1123, trial tr., 10978, 10998, 11017, 11020 (Williams).)

In sum, testimony of numerous witnesses made clear that while Ledbetter may have stayed clear of personal involvement in "street

level" crime, he was a driving force in the charged conspiracy. Indeed, as discussed in the following subsections, the evidence demonstrated Ledbetter's involvement in four murders connected to the enterprise. (*See* R. 300, superseding indictment, 1150; R. 1141, verdict, 12717-18, 12734, 12737, 12743-44, 12746, 12750.) In short, the jury had not only sufficient, but abundant evidence, to support their conclusion that Ledbetter agreed to be part of the RICO conspiracy charged in Count 1.

B. *The evidence supported Ledbetter's conviction for murder in aid of racketeering as to the death of Alan Johnson (Count 4).*

Count 4 alleged that Ledbetter committed the murder of Alan Johnson in aid of racketeering in violation of 18 U.S.C. § 1959.[7]

---

[7]  Section 1959(a)(1) provides that
"Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . or attempts or conspires to do so, shall be punished—(1) for murder, by death or life imprisonment . . . ."

Ledbetter argues only that there was insufficient evidence to demonstrate his involvement in the alleged murder.

In fact, his involvement in the killing was supported by a variety of evidence. First, numerous witnesses described the backdrop of the Alan Johnson murder: the murder of Ledbetter's brother, Elijah Ledbetter, approximately two weeks earlier, and the general belief that Alan Johnson was responsible. (R. 1115, trial tr., 9003-04 (Patterson); R. 1082, trial tr., 8009-10 (Slaughter); R. 1081, trial tr., 7796-97 (Fulton); R. 1074, trial tr., 5908 (Wright); R. 1076, trial tr., 6472 (Murphy); R. 1119, trial tr., 9959 (Jones).)

Second, several witnesses testified that Ledbetter was involved in Johnson's murder. Kenneth Slaughter testified that after Johnson was killed, Marcus Peters (now deceased) told him that Peters and Harris did the shooting and that they were accompanied by Ledbetter. (R. 1082, trial tr., 8011-12 (Slaughter).) Peters told Slaughter the shooting was in retaliation for the murder of Elijah Ledbetter. (*Id*. at 8012.)

Earl Williams also testified about the Alan Johnson murder and Ledbetter's involvement. Like Slaughter, Williams had spoken with Marcus Peters about Johnson's murder after it occurred. Peters had

told Williams that he, Ledbetter, and Harris "caught up the dude inside a place" and that Peters and Harris shot him. (R. 1123, trial tr., 10975 (Williams).)

While Williams and Slaughter got their accounts from Peters, Troy Patterson heard about the Johnson murder from another participant in the offense—Harris. According to Patterson's testimony, Harris told Patterson that he went to the location with Ledbetter and Peters, and that he and Peters received $10,000 from Ledbetter for killing Johnson. (R. 1115, trial tr., 9004-06 (Patterson).) Allen Wright similarly heard about the Johnson murder from Harris, and testified that Harris admitted to committing the offense along with Ledbetter and Peters. (R. 1074, trial tr., 5909-11 (Wright).) In addition, Ledbetter's girlfriend Crystal Fyffe told her attorney, Steven Palmer, and her mother, Eileen Fyffe, that Ledbetter had killed the person who killed his brother. (R. 1121, trial tr., 10526 (Palmer); R. 1121, trial tr., 10526 (Fyffe).)

Finally, Samantha Murphy testified regarding what she heard from Ledbetter himself. Soon after his brother Elijah was killed, Ledbetter told Murphy "he wants to take care of who killed his brother."

(R. 1076, trial tr., 6472 (Murphy).) Murphy confirmed that "the belief" was that Alan Johnson killed Elijah. (*Id.*) Prior to Johnson's murder, Ledbetter and others were at Samantha Murphy's house, and he received a call letting him know where Johnson was. (*Id.* at 6475.) Murphy testified that the men subsequently left, after some of them got geared up in black hoodies. (*Id.*) Moreover, after Johnson was killed, Murphy heard Ledbetter "talking about he took care of" Johnson. (*Id.* 6476.) She described him as "proud" and "happy." (*Id.* at 6477.)

Ledbetter complains that "no one had any personal knowledge of what occurred." (Ledbetter Br. at 57.) But the jury was entitled to conclude that the independent testimony of multiple witnesses regarding what they learned from various participants in the killing was entitled to weight.

Moreover, Ledbetter ignores the testimony of Anthony Jones, who *did* have "personal knowledge" and in fact testified that he directed and accompanied the other participants, including Ledbetter, to the residence where Johnson was located.[8] (R. 1119, trial tr., 9965, 9967-68

---

[8] Ledbetter asserts without basis that Jones was "actually in prison the night of the Johnson murder," citing a broad swath of transcript pages that provide neither support nor explanation for this claim. (Ledbetter

(Jones).) Jones testified that when they got to the residence, Ledbetter and Peters got out, taking their weapons, and went to the apartment. (*Id*. at 9969.) Harris met them between the van and the apartment. (*Id*. at 9970.) The men went out of Jones's sight, and he heard some gunshots. (*Id*.) Then Ledbetter and Peters came back to the van, and they left. (*Id*. at 9970-71.) They took Jones back to the Short North. (*Id*. at 9917.) Later, Ledbetter gave Jones $3,500 for his assistance. (*Id*.)

C. *The evidence supported Ledbetter's convictions for murder in aid of racketeering and murder with a firearm during a drug trafficking crime as to the death of Rodriccos Williams (Counts 9 and 10).*

Ledbetter was charged with two offenses involving the murder of Rodriccos Williams: murder in aid of racketeering in violation of § 1959(a)(1) (Count 9) and murder with a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(j) (Count 10). Ledbetter

---

Br. at 57.) Jones was recalled to the stand after it was learned that he had previously testified that he was present at an incident during a time when he was actually in Department of Youth Services custody. But that incident was a shootout at Joyce Park in November of 2006, not the Alan Johnson murder in April of 2006. (*See* R. 1124, trial tr., 11349-51, 11388.)

claims that the evidence of his involvement in the murder was insufficient as to both counts. (Ledbetter Br. at 57-58.)

In fact, ample evidence connected Ledbetter to the Williams murder. First, Michael Boyd testified that before Rodriccos Williams was killed, Ledbetter had come into Boyd's strip club, where Ledbetter expressed hostility toward Rodriccos Williams and told Boyd about Ledbetter's "crew" and how they hurt people. (R. 1075, trial tr., 6369-70, 6372-74 (Boyd).) Boyd said Ledbetter used the name "Cut Throat Committee." (*Id*. at 6372.) Boyd testified that Ledbetter was angry that his ex-girlfriend Latonia was now with Rodriccos Williams. (*Id*. at 6369-70.) Indeed, Ledbetter was so angry that Boyd called Rodriccos and Latonia and warned them not to come to the club, as Boyd was concerned regarding what Ledbetter might do to them. (*Id*. at 6372-74.) This event was a few weeks before Rodriccos Williams was killed. (R. 1080, trial tr., 7534-35 (Boyce).)

Second, the jury heard testimony from Earl Williams, who participated in the offense with Ledbetter. Williams testified that Ledbetter recruited him to come along to assist with this home invasion at Rodriccos Williams's home and to keep an eye on the younger

homeys— Harris, Liston, and R.J. Wilson. (R. 1123, trial tr., 10982-84 (Williams).) Williams said Ledbetter was on the phone with Latonia from Ledbetter's aunt's house in Pickerington, and they were talking about Rodriccos being at the movie with his children. (*Id.* at 10985-86.) Williams testified that Ledbetter went up to the door, but not into the house (R. 1123, trial tr., 10987-89 (Williams)), and that Ledbetter was later responsible for disposing of the firearm used (*id.* at 10995). Williams said that he himself went upstairs and demanded money from a woman in a bedroom, who ultimately gave him a bag from under the bed. (*Id.* at 10989.)

Third, the jury was presented with a variety of evidence that confirmed Earl Williams' firsthand account. Latonia Boyce agreed that she had spoken to Ledbetter by phone and told him her husband and children were at a movie. (R. 1080, trial tr., 7538-41 (Boyce).) Phone records back that up, showing several calls between Ledbetter and Latonia. (R. 1604, notice, 19304-35 (Exh. 48-18); R. 1122, trial tr., 10898-01 (Gill).) Rodriccos Williams' brother-in-law, Dale Boyce, saw three masked men in black enter with Rodriccos, just as Williams described. (R. 1080, trial tr., 7681 (Boyce).) They were repeatedly asking

Rodriccos where the money was. (*Id*. at 7683.) And Latonia Boyce confirmed what Williams described himself doing during the offense: she testified that a man with a gun came upstairs and demanded (and received) money from her. (R. 1080, trial tr., 7543-47 (Boyce).)

In addition, testimony showed that Ledbetter's girlfriend, Crystal Fyffe, told her attorney and law enforcement that on the day of the murder, Ledbetter had called her and asked her to look up directions to Rodriccos' address. (R. 1121, trial tr., 10524 (Palmer).) She also told her mother that after the murder, she received some items from Ledbetter and threw them away, but did not look at them or know what they were. (R. 1121, trial tr., 10658-59 (Fyffe).) This was consistent with the testimony of Williams, who indicated that Crystal had met them in a parking lot and took a bag containing the clothes they wore during the offense. (R. 1123, trial tr., 10996 (Williams).)

The jury also heard evidence that Latonia called Ledbetter later that night from a friend's phone to confront him regarding whether he was responsible for the home invasion and her husband's death. (R. 1080, trial tr., 7557-58 (Boyce).) Latonia testified that Ledbetter denied involvement, indicating that he was in the Short North at the time. (*Id*.

at 7559.) Suspicious, Latonia contacted Lela Rowe—a friend who worked for Verizon—and asked her to check on Ledbetter's phone location data. (R. 1080, trial tr., 7561-62 (Boyce).) Rowe's testimony at trial confirmed that she had (improperly) accessed that information for Latonia Boyce as a favor, and determined that Ledbetter's phone was in Pickerington, Ohio, near Rodriccos's house, in the relevant time period—nowhere near the Short North. (*See* R. 1081, trial tr., 7773-75 (Rowe).)

Fourth, the jury heard evidence suggesting that following this murder, Ledbetter became concerned and took actions to try and cover his tracks. The next morning, he took the rental car he had used that evening—which appears to be captured on the dashboard camera of a police cruiser responding to the scene (R. 1123, trial tr., 10991-93 (Williams); R. 1079, trial tr., 7290-93 (Eberts))—and traded it for another rental car. (R. 1121, trial tr., 10494-97 (Leighton).) He also got rid of a long-standing phone number—the one he had used to talk with Latonia that night. (R. 1080, trial tr., 7670-71 (Boyce).) Evidence showed that Ledbetter became very concerned that Earl Williams, who had by then been arrested regarding another matter, would talk to

58

authorities about the Rodriccos Williams' murder. The jury saw text
messages between Ledbetter and his girlfriend speculating that based
on what they perceived as a favorable sentence Williams received in the
other matter, "[h]e's snitchin' heavy."  (R. 1604, notice, 19308 (Exh. 84-
13 at 276).) Ledbetter observed via text that "this edub [Earl Williams]
shit got me sick." (*Id.* at 19306 (Exh. 84-13 at 274); *see* R. 1125, trial tr.,
11631-32 (Lauber).)

Finally, Harris told codefendant Troy Patterson that Ledbetter
had set up the Rodriccos Williams' offense. (R. 1115, trial tr., 9072,
9077-78 (Patterson).) And Ledbetter himself told Patterson that he was
concerned Earl Williams was telling about what happened that night.
(R. 1115, trial tr., 9079 (Patterson).) Allen Wright also testified that
Harris had told him that a group including Harris, Ledbetter, and
Williams had done the murder, and that Harris was concerned Earl
Williams was "telling." (R. 1074, trial tr., 5925-26 (Wright).)

Ledbetter complains that the evidence was "self-serving testimony
by cooperating witnesses." (Ledbetter Br. at 58.) But there was nothing
self-serving about much of the evidence regarding this offense, which
included testimony by disinterested witnesses Latonia and Dale Boyce

and Lela Rowe, as well as phone and rental records. Ledbetter was free to, and did, attack the credibility of the cooperating witnesses. Given the wealth of interlocking evidence, however, the jury was entitled to disagree.

> D. *The evidence supported Ledbetter's convictions for murder in aid of racketeering, conspiracy to murder a witness, and discharge of a firearm during a crime of violence as to the death of Crystal Fyffe (Counts 29, 30 and 31).*

The jury convicted Ledbetter of three counts in connection with the death of Crystal Fyffe: murder in aid of racketeering in violation of § 1959(a) (Count 29), conspiracy to murder a witness in violation of § 1512(k) (Count 30), and discharge of a firearm during a crime of violence in violation of § 924(c) (Count 31). Ledbetter argues that the evidence of his involvement was insufficient on all three counts, noting (accurately) that he had been in prison for 13 months at the time Fyffe was murdered. (Ledbetter Br. at 59-60.)

On the contrary, the trial evidence provided ample support for the jury's conclusion that, while he was not personally on the scene, he was guilty of these offenses. First, evidence showed that Fyffe and Ledbetter had a long and violent relationship, including a 2009 incident during

which Ledbetter had tied her up, threatened her, and shot at her,
striking her in the hand. (R. 1121, trial tr., 10651, 10653-54, 10660
(Fyffe).) Ledbetter himself told Earl Williams about that incident. (R.
1123, trial tr., 11043 (Williams).) Fyffe did not tell police the true story
at the time, but shared it with her mother and her attorney once
Ledbetter was in prison. (R. 1121, trial tr., 10651, 10653-54 (Fyffe); *id.*
at 10520 (Palmer).)

The jury saw text messages between Crystal and Ledbetter that
provided insight into their threat-laden relationship. When Crystal had
confronted Ledbetter in 2010 about a report she received from a friend
that he had been with another woman, Ledbetter turned to threats,
texting "Motherfuckers who lie together can die together. Fuck all y'all.
I got the answer to all of this bullshit. Hood love. Player prices. Ten
stizzles. Two for one."  (R. 1604, notice, 19333 (Exh. 84-13 at 301).)
When Crystal responded "I told you that you might as well kill me to.
I'm not protecting anyone. She did what she's supposed to do if she seen
u with a chick," (*id.*), Ledbetter replied "Ok have ur way, you go too!"
(*id.*). Crystal responded "Make sure u finish what you started don't have
it done," (*id.*), which the jury could have inferred was a reference to the

earlier incident when he shot her in the hand. Consistent with
Ledbetter's threatening text messages, Earl Williams testified that
Ledbetter had actually asked him to kill Crystal on a couple of occasions
because she was going to tell another of Ledbetter's girlfriends about
their relationship. (R. 1123, trial tr., 11043 (Williams).)

Second, the jury heard evidence regarding Fyffe's awareness of
Ledbetter's involvement in various offenses. She had given him
directions to Rodriccos Williams' residence shortly before Williams was
murdered. (R. 1121, trial tr., 10526, 10538, 10559, 10597 (Palmer).) She
also took some items from Ledbetter and disposed of them after that
offense. (R. 1121, trial tr., 10658-59 (Fyffe); R. 1123, trial tr.,
(Williams).) The evidence also showed Crystal Fyffe was aware of other
incidents involving Ledbetter, including his possession of firearms and
a fraudulent insurance claim regarding a vehicle. (R. 1121, trial tr.,
10662-63 (Fyffe); R. 1125, trial tr., 11675-76 (Lauber); *see also* (R. 1604,
notice, 19333 (Exh. 84-13 at 301) (text from Ledbetter to Crystal stating
"fuck it, tell them mufuckas I was drivn and that was my strap! Tell em
verything to get me the fuckn chair since mufuckas got shit to tel").)
Given Crystal's awareness of Ledbetter's criminal activities, the jury

62

was entitled to conclude that Ledbetter had reason for ensuring she did not talk to authorities.

And Crystal had in fact done just that. After Ledbetter was arrested for receiving almost 2,000 pounds of marijuana, *see supra* at 26, Crystal turned over $30,000 of Ledbetter's money to the DEA when they came to the house. (R. 1121, trial tr., 10665-65 (Fyffe); *id.* at 10503-05 (Leighton); *id.* at 10540 (Palmer).) In addition, Fyffe's attorney testified that Fyffe had a proffer with the Fairfield County Prosecutor during which she discussed having provided directions to Ledbetter prior to the Williams murder. (R. 1121, trial tr., 10538 (Palmer).)

Moreover, there was extensive evidence that Crystal herself feared that Ledbetter or his "crew" was going to kill her. Crystal Fyffe's attorney testified that before her death, she confided in him repeatedly that she was terrified of Ledbetter, that Ledbetter had shot her on another occasion, and that she was afraid that "he would kill her, or one of the people would kill her that he associated with." (*Id.* at 10536; *see also id.* at 10532.) Ledbetter had indicated to Fyffe that if she was "playing him" she would be "swimming with the fishes." (*Id.* at 10537.)

Fyffe showed her attorney a letter from Ledbetter in which he threatened to kill her if she cooperated. (*Id.* at 10542.) Her attorney noted that Fyffe had also revealed her fear of Ledbetter in the Fairfield County proffer. (*Id.* at 10538.)

Eileen Fyffe, Crystal's mother, similarly recounted Crystal's fear of Ledbetter. According to Eileen, Crystal indicated that Ledbetter had earlier shot her in the hand because she threatened to leave him, and he also threatened her family members. (R. 1121, trial tr., 10660 (Fyffe).) After Crystal was questioned by law enforcement regarding the Williams murder, she was very scared of Ledbetter. (*Id.*) Once Ledbetter himself was in prison, Fyffe's mother testified that Fyffe was particularly afraid of a man who went by "Santa"—a contact of Ledbetter's who she was afraid Ledbetter would use to kill her. (*Id.* at 10665-66.)

Crystal's fears of Ledbetter proved warranted when she was shot and killed outside her residence by an unidentified individual while her mother was inside with Crystal's young daughter. (*Id.* at 10669-70.) Crystal's mother later gave some of Crystal's letters and documents to law enforcement. (*Id.* at 10672-73.)

Those letters reveal Ledbetter's concern that Crystal was "talking." One of the letters the jury saw was a letter from Ledbetter to Crystal three months before her death, after Ledbetter was in prison for the drug offense. He wrote that "the words you choose to let leave your lips to certain individuals really has me at a loss for words. Wow!  God knows if I knew you were going to abandon ship like that on some cold-blooded shit, then I would have made certain preparations for this." (R. 1125, trial tr., 11637 (Lauber).)

He continued that "before you know it Santa Claus will be coming to town. . . I am sure not happy that I won't get to see these days in person." (*Id.*) Given the testimony of Eileen Fyffe—and the fact that this letter was sent in July—the jury was entitled to conclude that this reference was not to Christmas, but to Ledbetter's contact "Santa," who Crystal had indicated to her mother that she was afraid Ledbetter would "use to kill her." (R. 1121, trial tr., 10665 (Fyffe).)

Ledbetter's letter continued, noting that "I hope you are content with your decision. All eyes and ears are open right now and one by one things will fall into place." (R. 1125, trial tr., 11638 (Lauber).) Ledbetter observed that "It's been almost 2 months and not a fucking

peep from you. Well at least not to me, but plenty of peeps to all the wrong listeners. And that's not good. That's not good at all." (*Id.* at 11639.) He observed that while he didn't have any pictures of Crystal "in here," "[l]uckily, I put a few of them up out there. I was really hoping and wishing that I was wrong. But obviously I'm not." (*Id.* at 11639-40.) The jury was entitled to infer that Ledbetter was referring to the availability of photos of her for use by his crew "out there" in getting rid of her.

The jury was also presented with evidence of the circumstances of Fyffe's death, which suggest an intentional assassination. She was killed outside her home by a gunshot wound to the head as she returned to the residence with a pizza in the early evening. (R. 1121, trial tr., 10669-70; *id.* at 10480-81 (Maclellan).) Although there were phones and keys on her person, they were not taken. (*Id.*)

Finally, the jury heard evidence that Ledbetter and his coconspirators had spoken about Fyffe's murder. Troy Patterson testified that Ledbetter told him while they were incarcerated together that Crystal "had to go" because she was cooperating. (R. 1115, trial tr., 9079-80 (Patterson).) And Ledbetter's cousin (unindicted coconspirator

Keith Maye) told Samantha Murphy that Ledbetter got Crystal Fyffe killed "because she knew too much." (R. 1076, trial tr., 6485 (Murphy).)

Ledbetter argues it was "questionable that Fyffe was actually cooperating with the government." (Ledbetter Br. at 59.) In fact, while it is clear Crystal had not shared everything she knew, her attorney testified that she had admitted to prosecutors providing directions to Rodriccos' house. (R. 1121, trial tr., 10538 (Palmer).) She had also handed over Ledbetter's $30,000 to the DEA when they came to her house following Ledbetter's federal drug charges. (R. 1121, trial tr., 10665-65 (Fyffe); *id.* at 10503-05 (Leighton); *id.* at 10540 (Palmer).) Moreover, none of the charges required the government to prove that Fyffe "was actually cooperating." Regardless of what information Fyffe had or had not shared to date, ample evidence supported a conclusion that Ledbetter arranged the killing to ensure her silence.

E. *The evidence supported Ledbetter's conviction for murder in aid of racketeering and murder with a firearm during a drug trafficking crime as to the death of Marschell Brumfield (Joined Counts 1 and 2).*

The jury convicted Ledbetter of two offenses as to the death of Marschell Brumfield: murder in aid of racketeering in violation of § 1959(a)(1) (Joined Count 1) and murder with a firearm during a drug

67

trafficking crime in violation of § 924(j) (Joined Count 2). Here, too, Ledbetter's claim is that the evidence of his involvement was insufficient. He notes that there were no fingerprints recovered, and that cooperating witness Troy Patterson did not claim that Ledbetter was in the van with him and those who actually shot Brumfield. (Ledbetter Br. at 60.)

To be sure, Troy Patterson testified that Liston, Ussury, and Harris, along with Patterson and an unindicted coconspirator, were the ones who went to the door of the apartment and shot Brumfield. (R. 1115, trial tr., 9048-49 (Patterson).) But Patterson also testified that Ledbetter came along in a separate vehicle to show them where the victim lived. (*Id*. at 9045-46.) In fact, after the murder, Harris told Patterson that Ledbetter had identified Brumfield as a target when he saw him participate in a large-scale drug transaction. (*Id*. at 9052.) After that transaction, Ledbetter had followed Brumfield to his apartment to learn its location, which he later shared with Harris and the others. (*Id*.)

Patterson's firsthand account of the offense was consistent with information provided by two neighbors. One looked out the window and

saw her neighbor, Brumfield, surrounded by men in dark hoodies. (R. 1079, trial tr., 7193-95 (Armstead).) She described the neighbor lifting up his shirt, then swinging at one of the men, after which another of the men "started shooting." (*Id.* at 7194.) This coincided with Patterson's testimony that Liston had told the victim to "strip" and that Liston and Usury had shot Brumfield after he took a swing at them. (R. 1115, trial tr., 9049-50 (Patterson).) Another neighbor testified that she saw four or five people in dark hoodies run and jump into a van after shots were fired. (R. 1078, trial tr., 7135 (Chambers).) Particularly given these confirmations of Patterson's description of the incident, the jury was entitled to conclude that Patterson's firsthand account of the murder—including Ledbetter's involvement—was accurate. That is all the more so given that, as Agent Lauber explained, the details Patterson recounted to law enforcement were facts that could not have been known to him absent his participation. (R. 1125, trial tr., 11590-93, 11658-59 (Lauber).)

69

## II. Sufficient evidence supported Ussury's Count 11 conviction for the murder of Dante Hill in aid of racketeering. *(responding to Ussury's second issue)*

A. *There was sufficient evidence Ussury committed the murder.*

Ussury argues that there was insufficient evidence to establish that he was the person who murdered Dante Hill. Ussury asserts that no witness "actually saw the shooting," "was able to identify the shooter," or "was able to place Mr. Ussury at the scene at the time of the shooting." (Ussury Br. at 20-21.) Ussury was free to, and did, point out perceived shortcomings in the evidence to the jury. There was easily sufficient evidence, however, to support the jury's conclusion that Ussury murdered Hill.

As a starting point, the evidence demonstrated that Ussury was friends with, and had committed a robbery with, Tabib Broomfield, outside whose residence the Hill shooting occurred. (R. 1078, trial tr., 6978-80 (Broomfield).) Broomfield testified that on an earlier occasion, he told Ussury about some Jamaicans who were a possible target. (*Id.*) Ussury, Broomfield, and others conducted the robbery, taking a large amount of cash and marijuana. (*Id.* at 6983-85.)

Second, while Broomfield did not see the Dante Hill shooting, the jury was entitled to infer from his testimony that Ussury was the shooter. Broomfield testified that the reason Hill was in Broomfield's driveway was that he had arranged with Broomfield to come there to buy marijuana. (*Id.* at 6992.) Hill's girlfriend, Casey Martin, confirmed that Broomfield was Hill's marijuana supplier, and that Hill and Broomfield had communicated by phone that evening. (R. 1079, trial tr., 7324-26 (Martin).)

Broomfield also testified that he had arranged for Ussury to meet Hill at Broomfield's house. Broomfield's marijuana supply had run out, so he arranged by phone for his friend Ussury to come handle the deal. (R. 1078, trial tr., 6993 (Broomfield).)

The deal, however, went bad. Broomfield was not himself at home, but down the block. (*Id.* at 6997.) When he got back to his house, moments after the shooting, he found a vehicle in his driveway and Hill's girlfriend putting Hill—who she was afraid was not breathing— into the car. (*Id.* at 6998-99, 7001-02; *see also* R. 1079, trial tr., 7332-34 (Martin).) At trial, Broomfield indicated that he saw a car leaving the area just before he arrived, but did not see who was in it. (R. 1078, trial

71

tr., 7023 (Broomfield).) The jury was entitled to disbelieve that, however, as Broomfield was confronted with his grand jury testimony that he saw "the dark car coming back up the block which was the car that Deounte [Ussury] was in." (*Id.*; *see also id.* at 7163 (district court noting inconsistent grand jury statements can be admitted as substantive evidence, citing *United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980) and *United States v. Odom*, 13 F.3d 949, 954 (6th Cir. 1994).)

Broomfield admitted at trial that after he returned home and saw that Hill had been shot, he called Ussury, then went to see him in the Short North. (R. 1078, trial tr., 7006-07, 7010.) Ussury said that things "went bad." (*Id.* at 7010.) The jury was entitled to conclude, however, that Broomfield was truncating his account at trial, as he was confronted with his grand jury testimony that Ussury also stated that Hill had been "trying to do something to him," which Broomfield found implausible given Hill's small size. (*Id.* at 7011-12.)

The testimony of Hill's girlfriend, Casey Martin, was consistent with Broomfield's. Martin testified that she accompanied Hill to Broomfield's house pursuant to an arranged meeting. (R. 1079, trial tr., 7326 (Martin).) Martin accompanied Hill to Broomfield's house. (*Id.* at

72

7326-27.) When Hill left the vehicle, he almost immediately began
running back to his vehicle, pursued by a person in a black hoodie. (*Id.*
at 7329-31.) Martin heard a thud and saw Hill fall to the ground. (*Id.* at
7331.) The other man ran across the street, jumped in a car, and left.
(*Id.*)

Ussury's travel to and presence in the area at the time of the
shooting was confirmed by cell tower data. (R. 1604, notice, 19303 (Exh.
49-12 at p.7)); R. 1125, trial tr., 11510-12 (Moledor).) Telephone records
showed that Ussury had multiple calls with Tabib Broomfield
immediately prior to that time of the shooting. (R. 1604, notice, 19303
(Exh. 49-12 at p. 7)); R. 1125, trial tr., 11510-12 (Moledor; *see also* R.
1078, trial tr., 6993-96, 7034-36 (Broomfield).) Location data showed
that prior to the time of the shooting (11:45 p.m.) Ussury's phone was to
the west of Broomfield's house (toward the Short North); near the time
of the shooting (11:57 p.m. to 12:14 p.m.) it was using a tower within a
half mile of Broomfield's house; and following the shooting (12:20 p.m.),
it again used a tower traveling west from that neighborhood. (R. 1125,
trial tr., 11510-12 (Moledor); R. 1604, notice, 19303 (Exh. 49-12 at p. 7).)

73

Those telephone records themselves provided a strong basis for the jury to place Ussury at the scene.

Testimony of cooperating witnesses also confirmed Ussury's involvement. Anthony Jones testified that in the fall or winter of 2007 he was at a house with Harris, Liston, and R.J. Wilson when Ussury came in and told R.J. he had to get rid of his gun because he had tried to rob someone at Tabib Broomfield's house, and ended up shooting him. (R. 1119, trial tr., 9994-96 (Jones).) In addition, Troy Patterson testified that Ussury and Harris had both told him about the incident. (R. 1115, trial tr., 9081 (Patterson).) Ussury said that he was supposed to do a marijuana deal with a guy and ended up shooting and killing him. (*Id.*)

B. *There was sufficient evidence of the purposes required by 18 U.S.C. § 1959.*

The jury also had sufficient evidence to conclude that Ussury committed the offense with either or both of the alternative purposes required by 18 U.S.C. § 1959.

The offense of violent crime in aid of racketeering in 18 U.S.C. § 1959 ("VICAR")—created after the enactment of RICO—was intended to complement the substantive racketeering offense in 18 U.S.C. § 1962.

74

*See United States v. Odum*, 878 F.3d 508, 518 (6th Cir. 2017) (citing

*United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)), *vacated*

*on other grounds by Frazier v. United States*, 2018 WL 1640324 (U.S.

October 9, 2018). Both VICAR and RICO "seek the eradication of

organized crime in the United States." *United States v. Turkette*, 452

U.S. 576, 589 (1981); *see Concepcion*, 983 F.3d at 518. The "organized

crime" that Congress sought to eliminate included criminal activities by

organizations that are legitimate and illegitimate, formal and informal.

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 243-49 (1989); *Sedima,*

*S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985). To facilitate the

goal of eradicating organized crime, sections 1959 and 1962 are both

intended to "'be liberally construed.'" *Concepcion*, 983 F.2d at 381

(quoted in *Odum*, 878 F.3d at 518).

    While sharing a purpose of combatting organized crime, RICO and

VICAR focus on different behavior and motives. In particular, the

creation of § 1959 "allow[s] the government not only to prosecute under

RICO for conduct that constitutes a pattern of racketeering activity in

connection with an enterprise, but also to prosecute under § 1959 for

violent crimes" related to the racketeering enterprise. *Concepcion*, 983

75

F.2d at 380-81. Violent crimes fall within the scope of VICAR if committed for one of two purposes: "[1] as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or [2] for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).

VICAR's purpose element is satisfied if one of these was "an animating purpose" of the defendant's actions. *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (quotations omitted). The United States need not prove that the defendant "acted *solely or primarily*" with one of these purposes. *Id.* (emphasis added). In a felony-murder case, the United States satisfies the purpose element by showing that the defendant engaged in the underlying felony with the requisite purpose. *United States v. Mapp*, 170 F.3d 328, 335 (2nd Cir. 1999).

Here, the jury could rationally have concluded that Ussury murdered Hill with either or both of the statutory purposes. First, the jury could rationally conclude that Ussury committed the offense "as consideration for the receipt of, or as consideration for a promise or

agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(1). An item has "pecuniary value" for the purpose of VICAR if it is "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1) (referring to the use of the term in section 1959). It is not necessary that the item of pecuniary value be cash. *See United States v. Washington*, 318 F.3d 845, 853-54 (8th Cir. 2003); *United States v. Mercado*, 270 F. App'x 23, 24-25 (2nd Cir. 2008).

The evidence showed that Ussury had arranged to meet Hill at Broomfield's residence ostensibly to sell Hill marijuana. According to Hill's girlfriend, however, after Hill got out of his vehicle, he headed back toward it almost immediately, with a pursuer following, ending with a scuffle and Hill falling to the ground, shot in the chest. (R. 1079, trial tr., 7327-32 (Martin).) The jury was entitled to infer that the scuffle resulted from an attempt by Ussury to take Hill's payment without completing the deal.  *See also* (R. 1119, trial tr., 9994-96 (Jones) (Ussury said he tried to rob someone and ended up shooting him).)

77

In these circumstances, the jury could certainly conclude that Ussury had a purpose of obtaining "pecuniary value." The jury could also conclude that the pecuniary value that Ussury sought through the Dante Hill offense was "from the enterprise" because it arose from his participation, as an SNP and Homicide Squad member, in a core enterprise activity. Ussury does not contest that there was sufficient evidence that he was a member or associate of SNP and the Homicide Squad, nor could he. (R. 1074, trial tr., 5906 (Wright); R. 1119, trial tr., 9957 (Jones); R. 1115, trial tr., 8932 (Patterson).) Nor does he contest that violent robberies of drug-related targets outside the Short North were the stock-in-trade of the Homicide Squad (R. 1115, trial tr., 8982-84 (Patterson); R. 1074, trial tr., 5864-73 (Wright); R. 1079, trial tr., 7351 (Canter)), or that there was evidence he had participated with other SNP members in other such robberies (*see, e.g.,* R. 1115, trial tr., 9052, 9066-68 (Patterson); R. 1123, trial tr., 10980 (Williams).) The Hill murder was not a one-off, but a killing by a Homicide Squad member in the course of just the sort of robbery the Homicide Squad was known for.

Ussury argues there was "no testimony that the Short North Posse gained financially from the offense in any way." (Ussury Br. at 22.) But the jury could infer that *he*—an SNP member—gained (or sought to gain) financially from the offense, and that the hoped-for gain came from his participation in an activity connected to the enterprise. *Cf. Odum*, 878 F.3d at 517 (citing *United States v. Feliciano*, 223 F.3d 102, 117 (2d Cir. 2000)) (discussing when activity attributable to enterprise in assessing whether an enterprise was engaged in racketeering). The pecuniary motive is satisfied "where the murderer was a member of the racketeering enterprise who expected to receive pecuniary value from the activities of the enterprise." *United States v. Wilson*, 493 F. Supp. 2d 491, 503 (E.D.N.Y. 2007).

Perhaps even more clearly, the jury was entitled to conclude that Ussury committed the offense for the alternative purpose of maintaining or increasing his position in the enterprise. *See* § 1959(a)(1). A defendant commits an offense to maintain or increase his position in the enterprise where he commits the act "because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."

*Concepcion*, 983 F.2d at 381; *see also Odum*, 878 F.3d at 519

(concluding that this purpose element was satisfied where jury could

conclude offense was undertaken to maintain standing in a gang in

light of what was expected of members); *United States v. Carson*, 455

F.3d 336, 370 (D.C. Cir. 2006); *United States v. Dixon*, 901 F.3d 3122

(11th Cir. 2018); *United States v. Brady*, 26 F.3d 282, 289 (2d Cir.

1994). Evidence that "violence was a part of the group's culture," "that

the group expected its members to . . . engag[e] in violent acts," or that

a defendant "reported his actions to prove himself," can support an

inference that the defendant was "motivated" by his membership.

*Dixon*, 901 F.3d at 1343.

　　The jury could rationally have concluded that an attempt at

robbing Dante Hill served the group's purposes not only by potentially

enriching a member (Ussury) but also by enhancing the group's (and

Ussury's) reputation for violence. *See, e.g.*, *United States v. McGill*, 815

F.3d 846, 933-34 (D.C. Cir. 2016). Certainly the evidence showed that

"violence was a part of the group's culture," and that after the fact,

Ussury "reported his actions" to others. *See Dixon*, 2018 WL 4038188 at

*10; *see* (R. 1119, trial tr., 9994-96 (Jones)); R. 1115, trial tr., 9081

(Patterson).) Moreover, to the extent that the jury believed that Dante Hill was "trying to do something to" Ussury (*see* R. 1078, trial tr., 7006-07, 7010), they could have concluded that the perceived need for a violent response to that was itself driven by Ussury's role in SNP and the Homicide Squad. *See Hackett,* 762 F.3d at 500-01; *United States v. Gills*, 702 F. App'x 367, 376-77 (6th Cir. 2017). As such, a rational jury could have concluded that whether the shooting arose from a robbery attempt by Ussury or a violent response to some actual or perceived violence by Hill, Ussury committed the offense to maintain or increase his position in the enterprise. *See, e.g.*, *Carson*, 455 F.3d at 370; *United States v. Lee*, 660 F. App'x 8, 16 (2d Cir. 2016).

### III. Sufficient evidence supported the purpose element for Harris's and Robinson's Count 5 convictions for the murder of Donathan Moon in aid of racketeering. *(responding to Harris's second issue and Robinson's first issue)*

Both Harris and Robinson argue that there was insufficient evidence to support the purpose element of their Count 5 convictions for murder in aid of racketeering under 18 U.S.C. § 1959(a)(1). *See supra* at 76-77 (discussing required purposes under the statute).

81

As to Harris, the jury was instructed on Count 5 regarding both alternative purposes under § 1959; as to Robinson, the jury was instructed only on the pecuniary gain theory. (R. 1550, trial tr., 17611; *see also* R. 1141, verdict form, 12726-27.) The district court correctly concluded that the evidence of purpose was sufficient as to both defendants. (R. 1126, trial tr., 11741; R. 1548, trial tr., 17151-54; R. 1137, opinion and order, 12695.)

    A.    *The evidence was sufficient to support a conclusion that both Harris and Robinson committed the offense for a pecuniary purpose.*

The evidence supported a conclusion that both Harris and Robinson conspired to commit the robbery during which Moon was killed as consideration for something of "pecuniary value"—namely, a share of the anticipated proceeds. The evidence showed that the robbery target, Greg Cunningham, often had large amounts of cash in order to give change for dancers' tips. (R. 1082, trial tr., 8073, 8092 (Cunningham).) There was evidence that the participants in the offense were aware of homeowner Cunningham's entertainment business (R. 1083, trial tr., 8290 (Hurt) (noting that codefendant Rastaman Wilson had told him in recruiting him for the offense that the guy "owned a

strip club"), and believed that "there was some money out there." (R. 1084, trial tr., 8601 (Wilson).) Moreover, offense participant David Hurt testified that he was informed by fellow participant Rastaman Wilson that he would likely receive a cut of a "couple thousand." (R. 1083, trial tr., 8289 (Hurt).) A rational jury could have inferred that Harris and Robinson similarly anticipated a "cut" of the proceeds, particularly given other testimony that splitting up robbery proceeds was the standard procedure within SNP and Homicide Squad. (*See, e.g.*, R. 1123, trial tr., 10958 (Williams); R. 1074, trial tr., 5862-63 (Wright); R. 1119, trial tr., 9978-79, 10090 (Jones).)

There was also sufficient evidence to permit a conclusion that the pecuniary value at issue was "from an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(1). The jury heard evidence that two participants in the Donathan Moon murder—Harris (who broke in the door) and R.J. Wilson (who fired the fatal shots)—were members of the Short North Posse and the Homicide Squad. The involvement of these SNP members was not by happenstance. Harris and R.J. Wilson were known to and enlisted by Rastaman Wilson, who told his girlfriend that Harris ("a big guy named O") was "brought to

83

kick down the door," and that R.J. Wilson was "a kid . . . who liked to prove himself" and was "quick to pull the trigger." (R. 1081, trial tr., 7916-17 (Ward).) Rastaman Wilson went and picked up the men (and their firearms) in the Short North en route to the robbery. (R. 1083, trial tr., 8290, 8292 (Hurt).) Harris and R.J. Wilson were enlisted to do—and did—just what the Homicide Squad was known for. After the offense, Rastaman assured Hurt—a non-SNP member who had been recruited as a driver—that the men "from the Short" would deal with getting rid of the gun. (R. 1083, trial tr., 3299 (Hurt).)

Harris does not contest that he was one of those men "from the Short," but suggests that this offense was nonetheless unrelated to the enterprise. (Harris Br. 20, 28-29.) This is not, however, some stray crime by Harris unrelated to other activities of the enterprise. Harris was "a member of the racketeering enterprise who expected to receive pecuniary value from the activities of the enterprise." *United States v. Wilson*, 493 F. Supp. 2d 491, 503 (E.D. N.Y. 2007). The evidence showed that members and associates of the enterprise frequently organized and took part in just such robberies outside the Short North. In particular, the evidence showed that members of the Homicide Squad—including

84

Harris and R.J. Wilson—specialized in robberies of drug dealers and other targets thought to have large sums of cash or firearms. *See supra* at 16-17, 24, 32-33.

The robbery leading to Moon's murder fit squarely within this pattern, featuring a target (Greg Cunningham) outside the Short North who had an entertainment business and was suspected to have cash on hand. This robbery was thus positioned not only to enhance the income of SNP members (and others) participating, but to enhance the violent reputation of SNP and Homicide Squad. It was an activity attributable to the enterprise, and the pecuniary gain anticipated by participants in the activity represented pecuniary gain from the enterprise. *See, e.g., Odum* 878 F.3d at 517 (quoting *United States v. Feliciano*, 223 F.3d 102, 117 (2d Cir. 2000)) (an individual's activity is attributable to the enterprise where he "'acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group'"); *cf. United States v. Moore*, 651 F.3d 30, 98 (D.C. Cir. 2011); *Mercado*, 270 F. App'x at 24-25.

That Robinson was not himself part of the enterprise is irrelevant to whether he had the necessary pecuniary motive. As the district court aptly concluded (R. 1548, trial tr., 17151-54), while the second motivational prong—the "positional" prong—considers the defendant's actual or desired position in the RICO enterprise, the "pecuniary" prong encompasses the actions of a so-called independent contractor who performs violent crimes for pecuniary gain. *See, e.g., Concepcion*, 983 F.2d at 384; *United States v. Muyet*, 994 F. Supp. 501, 515, 519 (S.D.N.Y. 1998) (sufficient evidence to convict on "compensation" VICAR theory although defendant was a "freelancer"), *aff'd* Nos. 98-1421 et al., 2000 WL 1275925, *4 (2d Cir. Sept. 8, 2000). Section 1959, unlike section 1962, allows the United States to prosecute an individual without knowledge of the enterprise's racketeering activities. *Odum*, 878 F.3d at 518; *compare with United States v. Lawson*, 535 F.3d 434, 443 (6th Cir. 2008); *United States v. Godwin*, 765 F.3d 1306, 1321 (11th Cir. 2014); *see also United States v. Lugo*, No. 01-CR-022, 2005 WL 1412137, at *2 (E.D.N.Y. June 15, 2005) ("there is simply no element of the [statute] that require[s] the defendant to have intended to act in

'aid' of the Enterprise or even to know of the existence of the Enterprise," under the pecuniary gain provision).

The fact that Robinson is charged with only a single offense connected to the enterprise also does not put him outside the reach of VICAR's pecuniary motive. Consistent with the provisions' complementary but distinct purposes, section 1959, unlike section 1962, allows the United States to prosecute an individual who did *not* necessarily engage in or agree to engage in a pattern of racketeering activity. *Odum*, 878 F.3d at 517-18; *United States v. Bracy*, 67 F.3d 1421, 1430 (9th Cir. 1995). And section 1959, unlike section 1962, does not require the United States to prove that an individual "conduct[ed] or participate[d]" in the affairs of the enterprise. *Compare* 18 U.S.C. §§ 1959(a) *and* 1962.

Robinson argues that there was evidence suggesting that Robinson himself first proposed the robbery. (Robinson Br. at 28.) Robinson makes an unwarranted assumption, however, that if the target was his idea, that would necessarily preclude a conclusion by the jury that his participation was "as consideration for . . . a promise or agreement to pay, anything of pecuniary value from an enterprise."  18

87

U.S.C. § 1959(a)(1). Nothing in section 1959 says it is determinative who makes the initial pitch, nor does Robinson cite any authority treating that as essential. A jury could rationally conclude, however, that even if the target was suggested by Robinson, an "animating purpose" of the offense was ultimately to obtain a cut "from the enterprise"— particularly given that the Short North Posse (in the person of Harris and R.J. Wilson) was deliberately enlisted to effectuate the robbery. *See United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014). Nothing in the statute prevents the pecuniary value "from the enterprise" from coming through profit-sharing in a violent joint-venture.

On the contrary, Congress's purpose of eradicating organized crime—and associated violence—would be undermined by understanding section 1959 not to capture the conduct of outsiders who, for their own pecuniary gain, enlist racketeering enterprises in jointly undertaken violent crimes. Appellants' argument that a rational jury could not find the "pecuniary" purpose satisfied in this case is inconsistent with the statute's purposes, the requirement that the provision be "liberally construed," *Concepcion*, 983 F.2d at 381 (quoted

88

in *Odum*, 878 F.3d at 518), and the requirement that the evidence be viewed in the light most favorable to the government, *see Jackson*, 443 U.S. at 319. In this case, viewing the evidence in the light most favorable to the government, there was, as the district court concluded (R. 1126, trial tr., 11741; R. 1548, trial tr., 17151-54), sufficient evidence to support a conclusion that the necessary pecuniary purpose was present for both Harris and Robinson.

B.  *The evidence was also sufficient to support a conclusion that Harris committed the offense to maintain or increase his position in the enterprise.*

There was also sufficient evidence for a rational jury to conclude that Harris committed the murder to maintain or increase his position in the enterprise.

Harris does not contest that there was sufficient evidence for the jury to conclude that he had a position in the enterprise. He argues, however, that the fact that he and his fellow participant in the Moon murder, R.J. Wilson, were members of the Short North Posse "does not make their every crime an action in furtherance of the RICO enterprise." (Harris Br. at 23.) The United States does not disagree with that; but that is not the question. The question is whether the jury

could reasonably conclude that one of Harris's purposes in undertaking *this* offense was maintaining or increasing his position in the enterprise. The answer to that question is yes.

As noted above, the evidence showed that the Homicide Squad, which included Harris, specialized in just such violent robberies of cash-rich targets outside the Short North. The jury was entitled to conclude that the attempted robbery during which Donathan Moon was killed served the group's purposes in that it was anticipated to yield money and/or drugs for enterprise members Harris and R.J. Wilson and to expand the organization's activity and influence.

Here, Harris and R.J. Wilson were enlisted to effectuate just the sort of robbery that Homicide Squad regularly conducted. In fact, the evidence indicated that they had particular traits that made their participation valuable. (R. 1081, trial tr., 7916-17 (Ward) (Harris ("a big guy named O") was "brought to kick down the door" and R.J. Wilson was "a kid . . . who liked to prove himself.") Moreover, the evidence showed that "violence was a part of the group's culture," and that after the fact, Harris "reported his actions" to another SNP member. *See Dixon*, 901 F.3d at 1343; (R. 1115, trial tr., 9031-32 (SNP member

Patterson testifying that Harris told him about the robbery and murder after it occurred). In these circumstances, the jury was entitled to include that Harris participated in the Moon offense at least in part to maintain or increase his role in the enterprise and in such offenses. *See Carson*, 455 F.3d at 370; *cf. United States v. Lee*, 660 F. App'x 8, 16 (2d Cir. 2016) (sufficient evidence of purpose of maintaining or increasing role in enterprise where "[t]he jury heard abundant evidence that the Crew's primary business was robbing drug dealers in order to obtain and sell drugs, which is precisely what happened in the [relevant] robbery").

## IV. Sufficient evidence supported the interstate commerce element for Harris's and Robinson's Count 6 convictions for the murder of Donathan Moon with a firearm during conspiracy to commit Hobbs Act robbery. (*responding to Harris's fourth issue and Robinson's second issue*)

The jury convicted Harris and Robinson in Count 6 of murdering Donathan Moon during and in relation to a crime of violence, namely, conspiracy to commit Hobbs Act robbery. (*See* R. 1551, trial tr., 17712-13 (jury instructions).) Harris and Robinson argue there was

91

insufficient evidence to support the interstate-commerce nexus for the predicate Hobbs Act conspiracy.

The Hobbs Act makes it a federal crime to "*in any way or degree* obstruct[ ], delay[ ], or affect[ ] commerce *or* the movement of any article or commodity in commerce, by robbery . . . .or conspire[ ] to do so." 18 U.S.C. § 1951(a) (emphases added). The Act broadly defines "commerce" as encompassing, *inter alia*, "all . . . commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3); *see also Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (noting definition "is unmistakably broad"). The Supreme Court has noted that the Act's words "do not lend themselves to restrictive interpretation," but rather "manifest[ ] a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by . . . robbery." *United States v. Culbert*, 435 U.S. 371, 373 (1978) (quoting *Stirone v. United States*, 361 U.S. 212, 215 (1960)).

This Court has long recognized that "[i]f the victim of the robbery or violence is a business entity, the effect on interstate commerce need only be *de minimis*." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005) (citing *United States v. Smith,* 182 F.3d 452, 456 (6th Cir.

1999)); *United States v. Davis*, 473 F.3d 680, 682-83 (6th Cir. 2007).

This flows from the broad reach of Congress's authority under the

Commerce Clause, and the established principle that "'if a statute

regulates an activity which, through repetition, in [the] aggregate has a

substantial effect on interstate commerce, the *de minimus* character of

individual instances arising under the statute is of no consequence.'"

*United States v. Baylor*, 517 F.3d 899, 902 (6th Cir. 2008) (quoting

*United States v. Dupree*, 323 F.3d 480, 485 (6th Cir. 2003)). It is not

necessary that there be an actual effect on interstate commerce—only a

"realistic probability" of such an effect. *United States v. Watkins*, 509

F.3d 277, 281 (6th Cir. 2007) (citing *United States v. Peete*, 919 F.2d

1168, 1174 (6th Cir. 1990)).

In assessing whether a robbery satisfies the Hobbs Act's *de

minimis* standard, it is sufficient that a victim business utilizes goods or

services from out-of-state or sells products or services to customers from

out-of-state. *See, e.g., Davis*, 473 F.3d at 684 & n.3 *(de minimis

standard satisfied where victim bar purchased some of its alcohol from

an out-of-state retailer and had customers from out-of-state); *Watkins,*

509 F.3d at 281 (standard satisfied where defendant robbed check-

93

cashing business that drew checks on nationwide banks); *United States v. Harding*, 563 F.2d 299, 302 (6th Cir. 1977) (extortion of Tennessee real estate brokers had required connection to interstate commerce given that such brokers' services were directed in part to out-of-state customers); *United States v. Clausen*, 328 F.3d 708, 711-12 (3rd Cir. 2003) (robbery of victim businesses had *de minimis* connection to interstate commerce based in part on hiring employees and contractors from out-of-state); *cf. United States v. Chance*, 306 F.3d 356, 375 (6th Cir. 2002) (*de minimis* standard not satisfied where victim was a local gambling operation as to which there was no evidence regarding "who its customers were or whether money, either incoming or outgoing, traveled across state lines").

The *de minimis* standard was easily met here. Robbery target Greg Cunningham described his business, Tap Out Entertainment, during the trial. (R. 1082, trial tr., 8070-71, 8112 (Cunningham).) He explained that he hosted exotic parties at clubs in various states, and also at his residence, which was furnished as a party venue. (*Id.*) During the parties Cunningham hosted, he arranged for performances by exotic dancers from Ohio and nearby states. (*Id.* at 8072.) Indeed,

94

Cunningham was paid to host a bachelor party in his residence the night before the robbery that led to Donathan Moon's death. (*Id.* at 8074, 8090.) That party included 60 to 70 guests from several states and featured performances by 13 exotic dancers from Ohio and Kentucky. (*Id.* 8074, 8090, 8104; *see also id.* at 8186-89 (Steele).) The guests tipped the dancers individually for their performances. (*Id.* at 8073-74 (Cunningham).) Tap Out Entertainment's use of out-of-state dancers, and its service of out-of-state customers, easily satisfies the *de minimis* standard under this Court's above-cited precedents.

Seeking to downplay the impact on interstate commerce, Robinson points to certain testimony suggesting that Cunningham's entertainment business survived the offense. (Robinson Br. at 41.) Similarly, Harris asserts that the government did not prove any effect on Tap Out Entertainment, as it already had some financial problems. (Harris Br. at 29.) These arguments miss the mark for two reasons. First, the jury was free to credit testimony that made clear that while the business might have survived, it was damaged by the offense conduct. (R. 1082, trial tr. 8088, 8119-20) (Cunningham).) Second, as the district court observed, because the charged offense was a

95

conspiracy to commit Hobbs Act robbery, not a completed robbery, even if commerce were not affected (which it was) in light of the failed robbery and murder, the required nexus would be satisfied if the intended robbery "would have affected interstate commerce had it been carried out." (R. 1548, trial tr., 17163.) *See United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir. 1989).

Unable to meaningfully contest that the offense here satisfies the *de minimis* standard, Appellants seek to avoid that standard, citing *United States v. Wang,* 222 F.3d 234, 237-40 (6th Cir. 2000). There, this Court held that where robbery of "private citizens in a private residence" is at issue, the government must show more than a *de minimis* connection to interstate commerce to sustain a conviction under 18 U.S.C. § 1951. In particular, "when the Government seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one—not one that is fortuitous or speculative." *Wang* at 239-40.

The district court correctly concluded that *Wang's* private-individual standard does not apply here. (R. 1548, trial tr., 17160-63; R.

1137, opinion and order, 12703.) As the district court observed, in
*Wang*, the defendant had robbed two individuals at a private residence,
and business proceeds happened to be present. (R. 1548, trial tr.,
17160.) Here, in contrast, while the location of the robbery was a house,
it was not simply a "private residence." The living room housed a hot
tub, and the basement was outfitted with a commercial-style bar,
mirrored walls and ceilings, a pool table, and stripper poles. (R. 1082,
trial tr., 8072, 8104 (Cunningham).) One of the bedrooms was
configured with a computer from which Cunningham could control the
sound system. (*Id.* at 8096.) There were numerous surveillance cameras
in the house, which Cunningham could monitor simultaneously. (*Id.* at
8075, 8096.) This was a location directly involved in interstate
commerce. In charging clients fees to host parties for guests from
various states and arranging dancers from various states, Cunningham
was directly engaged in commerce at the residence, creating a very
"realistic probability" that a robbery of that location would affect
interstate commerce. *United States v. Watkins*, 691 F.3d 841, 849-50
(6th Cir. 2012).

Robinson's citations to this Court's decisions in *Turner* and

*Chance* are inapt in light of the factual record here. *See United States v.*

*Chance*, 306 F.3d 356 (6th Cir. 2002); *United States v. Turner,* 272 F.3d

380 (6th Cir. 2001). In *Turner*, the robbery target was an illegal

gambling business conducted, in part, in a private residence. This Court

did not resolve whether the applicable standard in that situation was

the *de minimis* standard applicable to businesses or the more

demanding standard applicable to private individuals.[9] It did not need

to, because, either way, the evidence was insufficient, as the

government (unlike here) had not established that the illegal gambling

business itself had even a *de minimis* connection to interstate

commerce: "The government did not elicit testimony showing whether

his illegal business was engaged in interstate commerce, or somehow

affected interstate commerce, through regular purchasing or otherwise."

*Turner,* 272 F.3d at 388.

---

[9] *Turner* noted that in light of the differing standards for robberies of a
business and of a private individual, "a distinction between home
businesses and a home office or a portion of a home otherwise dedicated
to business use could be of great importance." 272 F.3d at 386. The
situation here is clearly on the "home business" side of the line—a
substantial portion of the home was outfitted for commercial use and
open to customers.

*Chance* is equally unhelpful to Robinson. That case did not involve a robbery at a residence at all, but robbery of illegal gambling operations operating at a bar and a restaurant. As in *Turner*, the shortcoming in the government's proof was simply a failure to show that the gambling operation affected interstate commerce. *See Chance*, 306 F.3d at 375 ("there was no evidence regarding its size, amount of profits, who its customers were, or whether money, either incoming or outgoing, traveled across state lines"). The evidence regarding the business's connection to interstate commerce—lacking in *Turner* and *Chance*—was present here. As discussed above, the evidence easily established that Tap Out Entertainment had the requisite connection to interstate commerce through its reliance on out-of-state dancers and service of out-of-state customers.

Moreover, even applying the alternative *Wang* standard, the evidence was sufficient. Given that the house was itself actively used as a commercial entertainment venue, Cunningham's connection to Tap Out Entertainment was "a substantial one—not one that is fortuitous or speculative." *Wang*, 222 F.3d at 239-40. This was not a private residence where business proceeds happened to be present, it was a

location "directly involved in interstate commerce." *Id.* at 240; *cf. United States v. Vichitvongsa*, 819 F.3d 260, 271 (6th Cir. 2016) ("[r]obbing drug dealers" or other individuals "who can be legitimately characterized as engaged in business . . . does not fall within *Wang's* 'private individual exception." *Id.* (quotation omitted); *see also Ostrander*, 411 F.3d at 694.

Robbing a location that is itself a venue for events affecting interstate commerce has more than a "reasonable probability" of affecting interstate commerce—indeed, the contemplated robbery here, even though it ultimately resulted in a murder and no cash, *actually did just that* by diminishing Cunningham's ability to book parties and dancers to work in that location. (R. 1082, trial tr., 8088, 8119-20 (Cunningham).) This effect did not result from any "long chain of causal inference," *Wang*, at 239. That a robbery (and murder) at an event venue adversely impacts the business of that venue is no surprise. *See, e.g., United States v. Nguyen*, 155 F.3d 1219, 1224-25 (10th Cir. 1998); *cf. Wang,* 222 F.3d at 244 (Hood, J., concurring) (noting that the victims "were not at their place of business when they were robbed").

Moreover, even in situations not involving a business operating in the robbed residence itself, *Wang* recognized that the robbery of a private individual would have the necessary Hobbs Act nexus where "the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *Id.* at 240; *see also Chance*, 306 F.3d at 374-75 & n.8. A rational jury could have concluded that was the case here in light of testimony that the conspirators targeted the residence not by happenstance but because they knew the victim "owned a strip club" and they believed there was "some money out there." *See supra* at 82-83. Further, there was other testimony that Cunningham's hosting of parties was known in his neighborhood (R. 1082, trial tr., 8075-76 (Cunningham); R. 1082, trial tr., 8138 (Geiger)), and that he also regularly hosted exotic events at clubs in Columbus and elsewhere. (R. 1082, trial tr., 8073, 8112 (Cunningham).)

Robinson argues (Robinson Br. at XX) that the situation here does not satisfy the factors proscribed by the Fifth Circuit in *Collins*, which this Court quoted in *Wang. See Wang* at 238-39 (quoting *United States v. Collins,* 40 F.3d 95, 100 (5th Cir. 1994). *Collins* held that "[c]riminal acts directed toward individuals may violate section 1951(a) only if: (1)

101

the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some 'cumulative effect on interstate commerce' " 40 F.3d at 100 (footnotes omitted)). In fact, however, the facts here satisfy the first two categories:  Cunningham was an "individual directly and customarily engaged in interstate commerce" and the conspirators' acts created a likelihood of depleting the assets of Tap Out Entertainment, "an entity engaged in interstate commerce." As such, *Collins* undermines, rather than assists Robinson's argument.

Accordingly, the district court correctly concluded that there was sufficient evidence of the required interstate nexus, and correctly denied Harris's and Robinson's motions for judgment of acquittal on Count 6. (*See* R. 1548, trial tr., 17160-63; R. 1137, opinion and order, 12703.)

## V. There was sufficient evidence of Robinson's identity as to Counts 5 and 6. (*responding to Robinson's fourth issue*)

Robinson argues that there was insufficient evidence that he is the same "Tink" that committed the crimes in Counts 5 and 6. The district court correctly rejected Robinson's claim of insufficiency on this score. (*See* R. 1137, opinion and order at 12707-12710.)

Evidence linking Robinson to Donathan Moon's murder came from several witnesses. First, Ashley Ward testified that her then-boyfriend, Rastaman Wilson, had shared the details of the Donathan Moon murder with her on the same night that it occurred. (R. 1081, trial tr., 7915-19 (Ward).) According to Ward, Rastaman Wilson identified several others as participating with him in that murder, including "Tink," an acquaintance of Rastaman who had previously been to Ashley's house. (*Id.* at 7912, 7916.) Ashley Ward made an in-court identification of Clifford Robinson as the "Tink" she knew through Rastaman. (*Id.* at 7932.) And she testified at trial that the first name of the "Tink" she knew was Clifford. (*Id.* at 7911.)

Rastaman Wilson not only told his girlfriend about the crime; he also told his mom, Jada Wilson, who the jury heard from at trial. (R. 1084, trial tr., 8600 (Wilson).) Within a week of the incident, Rastaman

discussed the crime with Jada, and said he had done it with his long-time friend Tink and others. (*Id*.) Jada knew "Tink" or "T" was Clifford Robinson, who Rastaman had been friends with for ten to fifteen years, and who Jada knew well. (*Id*. at 8598-99, 8605.) In fact, years later, when both he and Clifford Robinson were in prison, Rastaman asked his mom to put some money on Clifford Robinson's prison account for expenses, which she did, three times. (*Id*. at 8606; R. 1120, trial tr., 10382-85 (Bajus).)

Robinson was also linked to the Moon offense by witness David Hurt, the unindicted co-conspirator who acted as a driver on the evening of the Moon offense. Hurt named Rastaman Wilson and Rastaman's friend "Tink" as two of the participants. (R. 1084, trial tr., 8508 (Barbuto); R. 1083, trial tr., 8290 (Hurt).) Hurt testified that "Tink" rode in Hurt's car that evening. (R. 1083, trial tr., 8290, 8291, 8297 (Hurt).) Hurt had himself been acquainted with Tink prior to the murder and indicated that he had been to Tink's mother's house. (R. 1083, trial tr., 8285-87, 8304-07 (Hurt); *see also* R. 1084, trial tr., 8576 (Barbuto).) In fact, when initially questioned by law enforcement in 2012, he told officers that Tink's mother lived near Livingston and

104

Lockbourne, and that the house was near a doctor's office (R. 1083, trial
tr., 8304-07 (Hurt)), all of which which proved to be an accurate
description of where Clifford Robinson's mother in fact lived. (R. 1120,
trial tr., 10340-42 (Bajus).) Like Ashley Ward, Hurt made an in-court
identification of Clifford Robinson as the "Tink" that participated in the
Donathan Moon murder. (R. 1083, trial tr., 8316 (Hurt).)

The Government also introduced other evidence linking Robinson
to "Tink." During the course of the investigation, Detective Barbuto
went to talk to Clifford Robinson in 2012. (R. 1084, trial tr., 8522
(Barbuto).) In response to Barbuto's questioning, Robinson confirmed he
used the nickname Tink, and that he knew Rastaman Wilson, an R.J.,
and an "O" (a nickname used by Harris). (*Id.* at 2889, 2937-38, 2943-44.)
Consistent with that, during trial, the Government introduced evidence
that Harris had an entry for "Tink" in his cell phone directory. (R. 1118,
trial tr., 9914-15 (Simon); R. 1122, trial tr., 10880 (Gill).)  Testimony of
other witnesses confirmed that Clifford Robinson was known to
members of SNP and Homicide Squad. Cooperating witness Anthony
Jones, who identified himself as a member of Homicide Squad, testified
that he knew a person named Tink, whose real name was "Clifford

105

something." (R. 1119, trial tr., 9952, 9992 (Jones).) Samantha Murphy, who had children with Ledbetter's cousin (R. 1076, trial tr., 6441 (Murphy)), identified a photo of Robinson as a person she saw "exchanging drugs and guns" with Ledbetter. (*Id.* at 6447.)

Robinson's conduct after being questioned by Detective Barbuto in 2012 provided further evidence that he was the "Tink" who was acquainted with Harris and Rastaman—and who was involved in the Moon murder. Following the interview, Robinson placed a call in which he gave the person he was speaking to Jada Wilson's number, and referred to "Rasta, O-Dog, and R.J." (R. 1084, trial tr., 8578 (Barbuto).) Robinson's reference to "O-Dog" in the call confirmed his familiarity with Harris, as Detective Barbuto had referred only to "O" in speaking with Robinson. (*Id.* at 2944.) Similarly, Robinson's awareness of Jada Wilson's number, which he shared in the call, was consistent with his being the "Tink" who was a friend of her son Rastaman.

In addition, after government witness Jada Wilson testified, Robinson was "in a rant" after being returned to the lockup, and a deputy marshal heard Robinson state that "Santa Clause should pay her a visit." (R. 1124, trial tr., 11415 (Aguilar); *see also,* R. 1124, trial

tr., 11440 (additional deputy marshal heard comment but could not tell who said it).) This reference to "Santa" paying a visit to Jada Wilson paralleled evidence that Crystal Fyffe had been afraid of Ledbetter's contact "Santa" who "took care of business" for him, and evidence that Ledbetter had referred to "Santa" coming early in a threatening letter to Crystal before she was murdered. *See supra* at 64-65.

Robinson argues that while the evidence was sufficient to show that he went by "Tink," and that someone who went by Tink was involved in the Moon murder, it was not sufficient to show that he was *that* Tink. While acknowledging that he was identified in court as *that* Tink by both Ashley Ward and David Hurt, he notes that both of those witnesses had failed to identify his photograph from photo arrays Detective Barbuto displayed to them during the investigation.

But the jury could reasonably have chosen to give more weight to Ward and Hurt's in-court identifications of Clifford Robinson than the fact that they did not identify a particular photo of him in a photo array. The government argued that the photo of Robinson in the array was difficult to recognize. (*See* R. 1549, trial tr., 17463-65 (rebuttal close); *see also* R. 1083, trial tr., 8319-20 (Hurt).) The jury had the

opportunity to view Robinson in court, to view the photo arrays in question, and to evaluate the credibility of Hurt's and Ward's in-court identifications of Robinson together with all the other evidence. Robinson was free to, and did, challenge the persuasiveness of the identifications, but the jury was free to view the evidence differently.

## VI. The definition of crime of violence in § 924(c)(3)(B) is not unconstitutionally vague, and Harris's and Robinson's arguments to the contrary regarding their Count 6 convictions do not require reversal. (*responding to Harris's third issue and Robinson's third issue*)

Harris and Robinson raise a vagueness challenge to their convictions on Count 6, which charged them with murder through the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c), (j), and (2). (R. 300, superseding indictment at 1190.) Under § 924(c), it is a federal crime to use or carry a firearm during and in relation to a crime of violence, or to possess a firearm in furtherance of a crime of violence. The statute defines "crime of violence" as a federal offense that is a felony and—

   (A)   has as an element the use, attempted use, or
         threatened use of physical force against the person or
         property of another, or

   (B)   that by its nature, involves a substantial risk that
         physical force against the person or property of another

108

may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

Here, the charged predicate "crime of violence" for Count 6 was a conspiracy to commit Hobbs Act robbery. (*See* R. 300, superseding indictment, 1190; R. 1553, trial tr., 17816-17.) The district court held that offense qualified as a crime of violence under § 924(c)(3)(B). (R. 1137, opinion and order, 12701-02.) Robinson and Harris argue, however, that § 924(c)(3)(B) is unconstitutionally vague, such that the charged predicate cannot qualify as a crime of violence. This Court reviews a constitutional challenge to a statute *de novo*. *See, e.g., United States v. Coss*, 677 F.3d 278, 289 (6th Cir. 2012).

> A. *This Court previously held that § 924(c)(3)(B) is not unconstitutionally vague, and that conclusion remains correct.*

The district court rejected Appellants' vagueness argument below, holding it was foreclosed by this Court's decision in *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016). (*See* R. 990, opinion and order, 5173-74; R. 1137, opinion and order, 12700-03.) Appellants acknowledge that this Court held in *Taylor* that § 924(c)(3)(B) is not impermissibly vague, but argue that *Taylor* is inconsistent with the Supreme Court's recent decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), which

109

reached a contrary conclusion regarding the residual clause of 18 U.S.C. § 16(b). (See Robinson's Additional Citation, May 12, 2018.)

A panel decision "remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Bonner v. Perry*, 564 F.3d 424, 430 (6th Cir. 2009). *Dimaya* addressed the constitutionality of 18 U.S.C. § 16(b), not § 924(c)(3)(B), and thus does not itself address the question *Taylor* resolved. Nor does *Dimaya's* holding as to § 16(b) logically require a similar conclusion as to § 924(c)(3)(B). Indeed, *Dimaya*'s conclusion that § 16(b) is unconstitutionally vague paralleled this Court's own analysis of § 16(b) in *Shuti v. Lynch*, 828 F.3d 440, 449-50 (6th Cir. 2016), *cert. denied sub nom. Sessions v. Shuti*, 138 S. Ct. 1977 (2018). In *Shuti,* this Court held that § 16(b) is unconstitutionally vague, *despite* having already reached a contrary conclusion as to § 924(c)(3)(B) in *Taylor*. *See Shuti*, 828 F.3d at 449-50. Given *Shuti*, any argument that an analysis of the vagueness of § 924(c)(3)(B) is necessarily controlled by *Dimaya*'s analysis of § 16(b) is contrary to circuit law.

At the same time, the United States acknowledges that the Supreme Court in *Dimaya* rejected in the § 16(b) context several arguments paralleling those accepted by this Court in the § 924(c)(3)(B) context in *Taylor. Compare Dimaya*, 138 S. Ct. at 1215-23 *with Taylor*, 814 F.3d at 378-79. The United States further acknowledges that the reasoning of an intervening Supreme Court decision may warrant panel reconsideration of a decision of this Court even though the holding of the intervening decision is not "precisely on point." *Ne. Ohio Coal. for the Homeless v. Husted,* 831 F.3d 686, 720-21 (6th Cir. 2016) (citing cases); *but cf. Gor v. Holder*, 607 F.3d 180, 188-192 (6th Cir. 2010).

Should this Court conclude that the disparate reasoning of *Taylor* and *Dimaya* warrants reconsideration of *Taylor* by this panel, however, the end result should remain unchanged. *Taylor*'s ultimate conclusion—that § 924(c)(3)(B) is not unconstitutionally vague—remains sound and correct, for reasons already recognized and relied on by this Court in *Shuti,* 828 F.3d at 449-50.

Understanding those reasons begins with consideration of the role of the categorical approach in the § 924(c) context. Section 924(c)(3)(A), which defines "crime of violence" by reference to the "element[s]" of an

111

offense, requires a categorical approach, under which courts examine the statutory definition of the predicate crime. *See, e.g.*, *United States v. Rafidi*, 829 F.3d 437, 443 (6th Cir. 2016). Although the United States and this Court have previously treated § 924(c)(3)(B) as also involving a categorical approach, *see United States v. Taylor*, 176 F.3d 331, 337 (6th Cir. 1999) (holding the predicate here, conspiracy to commit Hobbs Act robbery, categorically qualified as a crime of violence under the § 924(c)(3)(B) residual clause),[10] the Supreme Court's intervening decision in *Dimaya* raises serious constitutional questions about use of the categorical approach in this provision. *See Northeast Ohio Coalition*, 831 F.3d at 720-21 (reconsideration of panel decision warranted by intervening Supreme Court authority undermining reasoning).

If this panel reconsiders the interpretation and constitutionality of § 924(c)(3)(B) here, the Court should construe § 924(c)(3)(B) to require that the classification of an offense as a "crime of violence" under that

---

[10] In light of the United States' former position, this Court, while noting the application of a categorical approach to § 924(c)(3)(B), does not appear to have addressed the issue in a case in which it was contested. This Court in *Shuti* did not treat circuit precedent as necessitating a categorical approach to § 924(c)(3)(B), and instead viewed that provision as focusing on "real-world conduct." *Shuti*, 828 F.3d at 449-50.

provision be based on the defendant's actual conduct—a case-specific approach rather than a categorical one. Indeed, this Court already relied on that case-specific understanding of § 924(c)(3)(B) in *Shuti v. Lynch*, 828 F.3d 440, 449-50 (6th Cir. 2016), in distinguishing § 16(b). In addition, three Circuits have adopted that case-specific understanding post-*Dimaya*.[11] *See United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018); *Ovalles v. United States*, –F.3d–, No. 17-10172, 2018 WL 4830079 (11th Cir. Oct. 4, 2018) (en banc); *United States v. Douglas*, No. 18-1129, 2018 WL 4941132 (1st Cir. Oct. 12, 2018). As

---

[11] Even before *Dimaya*, a number of other courts had suggested abandoning the categorical approach to Section 924(c)(3)(B). *See, e.g., United States v. St. Hubert*, 883 F.3d 1319, 1334-37 (11th Cir. 2018); *In re Irby*, 858 F.3d 231, 234 (4th Cir. 2017); *United States v. Robinson*, 844 F.3d 137, 141 (3d Cir. 2016); *United States v. Prickett*, 830 F.3d 760, 761 (8th Cir.) (per curiam), vacated, 839 F.3d 697 (8th Cir. 2016) (per curiam), *cert. denied*, 138 S. Ct. 1976 (2018). In contrast, the Fifth, Tenth and D.C. Circuits have held that Section 924(c)(3)(B) is unconstitutionally vague in light of *Dimaya*. The United States is seeking further review in each instance. *See United States v. Davis*, 903 F.3d 483 (5th Cir. 2017), *petition for cert. pending* No. 18-431 (filed Oct. 3, 2018); *United States v. Salas*, 889 F.3d 681, 684-686 (10th Cir.), *petition for cert. pending* No. 18-428 (filed Oct. 3, 2018); *United States v. Eshetu*, 898 F.3d 36, 37-38 (D.C. Cir.) (per curiam), *petition for reh'g pending*, No. 15-3020 (D.C. Cir. filed Aug. 31, 2018). The Fourth Circuit has sua sponte ordered en banc review to reconsider whether Section 924(c)(3)(B) requires a categorical approach. *United States v. Simms,* No. 15-4640 (4th Cir. argued Sept. 26, 2018).

discussed in the following sections, a case-specific construction of § 924(c)(B) comports with the text and context of the statute; is supported by the canon of constitutional avoidance; and is consistent with Supreme Court authority.

>   B. *The Supreme Court's decision in Dimaya did not render § 924(c)(3)(B) vague nor did it require a categorical approach.*

In *Dimaya*, the Supreme Court held that the definition of a "crime of violence" in 18 U.S.C. § 16(b)—the language of which is nearly identical to § 924(c)(3)(B)—is unconstitutionally vague as incorporated into the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(43)(F). 138 S. Ct. at 1212, 1223. The Court determined that "[t]wo features" on which it had previously relied to invalidate the "residual clause" of the Armed Career Criminal Act of 1984 (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii), were likewise present in § 16(b) as incorporated into the INA. *Dimaya*, 138 S. Ct. at 1213 (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015)). The Court explained that § 16(b), like the ACCA's residual clause, "calls for a court to identify a crime's 'ordinary case' in order to measure the crime's risk" and creates "uncertainty about the level of risk that makes a crime 'violent.'" *Id.* at 1215. The Court emphasized, however, that the "substantial risk"

114

feature gives rise to constitutional concerns only when combined with the "categorical approach" feature. *Id.* at 1214-15. The Court "'d[id] not doubt' the constitutionality of applying" a "'substantial risk [standard] to real-world conduct.'" *Id.* at 1215 (quoting *Johnson*, 135 S. Ct. at 2561).

The Court also did not hold in *Dimaya* that language like § 16(b)'s invariably mandates a categorical approach under which a court must disregard real-world conduct in favor of attempting to identify the "ordinary case" of a particular crime. A plurality of the Court viewed § 16(b)—which often, as in the INA context presented in *Dimaya*, is applied to classify a prior conviction entered by another court in otherwise unrelated proceedings—as "[b]est read" to require such an approach. 138 S. Ct. at 1217 (opinion of Kagan, J.); *see id.* at 1216-18. The plurality observed, however, that the government had not asked the Court to abandon the categorical approach in the § 16(b) context. *Id.* at 1217. Justice Gorsuch, concurring in part and concurring in the judgment, similarly stressed that the government had conceded the categorical-approach issue in *Dimaya* and expressed his willingness to consider "in another case" whether "precedent and the proper

115

reading of language" like Section 16(b)'s in fact requires a categorical approach. *Id.* at 1233 (opinion of Gorsuch, J.). And Justice Thomas, joined by Justices Kennedy and Alito, filed a dissenting opinion advocating that the Court "should abandon [the categorical] approach" entirely under Section 16(b). *Id.* at 1242 (opinion of Thomas, J.).

*Dimaya* did not include any majority holding that § 16(b) requires a categorical approach, and it leaves open the same question for § 924(c)(3)(B). Pre-*Dimaya* precedent treating § 924(c)(3)(B) to require a categorical approach should be reconsidered in light of the constitutional concerns that such an interpretation would create following *Dimaya*. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (noting that a court is "obligated to construe [a] statute to avoid [constitutional] problems" if it is "'fairly possible'" to do so) (citations omitted). As discussed below, § 924(c)(3)(B) should be construed to require a case-specific approach that considers the defendant's own conduct, rather than the "ordinary case" of his crime. Such a case-specific approach makes particular sense in the context of § 924(c), which—unlike § 16(b) or the ACCA—employs the term "crime of

violence" exclusively to describe the circumstances of the conduct for which the defendant is *presently* charged.

C. *Section 924(c)(3)(B) should be interpreted to require a case-specific approach*

Conviction under § 924(c) requires a jury to find (or the defendant to admit through a plea) that the defendant "committed all the acts necessary to be subject to punishment for" a qualifying federal crime and that his commission of that crime had a sufficient nexus to his use, carrying, or possession of a firearm. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999). The jury's role thus inherently requires consideration of, and determinations about, the unlawful course of conduct charged as a "crime of violence" under § 924(c)(3)(B). Unlike in the context of a recidivist sentencing enhancement (like the ACCA) or the classification of a prior offense for purposes of determining an alien's removability (like § 16(b) in *Dimaya*), § 924(c)(3)(B)'s definition of a "crime of violence" is never applied to a prior conviction, the specific facts of which may not be before the court. Instead, a prosecution under § 924(c) will by necessity involve a developed factual record about the underlying crime. *See Ovalles*, 2018 WL 4830079 at *14-15. That feature of § 924(c) cases enables the jury to apply the "crime of violence"

117

definition in § 924(c)(3)(B) in a case-specific manner that considers a

defendant's own conduct. Viewed as a case-specific question, whether a

predicate is a "crime of violence" under § 924(c)(3)(B) presents a mixed

question of law and fact that must either be resolved by a jury or

admitted by the defendant in connection with a guilty plea. *See United

States v. Gaudin*, 515 U.S. 506, 509-10 (1995). Construing the statute to

incorporate such is consistent with its text, context, and interpretation

by the Supreme Court.

1. The text of section 924(c)(3)(B) is consistent with a case-specific approach

In order for an "offense" to be a crime of violence under

§ 924(c)(3)(B), it must, "by its nature, involve[]" a substantial risk that

physical force "may be used in the course of committing the offense." 18

U.S.C. § 924(c)(3)(B). That language comports with a case-specific

approach that relies on the conduct at issue in a particular prosecution.

As the Supreme Court recognized in *Nijhawan v. Holder*, 557 U.S.

29 (2009), "in ordinary speech words such as 'crime,' 'felony,' 'offense,'

and the like sometimes refer to the specific acts in which an offender

engaged on a specific occasion." *Id.* at 33-34. The Court in that case

accordingly interpreted a provision that used the term "offense" to

118

"call[] for a 'circumstance-specific,' not a 'categorical,' interpretation." *Id.* at 36; *see* 8 U.S.C. § 1101(a)(43)(M)(i). The Court in *United States v. Hayes*, 555 U.S. 415 (2009), likewise construed a statutory reference to "an offense . . . committed by a current or former spouse," 18 U.S.C. § 921(a)(33)(A)(ii), as contemplating a factual, rather than a categorical, inquiry. *Hayes*, 555 U.S. at 426. As the Court explained in a later decision, the language at issue in *Hayes* was exactly the type of language that Congress would employ as an instruction "to look into the facts" of a crime. *Mathis v. United States*, 136 S. Ct. 2243, 2252 (2016). Section 924(c)(3)(B)'s similar reference to "committing the offense" can thus reasonably be understood to refer to the specific criminal conduct at issue in the § 924(c) prosecution. *See Johnson*, 135 S. Ct. at 2562 (recognizing that reference to the commission of an offense can indicate a case-specific approach).

Section 924(c)(3)(B) also uses the term "involves," a term that Congress repeatedly used in other provisions of the Comprehensive Crime Control Act of 1984 (the enactment that contained the original "crime of violence" definition for § 924(c)) in a manner that requires courts to consider a defendant's underlying conduct. *See, e.g.*, Pub. L.

No. 98-473, § 4243, 98 Stat. 1837, 2059 (Oct. 12, 1984) (elevating the burden of proof for the release of "a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage"); *id.* at § 502, 98 Stat. 2068 (establishing the sentence for drug offenses "involving" specific quantities and types of drugs); *id.* at § 1952B, 98 Stat. 2137 (defining violent crimes in aid of racketeering to include "attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury"). Although the rule is not invariable, it is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (citations omitted). Application of that canon makes particular sense in this context, because the Supreme Court has previously relied on the *absence* of the word "involves" as indicating that a categorical approach *is* required. *See Taylor v. United States*, 495 U.S. 575, 600 (1990).[12]

---

[12] The ACCA's residual clause also includes the word "involves." *See Dimaya*, 138 S. Ct. at 1216-17 (plurality opinion) (noting this similarity between Section 16(b) and the ACCA's residual clause). But the

A jury can readily determine whether a defendant's underlying "offense . . . by its nature, involves" the use of physical force in the course of its commission without needing to consider what the "ordinary case" of that offense might be. The term "nature" refers to "the basic or inherent features, character, or qualities of something." Oxford Dictionary of English 1183 (3d ed. 2010). That "something" can be the defendant's own crime, rather than a stylized "ordinary case." Congress has, for example, instructed sentencing courts to consider "the nature and circumstances of the offense"—naturally understood as the defendant's own conduct—in determining the appropriate sentence in a federal criminal case. 18 U.S.C. § 3553(a)(1); *see, e.g.*, *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 242-43 (1957) (describing "the nature of the offense" of a bar applicant as "recruiting persons to go overseas to aid the Loyalists in the Spanish Civil War"); *see also Dimaya*, 138 S. Ct. at 1254 n.7 (Thomas, J., dissenting) (citing other examples). Similarly, in the context of § 924(c)(3)(B), the phrase "by its nature" can reasonably

---

Supreme Court has never explicitly focused on that term in applying the categorical approach to that clause and the Supreme Court's discussion in *Taylor* of the term's implications remains sound even if those implications may sometimes be overridden by other considerations.

be read to "mean only that an offender who engages in risky conduct cannot benefit from the fortuitous fact that physical force was not actually used during his offense." *Id.* at 1254 (Thomas, J., dissenting). A jury finding the facts of a particular offense is well positioned to also determine its "nature"—*e.g.*, whether a particular conspiracy that was as a factual matter largely or entirely inchoate nevertheless involved a substantial risk that force would be used in its commission.

### 2. The context of § 924(c)(3)(B) supports a case-specific approach

The statutory and jurisprudential context of § 924(c)(3)(B) provides additional support for a case-specific approach.

The position and function of § 924(c)(3)(B) suggest a statutory inquiry that goes beyond the legal definition of an offense. As noted above, § 924(c)(3)(B) operates in tandem with § 924(c)(3)(A), which defines a "crime of violence" to include any federal offense that "has as an element the use, attempted use, or threatened use of physical force." By focusing solely on the "elements" of the crime, § 924(c)(3)(A) requires an "elements-based categorical approach" by a court, rather than consideration of "the specific means by which the defendant committed the crime" by a jury. *United States v. Evans*, 848 F.3d 242, 245-46 (4th

Cir. 2017); *see, e.g.*, *United States v. St. Hubert*, 883 F.3d 1319, 1331 (11th Cir. 2018); *cf. Mathis*, 136 S. Ct. at 2248 (explaining that the inquiry under a similarly worded ACCA provision "focus[es] solely on whether the elements of the crime of conviction sufficiently match" the statutory definition). Section 924(c)(3)(B), however, is necessarily understood to cover offenses *other* than those covered by § 924(c)(3)(A). *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining the "basic interpretive canon[]" that different provisions of a statute should be interpreted to mean different things). And because § 924(c)(3)(A) already covers all offenses that have the legal element of physical force, § 924(c)(3)(B)'s substantial-risk-of-force standard naturally invites an inquiry that goes outside the four corners of an offense's legal definition.

The customary way to apply a "qualitative standard such as 'substantial risk'" is to do so by reference "to real-world conduct," not platonic legal constructs. *Johnson*, 135 S. Ct. at 2561. "[D]ozens of federal and state criminal laws" use such terms, and "almost all" of them "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*." *Id.* An "ordinary case" categorical approach is an anomaly, not the norm, and § 924(c)(3)(B)'s

123

"substantial risk" inquiry can thus readily be understood as a mixed question of law and fact that a jury would determine. *Gaudin*, 515 U.S. at 509-10; *see id.* at 513, 522-23 (noting that, with the exception of "pure questions of law," "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged") (emphasis omitted).

### 3. The reasons for applying the categorical approach to other statutes do not apply to § 924(c)(3)(B)

The Supreme Court has required an "ordinary case" categorical approach only in the context of statutes that are applied to classify prior convictions. The reasons for applying the categorical approach in that context do not extend to § 924(c)(3)(B), which instead applies only to the conduct giving rise to the current prosecution.

The Supreme Court first endorsed a "categorical approach" interpretation of a federal statute in *Taylor v. United States*, *supra*. *See St. Hubert*, 883 F.3d at 1335. The Court in that case considered whether the ACCA's reference to a prior conviction for "burglary" meant burglary as defined by state law or instead referred to "some uniform definition." *Taylor*, 495 U.S. at 580. The Court determined that

Congress had intended to refer to burglary in a uniform "generic" sense, *id.* at 598, and then addressed how the government would prove that a defendant's prior conviction was for "generic burglary," *id.* at 599-602. The Court resolved that issue by interpreting the ACCA to "mandate[] a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." 495 U.S. at 600.

The Court later interpreted the ACCA's now-defunct residual clause, which asked whether a prior conviction "involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), in light of "*Taylor*'s categorical approach." *James v. United States*, 550 U.S. 192, 208 (2007). The Court explained that the categorical approach for the residual clause required an inquiry into "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *Id.*

The Court has also "generally"—but not invariably—"employ[ed] a 'categorical approach'" when "the Government alleges that a state conviction qualifies as an 'aggravated felony' under the INA."

*Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013); *see Nijhawan*, 557 U.S. at 33-38 (applying a case-specific approach to a particular portion of the "aggravated felony" definition). The Court's use of the categorical approach in that context has extended to 18 U.S.C. § 16, which is incorporated by reference into the aggravated-felony definition, as well as "a variety of [other] statutory provisions, both criminal and noncriminal." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004).

*Taylor* adopted the categorical approach for reasons that were largely specific to the ACCA's focus on prior convictions and have no direct analogue in the context of § 924(c)(3)(B). *See* 495 U.S. at 600-02; *see, e.g.*, *id.* at 600 (reasoning that the ACCA required a categorical approach because that statute "refers to 'a person who . . . has three prior *convictions*' for—not a person who has committed—three previous violent felonies or drug offenses") (emphasis added). At the "heart of the decision" was a limitation on the amount of evidence about the circumstances underlying prior convictions that the parties would be permitted to introduce for the first time at sentencing. *Shepard v. United States*, 544 U.S. 13, 23 (2005); *see Taylor*, 495 U.S. at 601 (explaining why "the practical difficulties and potential unfairness of a

126

factual approach are daunting" in that context). Prior convictions "that are counted for an ACCA enhancement are often adjudicated by different courts in proceedings that occurred long before the defendant's sentencing." *United States v. Robinson*, 844 F.3d 137, 142 (3d Cir. 2016). In such cases, the categorical approach serves the "'practical' purpose[]" of "promot[ing] judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." *Moncrieffe*, 569 U.S. at 200-01 (citation omitted). The same is true for many statutes that incorporate § 16(b), including the immigration statute at issue in *Dimaya. See Dimaya*, 138 S. Ct. at 1218 (plurality opinion) (observing that the "utter impracticability" and "associated inequities" of a fact-based approach are "as great" in the context of classifying prior convictions under § 16(b) as they were under the ACCA's residual clause) (citation omitted). As this Court recognized in *Shuti*, what mandated the categorical approach for such provisions was "Congress's focus on the historical fact of prior conviction." *Shuti*, 828 F.3d at 444.

As explained in later cases, judicial factfinding involving prior convictions during sentencing also presents concerns about potential

violations of the Sixth Amendment. A judge's resolution of the disputed facts underlying a defendant's prior conviction at sentencing would be "too much like" the kind of factfinding that the Sixth Amendment requires the jury to conduct. *Shepard*, 544 U.S. at 25 (plurality opinion); *see Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Thus, in the context of the ACCA's residual clause, the categorical approach was required in order to comply with the "rule of reading statutes to avoid serious risks of unconstitutionality." *Shepard*, 544 U.S. at 25 (plurality opinion). The same is true of many criminal statutes that incorporate § 16(b). *See, e.g.*, 8 U.S.C. § 1326(b)(2) (providing an increased statutory-maximum term of imprisonment for an alien who illegally reenters the United States and has a prior conviction for an "aggravated felony," which includes a "crime of violence" under § 16).

But those "practical and constitutional reasons" for the categorical approach "are specific to the consideration of a prior conviction." *Douglas,* 2018 WL 4941132 at *10. Those reasons "do not exist," *id.*, in the context of § 924(c)(3)(B), where a jury has the factual record of the underlying offense before it and must determine whether the defendant committed that offense before determining whether the defendant's use,

128

carrying, or possession of a gun violated § 924(c). Unlike in the context of the classification of *prior* crimes, no practical or constitutional reason exists that would require courts to "analyz[e] a § 924(c) predicate offense in a vacuum." *Robinson*, 844 F.3d at 143. As this Court observed in *Shuti*, "[u]nlike the ACCA and INA, which require a categorical approach to stale predicate convictions, 18 U.S.C. § 924(c) is a criminal offense that requires an ultimate determination of guilt beyond a reasonable doubt—by a jury, in the same proceeding. This makes all the difference." *Shuti*, 828 F.3d at 449; *accord Barrett*, 903 F.3d at 178 (noting that § 924(c)(3)(B) "can be applied to a defendant's case-specific conduct, with a jury making the requisite findings about the nature of the predicate offense and the attending risk of physical force being used in its commission."); *see also id.* at 176 n.8.

Nor does an underlying-conduct approach give rise to any of the Sixth Amendment concerns that animated the Supreme Court's adoption of the categorical approach. "[A]ny fact that increases the penalty for a crime" under § 924(c) *is* "submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Accordingly, the defendant "suffers no prejudice because the court is not finding any new

129

facts which are not of record in the case before it." *Robinson*, 844 F.3d at 143; *see also Barrett,* at 179 (recognizing that a case-specific approach to § 924(c)(3)(B) "avoids not only the constitutional vagueness concerns that *Dimaya* . . . located in the categorical ordinary-case standard, but also the Sixth Amendment right-to-trial concern that originally prompted the Supreme Court to mandate a categorical approach to residual definitions of crimes of violence.").

> 4. Principles of constitutional avoidance support construing § 924(c)(3)(B) to require a case-specific approach

In the context of § 924(c)(3)(B), constitutional considerations counsel in favor of a case-specific, rather than a categorical, approach.

A court is "obligated to construe [a] statute to avoid [constitutional] problems" if it is "'fairly possible'" to do so. *St. Cyr*, 533 U.S. at 300 (citations omitted); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). That is particularly true where, absent a reasonable limiting construction, a statute could be deemed void for vagueness. *See United States ex rel. Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909) (noting that courts have a "plain duty" to adopt any "reasonabl[e]" interpretation of a statute that avoids constitutional concerns, rather than invalidating the statute as unconstitutionally

vague); *cf. Clark v. Martinez*, 543 U.S. 371, 381 (2005). "[T"here is a clearly plausible interpretation here that does not raise potential vagueness problems." *Douglas*, 2018 WL 4941132 at \*12. A court should not, therefore, lightly conclude that Congress intended § 924(c)(3)(B) to be applied in a manner that would render the statute unconstitutionally vague. Instead, the better interpretation of § 924(c)(3)(B), in light of the decision in *Dimaya*, is that the statute permits a jury to consider the defendant's real-world conduct in determining whether his offense qualifies as a crime of violence.

> D. *Although the district court did not require the jury to find that the predicate for Count 6 was a crime of violence, as would be necessary under a case-specific application of § 924(c)(3)(B), that omission was harmless in this case.*

Robinson and Harris may argue that, to the extent that a fact-specific rather than categorical approach is applied to § 924(c)(3)(B), the district court erred by instructing the jury that the Hobbs Act conspiracy predicate was a crime of violence rather than requiring a jury finding on the issue. (*See* R. 1553, trial tr., 17816.) Although the United States agrees that such a finding should, under a fact-specific approach, have been required, in light of the evidence at trial, the error is harmless.

The Supreme Court has made clear that while failure to instruct a jury on every element of an offense is error, it is subject to harmlessness review. *See Neder v. United States*, 527 U.S. 1, 8-13 (1999). The omission of an element is harmless if it is "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *see id.* at 15 (quotation omitted), such as where "the omitted element was uncontested and supported by overwhelming evidence." *Id.* at 17. *See also United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008).

That is just the situation here. Count 6 charged Harris, Robinson, and others with murder through use of a firearm during and in relation to conspiracy to commit Hobbs Act robbery. (*See* R. 300, superseding indictment at 1190.) The indictment alleged that the defendants "did unlawfully conspire to take and obtain cash belonging to G.C., by means of actual and threatened physical violence, in furtherance of such robbery, in violation of Title 18 United States Code, § 1951." (R. 300, superseding indictment at 1191.)

Here, there is no question that had the jury been asked, they would have found the requirements of § 924(c)(3)(B) to be satisfied as to the case-specific conduct at issue in this offense. The predicate offense

here was conspiracy to commit Hobbs Act robbery. *See* 18 U.S.C.

§ 1951(a). Harris, Robinson, and the other three participants set out,

heavily armed, for Cunningham's house. *See supra* at 29-30, 82-83.

Once there, Harris violently broke down the door, and Robinson walked

down the hall with an AK-47 and shot through a door into which

Donathan Moon had retreated. R.J. Wilson then entered that room and

shot and killed the man with a .45. *Id.* There is no possible doubt that

the jury would have concluded that this offense, under a case-specific

approach, satisfied the requirements of § 924(c)(3)(B). *Cf. Ovalles*, 2018

WL 4830079 at *18 (stipulated facts regarding charged predicate led

"inexorably" to conclusion that offense satisfied § 924(c)(3)(B) under

case-specific approach).


## Trial and Pretrial Issues

### VII.    The district court did not err in denying Ledbetter's motion to suppress evidence. (*responding to Ledbetter's first issue*)

Before trial, Ledbetter moved to suppress evidence including "all

evidence obtained from a warrantless traffic stop and search on

December 18, 2007." (R. 600, motion to suppress, 2503.) During the

traffic stop, an officer conducted a pat-down that led to the discovery of marijuana, crack cocaine, a firearm, and $45,000 in cash. (R. 790, order, 3646; R. 1567, suppression tr., 18511-12, 18518, 18553-54.) Ledbetter argued below that the police did not have sufficient basis to conduct the traffic stop or ensuing pat-down, which occurred after Ledbetter was observed carrying an unknown object out of a residence that was under surveillance in connection with suspected drug trafficking. (R. 600, motion to suppress, 2511-12.)

Following a hearing, the district court denied the motion. (R. 790, order, 3642-46, 3650-63, 71; R. 1567, suppression tr., 18467-18613.) The court concluded that the traffic stop was lawful based on officers' observation of Ledbetter turning left without signaling. (R. 790, order, 3652.) The court further concluded that the pat-down was lawful based on the totality of the circumstances, including Ledbetter's failure to immediately pull over when signaled, his nervous behavior and furtive movements, and contextual considerations. (*Id.* at 3653-63.)

On appeal, Ledbetter argues that the pat-down violated the Fourth Amendment because the officers did not reasonably suspect that

Ledbetter was armed and dangerous; he concedes the traffic stop was legal. (Ledbetter Br. at 23-25.)

This Court reviews findings of fact underlying a suppression order for clear error and conclusions of law de novo. *United States v. Fisher*, 745 F.3d 200, 202 (6th Cir. 2014). The existence of reasonable suspicion for a pat-down "is a mixed question of law and fact" that this Court reviews de novo. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016) (internal quotation marks omitted). Because the United States was the prevailing party, this Court considers the evidence in the light most favorable to the United States. *United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006).

A pat-down following a permissible stop satisfies the Fourth Amendment if based on circumstances leading up to the pat-down, the officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). This Court evaluates the reasonableness of an officer's suspicion based on "the totality of the circumstances" leading up to the pat-down. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). The ultimate question is whether "a reasonably prudent [person] in the

circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). An officer may draw "specific reasonable inferences . . . from the facts in light of his experience." *Id.*

Here, the district court correctly concluded that Ledbetter's flight from officers, combined with gestures consistent with accessing or discarding a weapon, provided strong evidence that he was armed and dangerous. (*See* R. 790, order, 3654-55, 3657-58; R. 1567, suppression tr., 18595.) In particular, (1) the officer who initiated the stop testified that after he signaled with lights and sirens for the vehicle to stop, Ledbetter made a left turn and drove for a block before stopping (R. 1567, suppression tr., 18505-07); (2) the same officer testified that after Ledbetter made the left turn, Ledbetter's vehicle "pulled over like it was going to come to a stop and then took off again," which the officer testified was "a huge red flag for us" because "[w]hen we've seen that before in the past, that's somebody who is trying to hide a gun, or do something to harm us" (*id.* at 18506 (testifying that "officer safety . . . was our main concern" after the vehicle pulled over); *see also id.* at 18545 (second officer testifying similarly)); and (3) the officer who

approached the driver's side of the vehicle testified that Ledbetter was in the driver's seat with his back to the officer, facing the center console with his hands toward the console—an action that the officer testified was consistent with accessing a weapon (*id.* at 18507-08; *see also id.* at 18546 (second officer testifying similarly)).

This Court's cases confirm that a defendant's flight from officers provides strong evidence that he might be armed and dangerous— particularly when combined with evidence consistent with an attempt to discard or access a weapon. In *United States v. Lane*, for example, the defendant began to flee after seeing uniformed police officers; after he had stopped and had been ordered to place his hands against the wall, he then attempted to reach into his pocket. 909 F.2d 895, 896-97 (6th Cir. 1990). This Court held that "[g]iven [the suspect]'s flight from the other officers and his attempts to reach into his coat pocket, [the officer] had a reasonable belief that [the suspect] was armed and dangerous, which justified his frisking [the suspect] for weapons." *Id.* at 900; *accord, e.g., United States v. Clemons*, No. 93-2347, 1994 WL 589649, *2 (6th Cir. Oct. 21, 1994) (affirming the legality of a pat-down where the defendant "was acting in a suspicious manner in a high crime area,

wearing a jacket in which a weapon could be hidden, and attempting to evade the officers").

These decisions are consistent with decisions in factually similar cases from other circuits. *See, e.g.*, *United States v. Lyons*, 733 F.3d 777, 782 (7th Cir. 2013) (attempted flight through a red light supported conclusion suspect was "armed and readily willing to put the safety of others at risk to avoid or delay an encounter with the police"); *United States v. Dawkins*, 419 F. App'x 224, 225 (3d Cir. 2011) ("[T]he fact that Dawkins appeared to be attempting to flee gave the officers reasonable suspicion that he was armed and dangerous."); *United States v. Scroggins*, 599 F.3d 433, 443 (5th Cir. 2010) (suspect's flight in contravention of commands was a ground for "suspecting danger"); *United States v. Tate*, 34 F. App'x 502, 505 (8th Cir. 2002) (defendant's "evasive driving maneuvers" contributed to holding that pat-down was reasonable).

Ledbetter notes that the officer who approached the passenger's side said that "he could see Ledbetter's hands so he knew he wasn't reaching for a weapon." (Ledbetter Br. at 27.) This statement misconstrues the evidence. The officer who approached the passenger's

side testified that Ledbetter's hands were positioned "around the center console," which he indicated "was very odd." (R. 1567, suppression tr., 18546, 18559.) When this officer indicated that he did not take any action toward Ledbetter because "I knew Officer Mabry would be approach[ing] and I could still see his hands," this statement only explained why he did not take action *before* Officer Mabry; it does not, as Ledbetter suggests, imply that there was nothing threatening about Ledbetter's position in the car. (*Id.*; *see also* R. 1567, suppression tr., 18596 (the district court indicating that it was "not worried about" the fact that the officer on the passenger's side did not take any action).)

This testimony was consistent with the testimony of his colleague: The officer who approached Ledbetter testified that Ledbetter's "back was toward me and he was facing toward the center console with his hands toward the center console" and that this position was another "flag[]" that "cause[d] us to believe there was some kind of weapon . . . nearby." (*Id.* at 18507-09, 18541-42.) In other words, both officers agreed that Ledbetter's position contributed to their suspicion, even though both officers testified that they could see Ledbetter's hands. (*See id.* at 18508 (driver's side officer testifying that Ledbetter's hands were

shaking).) And there is no support in the transcript for Ledbetter's allegation that "Detective Whitacre merely wanted to know who was in the van." (Ledbetter Br. at 28.) The district court correctly noted that Ledbetter's position supported reasonable suspicion. (*See* R. 790, order, 3657 ("Under analogous circumstances, the Sixth Circuit has found that an officer reasonably could have concluded that the defendant was attempting to reach for a weapon.") (citing *United States v. Bost*, 606 F. App'x 821, 825 (6th Cir. 2015).)

The district court also correctly concluded that reasonable suspicion was further supported by testimony about Ledbetter's nervousness and about the time of his arrest. (R. 790, order, 3657-58.) It was 8:30 p.m. and dark outside at the time of the traffic stop. (R. 1567, suppression tr., 18508, 18476.) The officer who approached the driver's side of the vehicle testified that, despite the fact that it was a cool, dark evening in December, Ledbetter was "glassy eyed" and "breathing heavy" and had hands that were shaking "uncontrollably," which the officer indicated exceeded "normal nervousness" associated with a traffic stop. (R. 1567, suppression tr., 18508.) *Cf. United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004); *see also United States v.*

*Jackson*, 663 F. App'x 426, 428-29 (6th Cir. 2016) ("Although nervousness is often inherent in traffic stops and thus alone an unreliable indicator of one's dangerousness, defendant appeared 'real nervous.'").

In sum, Ledbetter cannot demonstrate that the evidence, considered in a light most favorable to the United States, was insufficient to create a reasonable suspicion that he was armed and dangerous.

Even if Ledbetter could demonstrate error in the district court's decision to deny suppression, reversal would be unwarranted, as any error was harmless in light of the evidence at trial. *See United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007). The evidence obtained as a result of the stop—a firearm, $45,000 in cash, and small amounts of crack cocaine and marijuana—was not essential to any count and played a minor role in the lengthy trial.

It is true that Ledbetter's possession of these items was relevant to the conspiracy count: The possession was an overt act listed in the conspiracy count of the indictment. (R. 300, superseding indictment, 1169.) But the possession was not a *necessary* piece of evidence for the

141

conspiracy count: There were 112 overt acts listed in that count, and the court instructed the jury that in order to find that the defendant agreed that a conspirator did or would conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, it needed to be unanimous as to "at least two acts of robbery, murder, or distribution of a controlled substance, or any combination thereof." (R. 1551, trial tr., 17680-81; *see* R. 1141, verdict, 12717-19; R. 1551, trial tr., 17692.) In support of this count, the jury found that Ledbetter committed three murders—thus satisfying the requirement for predicate racketeering activity without reference to the possession. (*See* R. 1141, verdict, 12718.) The possession was not even an important piece of evidence for the conspiracy count: During the opening and closing statements, the United States never directed the jury to consider Ledbetter's possession of these items in its analysis of the conspiracy charge. (*See, e.g.,* R. 1073, trial tr., 5643 (describing, generally, the criminal activities of the enterprise); R. 1548, trial tr., 17183 (same). Any error in the admission of evidence obtained during the traffic stop was therefore harmless as to the conspiracy count.

142

The same is true of the two other counts connected to the challenged evidence: the charges related to the murder of Rodriccos Williams (counts nine and ten). The United States noted briefly in the initial closing that the robbery of Williams involved a suitcase with between 60 and 70 thousand dollars, and that less than a month later, Ledbetter was "stopped, December 18th, 2007, in his van, with crack, weed, a gun, and a whole bunch of money. . . . You can draw the inference that you know where that money came from." (R. 1548, trial tr., 17248 (closing statement); *see also* R. 1073, trial tr., 5696 (opening statement).) But the evidence of the money seized from Ledbetter weeks later was a very minor part of the extensive evidence of Ledbetter's role in the Williams murder. *See supra* at 55-59. Any error in the admission of evidence obtained during the traffic stop was therefore harmless as to these counts as well.

## VIII.    The district court did not err in denying Ussury's and Robinson's motions for severance. (*responding to Robinson's fifth issue and Ussury's third issue*)

In 2015, before any of the twenty charged defendants entered guilty pleas, the United States proposed grouping the defendants into three trials, including one that included the five Appellants here

(Ledbetter, Harris, Liston, Ussury, and Robinson) along with three co-defendants. (R. 639, notice of proposed grouping, 2710.) Several defendants, including Robinson and Ussury, moved for severance. (*See* R. 727, opinion and order, 3337 n.1 (summarizing motions and responses).) The district court denied the motions. (*Id*. at 3337.) During trial, Ussury and Robinson both renewed the motions for severance, with Ussury renewing during Earl Williams's testimony and Robinson renewing at the end of the government's case and at the close of evidence. (R. 1123, trial tr., 11156-57 (Ussury); R. 1126, trial tr., 11711-12 (Robinson); R. 1548, trial tr., 17178-79 (Robinson).) The court denied both motions. (R. 1123, trial tr., 11158; R. 1548, trial tr., 17178-79; 1131, order, 12647.)

On appeal, Ussury argues both that joinder was improper under Federal Rule of Criminal Procedural 8(b) and that the district court should have granted the motion to sever under Rule 14 because of prejudice allegedly caused by the joint trial. (Ussury Br. at 23, 26.) Robinson, conceding that joinder was proper, argues only that the district court should have granted the motion to sever under Rule 14. (Robinson Br. at 48.)

This Court reviews the district court's denial of Robinson's Rule 14 motion for severance for abuse of discretion. *United States v. Fields*, 763 F.3d 443, 456 (6th Cir. 2014). This Court reviews the denial of Ussury's Rule 8 motion for severance de novo. *United States v. Chavis*, 296 F.3d 450, 457 (6th Cir. 2002). Although Ussury argues that he "preserved the [severance] issue for this Court's review by filing a timely motion for severance before trial" (Ussury Br. at 23), this argument is incorrect as it relates to Rule 14. Because Ussury did not renew his motion to sever at the close of evidence, he has waived his Rule 14 objection. *See United States v. Allen*, 160 F.3d 1096, 1106 (6th Cir. 1998).

A. *Joinder was proper under Rule 8*

The United States is permitted to charge multiple defendants in the same indictment if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. Proc. 8(b). The allegations in the indictment determine whether joinder was proper. *Chavis*, 296 F.3d at 456. In general, Rule 8 "should be construed in favor of joinder." *United States v. Hatcher*, 680 F.2d 438, 440 (6th Cir. 1982). This accords with the principle that "joint trials conserve state

funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *United States v. Lane*, 474 U.S. 438, 449 (1986)(internal quotation marks omitted). Joinder of defendants is proper under Rule 8(b) where they are charged with a common RICO conspiracy. *United States v. Davis*, 707 F.2d 880, 883 (6th Cir. 1983).

The district court correctly concluded that joinder was proper under Rule 8(b). (R. 727, order, 3345.) As the district court indicated, "Fourteen defendants [including Ussury and three of his four co-defendants at trial] face the same RICO conspiracy count for their involvement with the Short North Posse." (*Id.*) The district court also correctly held that joinder was proper for all defendants (again including Ussury) who were "alleged to have committed at least one murder in furtherance of the same racketeering enterprise." (*Id.*) In other words, as the district court indicated, the prosecution of each defendant would "require an identical determination regarding the existence of the Short North Posse as an enterprise engaged in racketeering activity." (*Id.* (internal quotation marks omitted).) Ussury does not demonstrate otherwise by raising insignificant distinctions

146

between the murder charges against him and his co-defendants. (*See* Ussury Br. at 24-25.)

B. *Severance was not required under Rule 14.*

Under Fed. R. Crim. P. 14(a), even if joinder is proper, "the court may . . . sever the defendants' trials" if a joint trial "appears to prejudice a defendant." A defendant who seeks to sever his trial has the burden of showing "compelling, specific, and actual prejudice from" the denial of his motion. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). A defendant may not succeed in demonstrating prejudice by showing that "proof is greater against a co-defendant," *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992), or that he "may have a better chance of acquittal" in a separate trial, *Zafiro v. United States*, 506 U.S. 534, 539 (1993), or that "inflammatory evidence is admitted against one defendant, not directly involving another codefendant," *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir. 1985) (severance unnecessary despite evidence of "gruesome and brutal murders" charged against codefendants); *see also United States v. Scaife*, 749 F.2d 338, 344-45 (6th Cir. 1984) (defendant had not shown prejudicial joinder despite the fact that the testimony against his co-defendants included evidence

about the attempted murder of an FBI agent). A court should not grant severance "[w]here the same evidence is admissible against all defendants." *Warner*, 971 F.2d at 1196.

Robinson's charge of murder in aid of racketeering (count 5)—which includes, as an element, the existence of an enterprise engaged in racketeering activity, *see* 18 U.S.C. § 1959(a)(1)—makes the crimes of Robinson's co-defendants relevant in any trial against Robinson. (R. 300, superseding indictment, 1189-90.) *See United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992). The list of activities of the enterprise in count one of the superseding indictment (and incorporated in the murder in aid of racketeering charge against Robinson), included "murder, attempted murder and robbery, . . . the distribution and possession with the intent to distribute controlled substances, tampering with a witness, extortion, robbery and retaliation against a witness." (R. 300, superseding indictment, 1160-80, 1189.) Because evidence of the crimes of his co-defendants would have been admissible even in a separate trial of Robinson's murder in aid of racketeering count, Robinson cannot demonstrate that the district court abused its discretion by denying the motion to sever. (*See* R. 727, order, 3352

(noting that a specific purpose of RICO "is to tie together diverse parties and crimes") (internal quotation marks omitted).)

Furthermore, because both Robinson and his co-defendant Harris were charged in the murder of Donathan Moon, severance would have required identical evidence about the Moon murder to be presented in both trials. (*See* R. 300, superseding indictment, 1189-91.) And just as Robinson's co-defendants' crimes were admissible in any trial against him, the Moon murder would have been relevant and admissible for the enterprise-related charges against all of his co-defendants. Because evidence of Robinson's crime was admissible in the trial of his co-defendants, "separate trials would have necessarily involved repetitive use of most of the same evidence and same facts." *United States v. Ciampaglia*, 628 F.2d 632, 643 (1st Cir. 1980).

In addition, the jury instructions here countered the possibility of spillover prejudice, with the district court instructing as follows:

> [I]n our system of justice, whether a defendant is guilty or not guilty is both personal and individual. It is your duty separately to consider evidence against each defendant on each charge, and to return a separate verdict for each one of them. For each one, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge. In general, your decision on any one defendant or one

charge, whether it is guilty or not guilty, should not influence your decision on any of the other defendants or charges.

(R. 1551, trial tr., 17659-60.) *See Zafiro*, 506 U.S. at 539 ("less drastic measures [than separate trials], such as limiting instructions, often will suffice to cure any risk of prejudice"); *accord, e.g., United States v. Franklin*, 415 F.3d 537, 556 (6th Cir. 2005).

Although Robinson's primary argument involves allegations of "spillover prejudice," he also claims prejudice on the basis of a specific statement by Anthony Jones, a government witness. (Robinson Br. at 51-52; *see* R. 1124, tr., 11355; Ledbetter Br. at 39-40.) On cross-examination, Jones suggested that Ledbetter's attorney "gave information that probably got Crystal [Fyffe] murdered." (R. 1124, tr., 11355; Ledbetter Br. at 39-40.) As discussed in Part X herein, the testimony in question was stricken, and the jury instructed to disregard it. (R. 1124, tr., 11354-56.) Moreover, Robinson does not identify any "specific prejudice" against him that results from this statement regarding someone else's attorney, and his failure to do so dooms his argument. *See Saadey*, 393 F.3d at 678; *Gallo*, 763 F.2d at 1525. The

district court therefore did not abuse its discretion in denying Robinson's Rule 14 motion to sever.

Even if Ussury had renewed his Rule 14 motion to sever at the close of evidence, his arguments would be doomed by the same flaws as Robinson's: Ussury was charged with murder in aid of racketeering (counts 7 and 11)—which includes, as an element, the existence of an enterprise engaged in racketeering activity, *see* 18 U.S.C. § 1959(a)(1)— thus making the crimes of his co-defendants relevant in any trial against him. (R. 300, superseding indictment, 1191-92, 1196-97.) And because both Ussury and his co-defendant Christopher Harris were charged in the murder of Marcus Peters (counts 7 and 8), severance would require identical evidence about the Peters murder to be presented in both trials. (R. 300, superseding indictment, 1191-93.) His argument under Rule 14—which depends on spillover prejudice—fails. (Ussury Br. at 26-28.) Severance under Rule 14 was thus unwarranted as to Ussury as well.

**IX.    The district court did not plainly err in permitting testimony by Detective Caffey and Lieutenant Weir regarding gangs. (*responding to Liston's second issue, Harris's fifth issue, and Ussury's fourth issue*)**

Liston argues that the district court improperly allowed expert testimony by Detective Wayne Joseph Caffey (and, secondarily, Lieutenant Smith Weir); Harris and Ussury adopt his argument by reference. (Liston Br. at 24-37, Harris Br. at 29, Ussury Br. at 29.)

These arguments were not raised below. During Detective Caffey's testimony, the only comments from defense counsel took place during a sidebar, when Liston's attorney asked the court about whether Detective Caffey had been formally qualified (*see* R. 1074, trial tr., 6043 (". . . I could have totally missed it, but has he been qualified and declared an expert?"). The court responded by clarifying the process for qualifying experts in the Sixth Circuit under *United States v. Johnson*, 488 F.3d 690 (6th Cir. 2007). (*See* R. 1074, trial tr., 6043 ("You know, under Johnson he doesn't have to be qualified as an expert because . . . [y]ou don't want to give the jury the Court's imprimatur by having him declared an expert.")). The district court then stated, outside the hearing of the jury, that "I would declare him an expert under the old regime or if he was in state court because, you know, I can't imagine too

152

many people having more credentials . . . ." (*Id.* at 6043.) No objection

followed to Detective Caffey's qualifications, nor was there a request by

any defendant to voir dire Detective Caffey. (*See id.* at 6044-6093.) No

defendant raised any notice concerns. Similarly, no defendant objected

to Lieutenant Weir's testimony as improper opinion. (*See* R. 1118, trial

tr., 9773-9847 (Weir).) In the absence of an objection, this Court reviews

the admission of opinion testimony for plain error. *United States v.*

*Nixon*, 694 F.3d 623, 628 (6th Cir. 2012); *see also United States v. York*,

572 F.3d 415, 422 (7th Cir. 2009) (applying plain-error review to

arguments related to notice of expert testimony). Appellants cannot

show error, let alone plain error.

   A. *The district court did not plainly err in allowing Detective*
      *Caffey's opinion testimony.*

   The law-enforcement experience of agents and police officers can

qualify them to testify as experts about the nature and customs of

criminal enterprises. For example, this Court held that an expert was

qualified to testify about "the nature, organization, rules, and structure

of the national Cosa Nostra enterprise" in light of the fact that he had

spent 22 years with the FBI, including 17 in organized crime

investigations, and approximately 10 focusing on the Cosa Nostra.

*United States v. Tocco*, 200 F.3d 401, 418 (6th Cir. 2000). Similarly, the Eleventh Circuit held that Detective Caffey—the expert in this case— "was qualified to testify as a gang expert" in light of the fact that his "experience included thirty years with the LAPD specializing in street gangs" and "served as a nationwide consultant, speaker, and instructor on the origins, customs, and practices of the Bloods." *United States v. Wilson*, 634 F. App'x 718,736 (11th Cir. 2015).

Testimony about "the inner-workings of organized crime" is "a proper subject of expert opinion because such matters are generally beyond the understanding of the average layman." *Tocco*, 200 F.3d at 419 (internal quotation marks omitted). An expert's testimony about the characteristics of related national gangs can aid the understanding of the jury even where the expert has no knowledge of the local branch. *See United States v. Rios*, 830 F.3d 403, 415 (6th Cir. 2016) (approving the use of an expert who "opined about the nationwide Latin Kings, [when] the government sought to make the link to the Holland Latin Kings through other testimony").

Detective Caffey's qualifications were obvious: He testified that he had been a police officer in Los Angeles for 35 years; that he had spent

"[m]ost of [his] career . . . working gang assignments," including 12 years in "a gang surveillance unit"; that his specialized gang training included "courses provided by the California Gang Prevention Association, the attorney general's office of the State of California, and then several different gang associations throughout the country"; that for 25 years he had been teaching gang-related topics to law enforcement officials and others; and that he had testified about gangs and gang culture in federal court five times and in state court "about 500 times." (R. 1074, trial tr., 6037-39.)

Detective Caffey's testimony about Crip culture was also helpful to the jury in understanding the evidence. *See* Fed. R. Evid. 702(a). He testified about the Los Angeles origins of the Crips and the proliferation of "Crip sets," or independent, neighborhood-specific Crips gangs. (R. 1074, trial tr., 6040-42, 6044.) He indicated that the proliferation of gangs that identified as Crips resulted from "gang members from Los Angeles that spread throughout the country" or people who visited Los Angeles and "would take this culture back with them." (*Id.* at 6044-45.) He reviewed and commented on his understanding of photographs of graffiti found in the Short North area. (*Id.* at 6048-51.) He made very

clear, however, that he had never been to Columbus, was not familiar with any gang sets in Columbus, and was testifying only as to "just generally what you see nationally." (*Id.* at 6055.)

Appellants complain that Detective Caffey's lack of local knowledge rendered him unqualified, and that they lacked any opportunity for voir dire. But the presentation of Detective Caffey's testimony was consistent with the procedure established by this Court. In *United States v. Johnson*, this Court established the necessary procedure for using a law enforcement official as an expert: "[T]he proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose *voir dire* questions to the witness's qualifications if necessary and requested." 488 F.3d at 697-98.

It is unnecessary for courts to "conduct a formal inquiry into the qualifications of a witness before allowing expert testimony." *United States v. Neeley*, 308 F. App'x 870, 876 (6th Cir. 2009). It is also unnecessary for courts to formally qualify a witness: "If a witness's qualifications are obvious, we have found that there is no need to

formally qualify him as an expert." *United States v. Cobb*, 397 F. App'x 128, 139 (6th Cir. 2010). In the absence of an objection, this Court may infer the district court's qualification of the expert. *See, e.g.*, *United States v. Nixon*, 694 F.3d 623, 630 (6th Cir. 2012).

Here, because no defendant actually objected to Detective Caffey's qualifications below, *see Johnson*, 488 F.3d at 697-98, it was unnecessary for the court to rule on them. And because no defendant requested voir dire, there was no reason for the court to allow it. *Id.* The district court nevertheless indicated that it found Detective Caffey to be qualified. (R. 1074, trial tr., 6043.) Liston, Harris, and Ussury therefore cannot show error in the expert-admissibility procedure followed by the district court.

They also cannot show that admission of Detective Caffey's testimony was in error based on any notice-related issues. Liston briefly notes on appeal that the United States did not file a written notice relative to Detective Caffey or provide the written summary required under Federal Rule of Criminal Procedure 16. (Liston Br. at 27-28.) He does not, however, claim to have objected on this ground below. Appellants cannot fault the court for failing to explore never-mentioned

notice or discovery concerns. *See, e.g.*, *United States v. Derenak*, Nos. 98-1380, 98-1381, 210 F.3d 373, 2000 WL 331982 (6th Cir. March 24, 2000). Moreover, Liston does not explain why precluding the evidence entirely would have been a necessary remedy for any notice concern if raised. *See* Fed. R. Crim. Proc. 16(d); *see also, e.g.*, *United States v. Davis*, 514 F.3d 596, 611 (6th Cir. 2008) ("[S]uppression of evidence must be viewed as an undesirable remedy [for a discovery violation] reserved for cases of incurable prejudice or bad faith conduct demanding punishment by the court.") (*quoting United States v. Maples*, 60 F.3d 244, 247 (6th Cir.1995)). For example, given the anticipated length of the trial, the court could have deferred Detective Caffey's testimony from the first day until a later time.

In any event, any argument that Appellants were surprised by the subject matter of Detective Caffey's testimony is doomed by the extensive pre-trial briefing and argument concerning the intention of the United States to introduce an expert witness who would testify about gang culture, the court's order indicating that such testimony would be permissible from an appropriate witness (*see* R. 975, opinion, 4788-98.), and subsequent on-the-record indications that Detective

Caffey would serve as the "gang expert" (*see* R. 1547, trial tr., 17138 (SEALED); R. 1073, trial tr., 5794-95; *see also* R. 994, U.S. witness list, 5207). To the extent that Appellants intend to raise a notice-related argument on appeal, they cannot show plain error where the record makes clear they were aware of Caffey's anticipated testimony. *Cf. United States v. Jemison*, 310 F. App'x 866, 873-74 (6th Cir. 2009).

B. *The district court did not plainly err in allowing Lieutenant Weir's testimony regarding gangs.*

Liston, citing four pages of the transcript, argues that Lieutenant Weir also offered improper expert testimony. (Liston Br. at 32 (citing R. 1118, trial tr., 9776-79).) Although no defendant objected to Lieutenant Weir's cited testimony as impermissible opinion during the trial, (*see* R. 1118, trial tr., 9773-9847), Liston now challenges Weir's testimony "about gang related graffiti and gang signs," and testimony that "the Short North Posse is a set of a national Crip gang and that a particular hand sign, displayed in numerous photos and referred to [as] 'throwing

fours' was indicative of their gang." (Liston Br. at 32 (citing R. 1118, trial tr., 9776-79).)

Lieutenant Weir's testimony about his observations of gang tattoos and gang signs in Columbus was permissible lay-witness testimony based on his observations. (*See, e.g.*, R. 1118, trial tr., 9777 ("We would see [graffiti that included] messages, we would see people's names, and sometimes we would see just messages saying Short North Posse or SNP or something to that effect."), 9779 (describing hand signs he had seen). *See Rios*, 830 F.3d at 415. Moreover, to the extent that Lieutenant Weir's testimony included opinion testimony, it was permissible lay-opinion testimony based on his experience investigating the Short North Posse. *See United States v. Young*, 847 F.3d 328, 351 (6th Cir. 2017). At the least, given Weir's testimony regarding his personal involvement in the investigation, and in the absence of any objection, it was not plain error for the district court to permit the testimony. (*See* R. 1118, trial tr., 9775 (discussing his experience in the Short North), 9779-80 (discussing interviews of members or associates of the Short North Posse).)

In addition, any improper opinion in Lieutenant Weir's testimony did not affect Appellants' substantial rights in light of parallel testimony by others. In particular, Weir's testimony linking the Short North Posse and the Crips paralleled that of Detective Caffey, who testified that graffiti displayed in photos from the Short North included insignia indicative of a "Rollin 20s Crip set." (R. 1074, trial tr., 6048-49, 6051, 6065 (Caffey).) Caffey also explained that the graffiti contained other common features of the Crips, including Bs that were crossed out—as B stands for "Bloods"—and spellings avoiding use of "CK" which is understood to stand for "Crip Killer." (*Id.* at 6050, 6065.) In addition, Caffey explained that Crip sets nationally use the term "cuzz" or "cousin"—a terminology the jury heard employed by various witnesses throughout the trial. (*Id.* at 6052; *see, e.g.,* R. 1074, trial tr., 5803-04 (Wright); R. 1077, trial tr., 6766 (White); R. 1079, trial tr., 7240 (Nguyen).) Moreover, multiple lay witnesses themselves linked the Short North Posse and the Crips and identified associated graffiti and hand signs. (*See* R. 1074, trial tr., 5800, 5811, 5813-14, 5816, 5820-22, 5829, 5832, 5843-45, 5933 (Wright); R. 1115, trial tr., 8985, 8995 (Patterson); R. 1120, trial tr., 10242 (Cooper).) Appellants thus cannot

161

demonstrate that their substantial rights were affected by any error in

Lieutenant Weir's testimony.

## X. The district court did not err in denying a mistrial based on testimony relating to Ledbetter's defense attorney. (*responding to Ledbetter's third issue and Liston's third issue*)

Ledbetter's mistrial argument, adopted by Liston, challenges the

district court's denial of his oral motion for mistrial. This Court reviews

the denial of a motion for mistrial for abuse of discretion. *United States

v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994).

Appellants' argument that a mistrial was necessary depends

primarily on certain stricken testimony by government witness

Anthony Jones. (*See* Ledbetter Br. at 39-40.) During the cross-

examination of Jones, Ledbetter's attorney asked him a series of

questions about prior inconsistent statements, which led to the

following exchange:

Q:    And now you're here to come clean on these lies, correct?

A:    Yeah.

Q:    There's no reason any reasonable person would believe a word that you say, correct?

A:    Would they believe if I say that you gave information that probably got Crystal murdered?

Q:    I'm sorry?

MR. GATTERDAM [on behalf of Defendant Harris]: Objection.

BY MR. BERNDT:

Q:    I didn't hear what you said, sir.

A:    Would they believe if I said that you --

MR. GATTERDAM:    Objection, Your Honor. Sidebar, Your Honor. I'd ask for a sidebar.

A:    -- more than likely gave information that probably got Crystal murdered?

THE COURT:    Sidebar.

(R. 1124, tr., 11354-55.) At the sidebar, the court indicated that it would strike Jones's answer as non-responsive. (*Id.* at 11355.) The United States joined the objection. (*Id.*) Ledbetter agreed with the court's plan to instruct the jury to disregard the answer, and requested the opportunity to voir dire the witness outside the presence of the jury. (*Id.* at 11355-56.) Immediately after the sidebar, the court delivered the following instruction: "Ladies and gentlemen, . . . I'm going to instruct you to disregard the previous answer as it has no basis in fact or otherwise." (*Id.* at 11356.) The Court then excused the jury and permitted Ledbetter's counsel to voir dire the witness. (*Id.* at 11357.)

163

The witness explained that what he was referring to was his perception that Ledbetter's attorney gave Ledbetter information that certain individuals were cooperating. (*Id.* at 11357-58.)

After voir dire, Ledbetter's attorney made an oral motion for a mistrial, which the court took under advisement. (R. 1124, trial tr., 11446.) Before Ledbetter's attorney resumed his cross-examination, the court instructed Jones "to answer those questions [on cross-examination] directly and not volunteer answers that you know are not responsive to the questions asked." (*Id.* at 11380.)

After Jones's testimony, the court delivered the following instruction:

> Ladies and gentlemen, before we bring in the next witness, I want to reiterate to you, after Mr. Jones's testimony, that you are to completely disregard the answer that he gave to Mr. Berndt about some information somehow being related to Ms. Fyffe's murder. I want to emphasize to the court that Mr. Berndt has never, in this Court's opinion and the evidentiary record will reflect, engaged in improper conduct and that any inference to that effect that was created by Mr. Jones's testimony must be completely disregarded by you as a matter of law.

(*Id.* at 11405-06.)

The following day, the court orally denied the motion for mistrial:

Here, I find that any inflammatory or prejudicial comments concerning Mr. Berndt have been isolated and unlikely to

mislead or prejudice the jury; that there is no evidence of
bad faith on the government's behalf; that the strength of
the other evidence against all of the defendants is
substantial; and that the Court's actions in striking the stray
remarks and issuing limiting instructions to the jury cured
any risk that the defendants' substantial rights have been
impaired.

(R. 1125, trial tr., 11454-55.)

Appellants cannot demonstrate that the district court abused its

discretion in not granting a mistrial based on Jones's stricken

statement. To necessitate mistrial based on improper testimony, a

defendant must demonstrate that the testimony was not only improper,

*United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010), but "was

so clearly improper and prejudicial to the defendants that the harm

could not be erased by any instruction which the court might give."

*United States v. Smith*, 601 F.3d 530, 538 (6th Cir. 2010). To address

this requirement, this Court examines "(1) whether the remark was

unsolicited, (2) whether the government's line of questioning was

reasonable, (3) whether the limiting instruction was immediate, clear,

and forceful, (4) whether any bad faith was evidenced by the

government, and (5) whether the remark was only a small part of the

evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th

Cir. 2003). "[W]hen evidence is admitted in error, striking the testimony and providing clear limiting instructions to the jury usually cures the error." *United States v. Diomande*, 40 F. App'x 120, 122 (6th Cir. 2002). This Court "presume[s] that juries follow a trial judge's admonition to disregard an improperly introduced statement." *Id.*

Regarding the testimony by Jones about Ledbetter's attorney, all of the *Zuern* factors weigh against a finding of mistrial. Factors (1), (2), and (4) weigh against mistrial because the testimony followed a question by Ledbetter's attorney, not the government. (R. 1124, tr., 11355.) Factor (3) weighs against mistrial because the testimony by Jones was followed by a swift response from the district court. (*Id.* at 11355.) Factor (5) weighs against mistrial because—as the district court itself concluded— the evidence against both Ledbetter and Liston was strong. Moreover, as the district court observed, Jones's unsolicited response was "so nonsensical and non-responsive to the question posed that a reasonable juror would be unlikely to believe it." (R. 1131, opinion and order, 12656.) Neither Ledbetter nor Liston can establish that this stricken comment (which did not directly mention either of them) was so prejudicial as to require a mistrial.

166

While Appellants' arguments that mistrial was required focus primarily on the stricken testimony by Jones, they also point to certain testimony of Earl Williams. (*See* Ledbetter Br. at 38-39; Liston Br. at 35-36.) First, Williams testified that Ledbetter paid for Williams's attorney after Williams's arrest for the Rodriccos Williams murder. (R. 1123, trial tr., 11024-25.) Second, Williams testified that Ledbetter "sent his lawyer down to see me," and that "I told [Ledbetter's attorney] I wanted to keep [my attorney] because he seemed like he was more or less questioning me like a detective than more like trying to be a lawyer. He was trying to figure out what have I shared with my lawyer already." (*Id.* at 11029-30.)

Following objections by defense counsel, the district court instructed the jury to "disregard that portion of Mr. Williams' testimony wherein he testified that Mr. Berndt had questioned him like a detective," and further advised the jury that "as lawyers, we are required, in interviewing clients or perspective clients, to ask probing questions, and sometimes challenging questions, in properly discharging our responsibilities of zealous representation." (R. 1123, trial tr., 11059-60.) Appellants did not object to this instruction as

167

inadequate or claim that any of this testimony by Williams warranted a mistrial at the time it occurred (*id.*), instead only raising it as an additional basis for mistrial following the above-discussed Jones testimony (*see* R. 1525, trial tr., 11455).

The district court correctly concluded that Williams's testimony, even in tandem with Jones's, did not warrant a mistrial. First, as the district court recognized, after it struck Williams' testimony regarding counsel questioning him "like a detective," Ledbetter's own attorney re-opened the door by asking Williams on cross-examination about the stricken testimony. (R. 1125, trial tr., 11458 (". . . I permitted this line of questioning because Mr. Berndt had made a strategic decision to open this door during his cross-examination, and he was certainly entitled to do so.").) This cross-examination alone dooms Ledbetter's argument that Williams' testimony supports a mistrial. (*Id.* at 11458-59 ("[A]ny prejudice stemming from Earl Williams' testimony falls squarely on Mr. Ledbetter's defense team, because that was their strategic decision, not on the shoulders of the government, the Court, or other defense counsel.").)

Second, *Zuern* factor 2 weighs against mistrial because the "line of questioning was reasonable." *Zuern*, 336 F.3d at 485. Ledbetter's involvement in the arrangements regarding Williams's counsel was relevant to the relationship between cooperating witness Williams and Ledbetter, which was in turn relevant to proof of the charged offenses. *See, e.g., supra* at 55-56 (discussing Williams's testimony regarding his commission of the Rodriccos Williams murder with Ledbetter). Although the district court decided to strike a portion of the testimony and give a curative instruction, it did so pursuant to a Rule 403 balancing, not because the testimony was irrelevant. (*Id.* at 11059-60.)

The other factors of the mistrial standard also weigh against any necessity of mistrial based on the Williams testimony. The district court instructed the jury to "disregard" a portion of the testimony and gave a curative instruction. (R. 1123, trial tr., 11056-57; *id.* at 11059-60.) The district court also correctly recognized that there was no evidence of improper intent on behalf of the United States. (R. 1123, trial tr., 11039-40.) As such, Appellants fail to demonstrate any abuse of discretion in denying a mistrial.

**XI.  The district court did not err in its handling of evidence and prosecutorial statements regarding Liston's tattoos. (*responding to Liston's fourth issue*)**

Liston argues that (1) the district court erred under Fed. R. Evid. 403 by allowing the United States to present evidence of his "plainly visible" tattoos and (2) the United States' erroneous description of the evidence in closing constituted prosecutorial misconduct warranting reversal. This Court reviews evidentiary decisions—such as the admission of evidence of Liston's tattoos—for abuse of discretion. *United States v. Guthrie*, 557 F.3d 243, 249 (6th Cir. 2009). Where an objection is preserved, prosecutorial misconduct raises mixed questions of law and fact reviewed de novo. *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008). Review is for plain error, however, where, as here, a defendant objects to a prosecutor's statement but does not move for mistrial or object to an instruction given by the district court regarding the statement as inadequate. *See United States v. Manjate*, 327 F. App'x 562, 570 (6th Cir. 2009); *United States v. Spires,* 514 Fed. Appx. 569, 572-73 (6th Cir. 2013); *United States v. Griffin*, 437 F.3d 767, 769-70 (8th Cir. 2006). In any event, even if Liston is viewed as having adequately preserved an objection, because gang-affiliation tattoos are

highly probative evidence in RICO cases, and because the misstatement by the United States was isolated, unintentional, and followed by a cautionary instruction, Liston's arguments fail.

A. *The district court did not abuse its discretion by allowing evidence of Liston's visible tattoos.*

At trial, the United States consulted with the marshals and defense counsel about logistics related to the display of the defendants' tattoos. (R. 1115, trial tr., 9212.) The marshals expressed a preference to display the tattoos to the jury through photographs rather than in person, and the United States then made an oral motion "to order the defendants made available for photographs through one of our agents with the marshals." (*Id.*) After Liston and two other defendants challenged the request, the court requested briefing on the issue. (*Id.* at 9216.) The United States then filed a formal motion to display photographs. (R. 1100, motion, 8905-17.) Liston opposed. (R. 1102, Liston response, 8925-8928; R. 1110, opinion and order, 8950.)

The court granted the motion in part and denied it in part. The court held that evidence regarding defendants' tattoos was relevant and not unduly prejudicial, but that the Fifth Amendment prevented compelling the display of tattoos that were not "openly visible" on

defendants' bodies. (R. 1110, opinion and order, 8953-60.) For the tattoo evidence held to be admissible, the court agreed, "in light of safety concerns," to order the defendants to be photographed by the marshals. (*Id.* at 8960; *see also* R. 1123, trial tr., 11048-55 (oral ruling).)

The United States offered into evidence the resulting photographs, including six photographs showing tattoos on Liston's face, hands, and arms. (R. 1124, trial tr., 11416, 11419 (Aguilar); *see* R. 1604, notice, 19288-93 *(*Exhs. 1-6-1 through 1-6-6).) The United States cropped these photographs following objections from Liston's and Harris's attorneys, and the cropped photos were admitted. (R. 1125, trial tr., 11554-56.)

Liston cannot show that the district court abused its discretion in permitting this limited evidence regarding his tattoos. Liston's argument on appeal is that the evidence was "unfairly prejudicial." (Liston Br. at 41.) When an evidentiary decision depends on the balancing test in Federal Rule of Evidence 403, "[a] district court is granted very broad discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence." *United States v. Mack*, 258 F.3d 548, 555 (6th Cir. 2001) (internal quotation marks omitted). In reviewing an overruled Rule 403 objection, this

Court gives evidence its "maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Seymour*, 468 F.3d 378, 386 (6th Cir. 2006) (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988)).

This Court has held that gang-tattoo evidence, which "may be highly probative of an individual's membership in a particular gang," is admissible "in cases where the interrelationship between people is a central issue." *United States v. Rios*, 830 F.3d 403, 421 (6th Cir. 2016). In a prior drug conspiracy case involving the Short North Posse, for example, this Court held that "a tattoo indicating [the defendant]'s affiliation with the Short North Posse" was relevant evidence that the defendant was a conspiracy member. *United States v. Gibbs*, 182 F.3d 408, 422-23 (6th Cir. 1999). In RICO conspiracy cases, tattoo evidence is particularly relevant because the United States is "required to prove both the existence of a racketeering enterprise and each defendant's association with that enterprise." *Rios*, 830 F.3d at 421. In *Rios*, for example, this Court held that it was appropriate for the United States to "rel[y] heavily on gang-tattoo evidence to link members of the [gang] to each other." *Id.* at 420. The evidence at issue in *Rios* addressed "the

173

kinds of tattoos that Latin Kings throughout the country generally get, as well as the particular tattoos that various members of the [gang] had, . . . [and] the tattoos that [the defendants] have." *Id.*

The significant probative value for gang tattoos and insignia in such cases outweighs the prejudice, even if the tattoos or insignia refer to violent acts. For example, in *Gibbs*, this Court held t-shirts that named "Short North" and "4th Street Posse" were admissible despite the fact that they also included language such as "Death Row," as well as "a drawing of a tombstone and references to shootings": "Although the violent nature of some of the language of the T-shirts might be prejudicial . . . possession of the T-shirts was highly probative of the government's claim that he was a member of the SNP." 182 F.3d at 430.

Here as in *Gibbs*, evidence of Liston's tattoos was highly probative of his membership in the Short North Posse and Homicide Squad. Liston's visible tattoos included several commemorative tattoos with the words "R.I.P" and nicknames of deceased SNP members and a verse that began, "Homicide part one." (R. 1124, trial tr., 11419 (Aguilar); R. 1125, trial tr., 11555; R. 1604, notice, 19289-90, 19292 (Exhs. 1-6-2, 1-6-3, 1-6-5).) And while Liston's tattoos were directly probative (and thus

"prejudicial" in the sense that they tended to show his connection to the enterprise), Liston points to nothing about the tattoos that resulted in any "unfair" prejudice. Fed. R. Evid. 403.

To be sure, as Liston notes (*see* Liston Br. at 6-7, 11), there was other evidence that he was a member of the Homicide Squad. But particularly given that the existence of the enterprise and Liston's association with it were central to the charges, the district court did not err in allowing the government to present evidence that Liston's links and loyalty to the enterprise and its members were sufficiently significant to him to warrant commemoration in tattoos. *Cf. Rios*, 830 F.3d at 422, n.5 (permitting tattoo evidence over a Rule 403 challenge even where "defendants did not contest their membership," as "the prosecution is entitled to prove its case"), *quoting Old Chief v. United States*, 519 U.S. 172, 189 (1997). In addition, the existence of other evidence that Liston was in the Homicide Squad cuts both ways: in fact, given the other evidence showing Liston's affiliation with the enterprise and his violent acts, any error in admitting the tattoo photos was harmless.

B. *The prosecutor's unintentional misstatement in closing regarding the evidence of Liston's tattoos does not require new trial.*

In the rebuttal close, the United States said, while displaying a photo, "This is the hand of Buck. Rashad Liston. He's got a Homicide poem tattooed on his arm. Now, underneath his shirt, it is uncontroverted that he has homicide for the cash tattooed on his chest." (R. 1549, trial tr. 17475.) Liston's attorney objected. (*Id.*)

At sidebar, after Liston's attorney indicated that the United States had not in fact presented evidence about Liston's chest tattoo, the prosecutor indicated that, according to his recollection, there was testimony about the chest tattoo: "It was Al-Nuts, the very first person who testified." (*Id.*; *see also id.* at 17476 ("It was my witness, I remember asking the questions.").)

The court replied, "I don't recall that detail. And I'm going to leave it up to the jury because I would hate to instruct them that Mr. DeVillers was incorrect and then the transcript proved otherwise. I would hate to instruct the jury that he's correct and you're incorrect and the transcript proves otherwise. So I'm going to ask the jury to rely on its collective memory." (*Id.* at 17476.) The court indicated that it did not find that either attorney was "knowingly misrepresent[ing]" the

testimony: ". . . I believe that both of you recall what you believe that you heard. So I'm going to leave it up to the jury." (*Id.* at 17477.)

Immediately after the sidebar, the court delivered the following instruction to the jury:

> Ladies and gentlemen, as I previously admonished you, you are to rely on your combined, collective memories, as I advised both Mr. DeVillers and Ms. Dixon at side-bar. They're both officers of the court and they heard what they both believe they heard. I don't have a transcript with me, but I do rely on your collective memories to separate the wheat from the chaff.

(*Id.*) Liston did not move for a mistrial, did not object to the district court's stated intention to instruct the jury to rely on their collective memories, and did not object to the above instruction as inadequate after it was given. (*Id.* at 17476-77.) After the instruction, the United States never again referred to Liston's chest tattoo. It also did not thereafter mention the tattoo photographs.

In fact, the prosecutor recalled the testimony incorrectly. At trial, Allen Wright (aka Al-Nuts) testified that Wright *himself* has "Homo or homicide" tattooed on his chest. (R. 1074, trial tr., 5809 (Wright).) Wright also indicated that that *Robert* Liston—Defendant-Appellant Rashad Liston's older brother—has "Homo" tattoos on his chest. (*Id.* at

5921.) The prosecutor's statement about Liston's "homicide for the cash" tattoo was therefore not based on evidence introduced at trial.

This Court uses a two-step process to determine whether statements by a prosecutor amount to prosecutorial misconduct warranting a new trial. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). The Court first considers whether the statements were improper—if, for example, they misstate material evidence—and if they are improper, the Court uses a four-factor test to determine whether impropriety was flagrant and therefore merits reversal. *Id.* at 783-85. The four factors that this Court weighs to determine flagrancy are "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* at 783. In the review of these factors, the prosecutor's "remarks must be examined within the context of the trial." *United States v. Young*, 470 U.S. 1, 12 (1985); *Carter*, 236 F.3d at 783. If a prosecutor's remarks are improper but not flagrant, this Court will reverse only if the proof was not overwhelming, the defendant objected

to the remarks, and the court failed to cure the error with an admonishment to the jury. *United States v. Stover*, 474 F.3d 904, 915 (6th Cir. 2007). This Court "will not overturn a verdict unless the prosecutorial misconduct is so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, . . . or so gross as probably to prejudice the defendant." *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001) (internal quotation omitted).

Here, even if one assumes that the prosecutor's erroneous description of the evidence was "improper," reversal is unwarranted under these standards. First, given the court's handling of the issue, the prosecutor's misstatement had little tendency to mislead. In applying this factor, this Court recognizes that even the misstatement of evidence of "critical importance to the prosecution" may be "cured, or at least minimized, by curative instructions to the jury." *Carter*, 236 F.3d at 786-87. This Court "[o]rdinarily . . . should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error." *Id.* at 787.

179

Here, after Liston questioned the prosecutor's characterization, the court immediately offered a remedial instruction. The instruction recognized the differences in counsel's recollections of the testimony and admonished the jury to rely on their "combined, collective memories" to "separate the wheat from the chaff." (R. 1549, trial tr., 17477.) In addition, the court delivered the following general instruction before jury deliberations:

> The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations to which the lawyers agreed, and the facts, if any, that I've judicially noticed. Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My rulings are not evidence. And my comments and questions are not evidence.

(R. 1550, trial tr., 17547.) In light of the instructions given and the presumption that juries "understand and follow directions from the court," *Carter*, 236 F.3d at 783, the prosecutor's misstatement had little tendency to mislead.

Second, the comment here, which occurred at the end of a two-month trial, was clearly isolated. Under the "isolated or extensive" factor, this Court recognizes that "[i]f a prosecutor's comments were simply isolated remarks made during the course of a long trial, then the

error caused by such misconduct may be harmless." *Carter*, 236 F.3d at 788. That is exactly the situation here.

In fact, in addition to the wide range of other evidence, this misdescription of the evidence regarding Liston's tattoo was even a small part of tattoo evidence linking Liston to Homicide Squad. Troy Patterson testified that he had "HM tattoos, or Homicide for the Cash," tattooed on "[m]y neck, my hands, my arms" and that "Homicide for the Cash" was chosen because that is "our thing." (R. 1115, trial tr., 8984 (Patterson).) Patterson testified that, in the "HM" tattoo on his neck, there are names including "Buck, O-Dog, [and] Tone." (*Id.* at 8985.) ("Buck" is Liston. (*Id.* at 8984.)) Anthony Jones similarly testified that he had tattoos representing Homicide Squad on his arm and his back. (R. 1119, trial tr., 9952 (Jones).) Jones also testified that he had "Buck" tattooed on his arm, and that the names on his arm were people who were in Homicide Squad or were "a part of the same gang as me." (*Id.* at 9958; *see also* R. 1125, trial tr., 11686 (Lauber) (officer testifying about Jones's "Buck" tattoo).) The United States offered photographic evidence of Liston's visible tattoos, which included a poem beginning "Homicide part one." (R. 1124, trial tr., 11419, 11555; R. 1604, notice,

19289-90, 19292 (Exhs. 1-6-2, 1-6-3, 1-6-5).) The prosecutor's isolated misstatement was thus a small part of what the jury heard about tattoos linking Liston to Homicide Squad, and a very small part of the trial overall.

Third, there is no evidence or allegation that the misstatement was deliberate. (*See* Liston Br. at 43.) On the contrary, the district court specifically found that any mischaracterization by the prosecutor regarding the evidence presented regarding Liston's tattoos was *not* deliberate. (R. 1550, trial tr., 17477 (". . . I believe that both of you recall what you believe that you heard.").)

The context of the statement supports the court's conclusion. The prosecutor made the statement in rebuttal close. (R. 1549, trial tr., 17475.) It was part of a discussion describing the gang affiliations of the witnesses and defendants (*id.* at 17473-78); this discussion responded to, among other things, arguments by Liston's counsel suggesting that Homicide Squad did not exist (*id.* at 17374, 17381) and that Liston was not a member of Homicide Squad (*id.* at 17375-76; 17379-81). During the sidebar concerning the objection, the prosecutor indicated that it was his memory that the first witness in the trial (Allen Wright) had

testified that Liston had a "homicide for the cash" tattoo. (*Id.* at 17475.)
It is easy to imagine how, after a lengthy trial including evidence
regarding several individuals' tattoos, the prosecutor misremembered
the testimony of the first witness, particularly given that Allen Wright
did testify that *he* had Homo or Homicide tattooed on his chest (R. 1074,
trial tr., 5809 (Wright).), and that Liston's brother *Robert* Liston had
Homo tattooed on his chest (*id.* at 5921).

Fourth, the evidence against Liston was strong, and in fact
overwhelming. Indeed, during the closing argument by Liston's counsel,
he acknowledged to the jury that, wholly apart from anyone's tattoos,
two people had testified directly regarding Liston's membership in
Homicide Squad. (*Id.* at 17375-76; 17379-80.) The jury also heard
extensive evidence of Liston's participation in two murders, both
committed in the course of violent robbery attempts. Against this
evidence, there is no reason to think that the prosecutor's isolated
misdescription affected the outcome, particularly given that the
disagreement about the testimony was called to the jury's attention and
the court carefully instructed the jury (without further objection by

Liston) to rely on its recollection of the evidence, not statements by attorneys.

In sum, because none of the four factors supports viewing the misstatement here as flagrant, and because Liston does not meet the standards for reversal for non-flagrant remarks, *see Stover*, 474 F.3d at 915 (6th Cir. 2007), Liston cannot demonstrate that the prosecutor's misstatement requires reversal.

## XII.   This Court should not address Ledbetter's ineffective assistance claim on direct appeal, and to the extent that it does, the claim fails. (*responding to Ledbetter's second issue*)

Ledbetter claims that his trial counsel rendered ineffective assistance by failing to object to certain evidence, being "offensively overzealous" in cross-examination, and reopening the door to stricken testimony on cross-examination. (Ledbetter Br. at 30.)

As a general rule, however, "a defendant may not raise ineffective-assistance-of-counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005). Instead, "[i]neffective assistance claims are more properly raised in a post-conviction

184

proceeding brought pursuant to 28 U.S.C. § 2255, where the record

regarding counsel's performance can be developed in more detail."

*United States v. Lopez–Medina*, 461 F.3d 724, 737 (6th Cir. 2006)

(internal citations omitted). There is no reason for the Court to depart

from its standard practice in this case.

First, the record is not sufficiently developed to permit review of

Ledbetter's claim. While Ledbetter points generally to the extensive

trial record here, what matters is that there is no record of counsel's

reasons for his choices or of any strategic considerations that informed

them. Without defense counsel's explanation, the record is incomplete.

*See Massaro v. United States*, 538 U.S. 500, 505 (2003). Requiring

Ledbetter to raise his ineffective-assistance claim in a 28 U.S.C. § 2255

proceeding will create a more robust record for review. *See, e.g.*, *United

States v. Reid*, 764 F.3d 528, 534 (6th Cir. 2014); *United States v.

Bradley*, 400 F.3d 459, 461-62 (6th Cir. 2005).

Second, the district court should be permitted to address

Ledbetter's ineffective assistance claim in the first instance. Where a

§ 2255 motion is ruled on by the same judge who presided below, that

judge will "have an advantageous perspective for determining the

185

effectiveness of counsel's conduct and whether any deficiencies were prejudicial." *See Massaro*, 538 U.S. at 506. That is all the more so in a case such as this one, where the complained-of actions by counsel were isolated actions in a weeks-long trial.

Ledbetter's attempt to raise ineffective assistance of counsel on direct appeal should be rejected for the reasons discussed above. If the court chooses to review his claim, however, the claim must fail. Ineffective assistance of counsel requires a two-part showing: (1) that counsel's performance was "deficient;" and (2) that this deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Even assuming that Ledbetter could somehow show deficient performance by counsel as to the actions he raises, he could not show prejudice. The jury was presented with overwhelming evidence, summarized in a previous section, regarding each of Ledbetter's charges. In the face of this evidence, Ledbetter cannot show a reasonable probability that the isolated decisions of counsel he now questions affected the verdict on any count. *See Krist v. Folz*, 804 F.2d 944, 947 (6th Cir. 1986) ("Given the overwhelming evidence of Kristi's participation in the two robberies, even if the alleged failures of counsel

[to object] are considered errors, there was no showing of a reasonable probability that but for these errors 'the result of the proceeding would have been different.'").

## XIII. The due process right to unanimity was not violated as to the verdict forms for Harris's, Liston's and Ussury's murder in aid of racketeering counts. (*responding to Harris's first issue, Liston's first issue, and Ussury's first issue*)

Harris, Liston, and Ussury argue that due process required the district court to use a verdict form that directed the jury to specify the VICAR motive that served as the basis for their murder-in-aid-of-racketeering-convictions (Counts 5, 7, 9, 11, 15, and Joined Count 1). As Appellants recognize, they did not object to the verdict forms below. (Liston Br. at 13, Harris Br. at 16; Ussury Br. at 14.) Therefore, review is only for plain error. *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992); *United States v. Combs*, 253 F. App'x 532, 534 (6th Cir. 2007). Because the district court instructed jurors that they must unanimously agree on the VICAR motive, and because no authority requires the jury to identify the motive on a special verdict form, Appellants cannot show error, let alone plain error.

Under the principles of due process, "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element." *Richardson v. United States*, 526 U.S. 813, 817 (1999); *see Schad v. Arizona*, 501 U.S. 624, 634 n.5 (1991). Here, as Appellants recognize (Liston Br. at 16, Harris Br. at 17), the district court *did* require unanimity as to motive, instructing that "[t]he government need only prove that the murder was committed by the defendant for either one of two stated purposes, but your verdict must be unanimous as to which purpose." (R. 1551, trial tr., 17709.)

Appellants urge that a corresponding special verdict form was required, but even if unanimity is required regarding a particular fact, it is not necessary for a district court to use a special verdict form to assess which fact was found by the jury. *See United States v. Saunders*, 501 F.3d 384, 393 (4th Cir. 2007); *United States v. Ramirez,* 537 F.3d 1075, 1083 (9th Cir. 2008); *United States v. Pierce*, 479 F.3d 546, 552 (8th Cir. 2007);  *United States v. Harris*, 598 F. App'x 44, 45 (2d Cir. 2015); *cf. United States v. Stonefish*, 402 F.3d 691, 699 (6th Cir. 2005) (although special verdict form omitted an element of the charge, element was adequately covered by instructions). Indeed, special

188

verdicts and interrogatories have historically been viewed as potentially interfering with the jury's function to defendants' disadvantage. *See generally United States v. Blackwell*, 459 F.3d 739, 766-67 (6th Cir. 2006) (noting that, "[i]n general, special verdict forms are not favored [in criminal cases] and 'may in fact be more productive of confusion than clarity,'" and reasoning that fact that special verdicts are sometimes permissible does not make them a requirement). A general verdict form, along with instructions that correctly state the law on unanimity for a particular charge, is adequate to ensure unanimity. *See Saunders*, 501 F.3d at 393-94 (rejecting defendant's argument that "his constitutional right to a unanimous jury was violated because the jury was not given a special verdict form"); *see generally, e.g., United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001) (jurors presumed to follow instructions).

Appellants cite no case supporting the proposition that a requirement of unanimity necessitates not only an appropriate instruction, but a special verdict form. The cited district court case (*see* Liston Br. at 15), while noting that use of a special verdict form regarding VICAR motive "would have been advisable," stated that it

was "not required by law." *United States v. Ferguson*, 49 F. Supp. 2d 321, 324 n.5 (S.D. N.Y. 1999).

Appellants' reliance on *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999) is equally off the mark. That case held only that where a charged conspiracy allegedly involved two drugs with different statutory sentencing consequences, the higher sentence could not be imposed without a special verdict indicating which drug or drugs the jury found to be involved. *Id.* at 433. Indeed, *Dale* relied on a Second Circuit case that explained that "while special verdicts are generally not favored in criminal cases, they are appropriate *when the information sought is relevant to the sentence to be imposed.*" *Id.* at 433 (quoting *United States v. Orozco-Prada*, 732 F.2d 1076, 1083-84 (2d Cir. 1984) (emphasis added). *Dale* has no application here, as the two VICAR motives carry the same sentencing consequences. *See* 18 U.S.C. § 1959. Appellants thus fail to establish that the absence of a special verdict was error, much less plain error. *Cf. United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014) (holding that the absence of particular jury instruction on unanimity was not plain error because there was no controlling Sixth Circuit authority on point).

190

XIV. **There was no cumulative error rendering the trial fundamentally unfair. (*responding to Ledbetter's seventh issue and Liston's fifth issue*)**

Ledbetter and Liston argue that even if the trial errors they raise are individually harmless, taken together, they were prejudicial. Errors that are individually harmless may, in some circumstances, cumulatively prejudice a defendant. *See United States v. Hines*, 398 F.3d 713, 719 (6th Cir. 2005). But that is not the case here.

Application of the cumulative error doctrine first requires a conclusion that there are in fact multiple trial errors, and further, that the errors' combined effect was so prejudicial as to render the trial fundamentally unfair. *See United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004); *United States v. Blackwell*, 459 F.3d 739, 770 (6th Cir. 2006). Where some of the claimed errors are unpreserved,[13] cumulative error analysis as to those errors is for plain error only. *See, e.g.*, *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008) (articulating procedure for cumulative error review in cases with both preserved and unpreserved error).

---

[13] That is the situation here with respect to the "impermissible expert testimony" mentioned by Liston as contributing to cumulative error. (Liston Br. at 44.) *See supra* at 152.

Here, Ledbetter's and Liston's claims of trial error lack merit for the reasons discussed above. Their "cumulative error" arguments therefore fail at the outset. *See United States v. Underwood*, 859 F.3d 386, 394 (6th Cir. 2017) ("the accumulation of non-errors" cannot lead to reversible cumulative error). Moreover, given the strength of the evidence supporting Ledbetter's and Liston's convictions on all counts, even if this court were to identify multiple errors in this lengthy trial, Ledbetter and Liston cannot show that their trial was rendered fundamentally unfair.

**Sentencing Issues**

**XV. Ledbetter did not receive multiple punishments for the same conduct in violation of double jeopardy. (*responding to Ledbetter's fourth issue*)**

Ledbetter alleges double jeopardy violations in his sentences for three sets of charges. According to Ledbetter, the counts in each set amount to one offense charged multiple times. Ledbetter briefly raised a similar argument at sentencing below. (*See* R. 1544, sentencing tr., 16512; R. 1449-1, Ledbetter sentencing memo, 14596-97.) This Court reviews a double-jeopardy sentencing claim de novo. *United States v.*

192

*Vichitvongsa*, 819 F.3d 260, 273 (6th Cir. 2016); *see also United States v. Lombardo*, 582 F. App'x 601, 612 (6th Cir. 2014).

To evaluate whether an indictment "charg[es] a single offense in more than one count," this Court generally asks, as directed in *Blockburger v. United States*, "whether each charge requires proof of a fact that the other charge does not." *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)); *see also Pandelli v. United States*, 635 F.2d 533, 538 (6th Cir. 1980). The United States does not violate *Blockburger* simply by "[u]sing the same evidence to prove violations of two statutes." *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008).

None of Ledbetter's allegations of multiplicity survives the *Blockburger* test. The crimes charged in joined counts one and two—murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and murder with a firearm during a drug trafficking crime, 18 U.S.C. § 924(j)—require proof of different elements. A conviction under § 1959(a)(1) required, among other things, proof of an enterprise engaged in racketeering activity, *see* 18 U.S.C. § 1959(a), which a conviction under § 924(j) as charged does not. Conversely, Ledbetter's conviction in count two under

§ 924(j) requires, among other things, proof of a drug trafficking crime, which a conviction under § 1959(a) does not. *United States v. Johnson*, 219 F.3d 349, 359 (4th Cir. 2000) (rejecting a multiplicity claim involving § 924 and § 1959(a)(1)). The same analysis disposes of Ledbetter's arguments related to counts nine and ten.

A nearly identical analysis does two-thirds of the work for Ledbetter's arguments based on counts 29, 30, and 31: Counts 29 charges of murder in aid of racketeering and count 31 charges use of a firearm during a crime of violence, so the same *Blockburger* analysis applies with a small modification—the substitution of "crime of violence" for "drug trafficking crime." Count 30, the remaining charge in that set, charges conspiracy to murder a witness. It requires the existence of a conspiracy and that the targeted victim be a potential witness, *see* 18 U.S.C. § 1512(k), which neither of the other statutes require; sections 1959 and 924(j), in turn, require proof of an enterprise engaged in racketeering activity and proof of the use of a firearm, neither of which is an element the conspiracy charge. Ledbetter's argument regarding counts 29, 30, and 31 therefore cannot survive *Blockburger*.

194

In fact, Ledbetter himself admits that none of his groupings supports a successful *Blockburger* argument. (Ledbetter Br. at 43 ("Admittedly, applying the *Blockburger* test, these various counts do have elements not contained [in] the other.").) He cites *Rashad v. Burt*, 108 F.3d 677 (6th Cir. 1997), in an effort to save his argument, but that case has been limited by this Court and is irrelevant here. There, the United States charged possession with intent to deliver cocaine in two separate prosecutions. *Id.* at 679. The charges there survived the standard in *Blockburger*, but this Court suggested that the *Blockburger* test was insufficient to resolve the case, where "the concern is not multiple charges under separate statutes, but rather successive prosecutions for conduct that may constitute the same act or transaction." *Id.*

Ledbetter admits that the holding of that case is limited to successive prosecutions, and that "this is not a successive prosecution"; under this Court's rulings, that distinction is fatal to his argument. *See United States v. Farah*, 766 F.3d 599, 607 (6th Cir. 2014) ("The holding in *Rashad* has been limited by subsequent decisions of this Court. . . . [U]se of *Rashad* to resolve double jeopardy questions is limited to

circumstances such as were present in that case.") (alteration and quotations omitted); *see also Murr v. United States*, 200 F.3d 895, 901 (6th Cir. 2000) (limiting *Rashad* and noting its reliance on the "same evidence" test subsequently rejected by the Supreme Court).

And Ledbetter's fairness argument—"[T]he core element for each count is killing, so as such the multiple counts doubly or triply charge Mr. Ledbetter with murdering the same victim"—ignores the truism that the same conduct may violate multiple statutes. *See, e.g.*, *Volpe v. Trim*, 708 F.3d 688, 695-96 (6th Cir. 2013). Ledbetter therefore cannot succeed in demonstrating a double jeopardy violation.

## XVI. Ledbetter's sentence was procedurally reasonable. (*responding to Ledbetter's fifth issue*)

The court's calculation of the Guidelines range for Ledbetter included an enhancement for his leadership role under U.S.S.G. § 3B1.1(a). (R. 1544, sentencing tr., 16492.) Ledbetter argues that his sentence was procedurally unreasonable because application of the leadership enhancement was in error, and "based on disputed facts." (Ledbetter Br. at 45-48.)

This Court reviews sentences for procedural and substantive reasonableness. *See, e.g.*, *United States v. Taylor*, 800 F.3d 701, 712 (6th

196

Cir. 2015). A sentence is procedurally unreasonable if, *inter alia*, the district court improperly calculates the guideline range or relies on "clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). A district court's application of a leadership enhancement under U.S.S.G. § 3B1.1 is reviewed deferentially for clear error. *United States v. Washington*, 715 F.3d 975, 983-84 (6th Cir. 2013). A district court is required to rule on "any disputed portion of the presentence report or other controverted matter." Fed. R. Crim. Proc. 32(i)(3)(B). Failure to rule on a disputed issue is reviewed only for plain error if not raised in the district court. *United States v. Vonner*, 516 F.3d 382, 388 (6th Cir. 2008) (en banc).

A four-point enhancement is appropriate under U.S.S.G. § 3B1.1(a) "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." It is only necessary that the defendant was "the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1(a) n.2. The court considers factors including, among other things, "the recruitment of accomplices . . . . [and] the degree of participation in planning or organizing the offense." *Id.* n.4.

Here, the district court properly resolved the dispute over the application of the enhancement, concluding that the requirements of the enhancement were satisfied. (R. 1544, sentencing tr., 16491-92.) After a brief contrary argument by Ledbetter's counsel, the district court found that "the evidence was clear that Mr. Ledbetter was the leader, or a leader, in this enterprise." (*Id.* at 16491.) The district court specifically referenced "testimony regarding the murders of Johnson, Williams, and Brumfield" and made specific findings relative to each of these murders: "In the Alan Johnson murder, he served as a lookout, but it seems that he organized [it] in retaliation for the Elijah Ledbetter killing. The Rodriccos Williams' murder was, based on the facts, singly under the supervision of Mr. Ledbetter, as was the Brumfield murder." (*Id.* at 16492.)

To the extent that Ledbetter intends to argue for the first time on appeal that the district court did not resolve a disputed issue of fact, the record dooms this argument. To the extent that he intends to argue that it is error for the district court to apply an enhancement when the parties dispute the underlying facts, he is incorrect as a matter of law. *See, e.g., United States v. Murphy*, 530 F. App'x 522, 525 (6th Cir. 2013).

Moreover, the district court's conclusion that Ledbetter was a leader in the enterprise was not clearly erroneous. On the contrary, there was ample testimony to support the conclusion that Ledbetter in fact had a leadership role in all four murders with which he was charged.

Furthermore, any error in the application of the enhancement would in any event be harmless, and Ledbetter appears to raise this issue only in case it becomes relevant due to the reversal of his convictions. (*See* Ledbetter Br. at 47) (acknowledging that the issue is "somewhat moot"). A sentencing error is harmless if it did not affect the sentence. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). That is the situation here. As Ledbetter recognizes (Ledbetter Br. at 47), the statutorily required punishment for murder in aid of racketeering is life imprisonment or death. 18 U.S.C. § 1959(a)(1); *see also, e.g.*, *United States v. James*, 239 F.3d 120 (2d Cir. 2000). Ledbetter was convicted of four counts of murder in aid of racketeering and sentenced to a life term for each, to run concurrently. (R. 1478, judgment, 14761 (counts 4, 9, 29 and joined count 1).) As such, any error in the application of the leader or organizer enhancement is harmless,

as the defendant "was sentenced to a statutorily mandated life sentence." *United States v. Morris*, 533 F. App'x 538, 545 (6th Cir. 2013).

Moreover, the application of the enhancement did not even affect the Guidelines calculation: The combined adjusted offense level—which reflected the four-point enhancement at issue—was 52 (PSR ¶ 182); the Guidelines recommendation for any offense level at or greater than 43 is a life term in prison. Because of the statutory minimums at issue, and because the enhancement did not affect the Guidelines recommendation, any error in the application of the enhancement did not affect the sentence.

# CONCLUSION

The Court should affirm the judgments of the district court.


Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

/s/ Mary Beth Young
MARY BETH YOUNG
KIMBERLY ROBINSON
Assistant United States Attorneys
303 Marconi Blvd, Suite 200
Columbus, Ohio 43215
(614) 469-5715

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation specified in this Court's order of October 25, 2018.  The brief contains 39,739 words of Century Schoolbook (14 pt) proportional type. Word 2016 is the word-processing software that I used to prepare this brief.

/s/ Mary Beth Young
MARY BETH YOUNG

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g):

| Record number | Description | PAGE ID# range |
| --- | --- | --- |
| 14 | indictment | 104–183 |
| 300 | superseding indictment | 1150–1243 |
| 595 | order | 2470–2474 |
| 600 | motion to suppress | 2503–2520 |
| 639 | notice of grouping | 2709–2713 |
| 727 | opinion and order | 3337–3369 |
| 790 | order | 3642–3671 |
| 975 | opinion | 4788–4796 |
| 990 | opinion and order | 5162–5174 |
| 994 | U.S. witness list | 5205–5212 |
| 1073 | trial transcript | 5635–5796 |
| 1074 | trial transcript | 5797–6099 |
| 1075 | trial transcript | 6100–6390 |
| 1076 | trial transcript | 6391–6648 |
| 1077 | trial transcript | 6649–6876 |
| 1078 | trial transcript | 6877–7165 |

| | | |
|---|---|---|
| 1079 | trial transcript | 7166–7433 |
| 1080 | trial transcript | 7434–7712 |
| 1081 | trial transcript | 7713–7977 |
| 1082 | trial transcript | 7978–8277 |
| 1083 | trial transcript | 8278–8491 |
| 1084 | trial transcript | 8492–8630 |
| 1100 | motion | 8905–8917 |
| 1102 | response | 8925–8928 |
| 1110 | opinion and order | 8949–8961 |
| 1115 | trial transcript | 8970–9218 |
| 1116 | trial transcript | 9219–9459 |
| 1117 | trial transcript | 9460–9739 |
| 1118 | trial transcript | 9740–9944 |
| 1119 | trial transcript | 9945–10225 |
| 1120 | trial transcript | 10226–10472 |
| 1121 | trial transcript | 10473–10699 |
| 1122 | trial transcript | 10700–10948 |
| 1123 | trial transcript | 10949–11180 |
| 1124 | trial transcript | 11181–11449 |

| | | |
|---|---|---|
| 1125 | trial transcript | 11450–11698 |
| 1126 | trial transcript | 11699–11848 |
| 1131 | order | 12647–12660 |
| 1137 | opinion and order | 12690–12713 |
| 1141 | verdict | 12717–12753 |
| 1413 | Holt judgment | 14397–14402 |
| 1418 | Wright judgment | 14441–14447 |
| 1440 | Coates judgment | 14536–14541 |
| 1444 | Johnson judgment | 14561–14566 |
| 1446 | Wilson judgment | 14571–14576 |
| 1449 | sentencing memorandum | 14588–14603 |
| 1450 | Wharton judgment | 14604–14610 |
| 1452 | Hill judgment | 14615–14621 |
| 1454 | Bowers judgment | 14626–14631 |
| 1457 | Reynolds judgment | 14640–14646 |
| 1461 | Brown judgment | 14661–14667 |
| 1463 | Smith judgment | 14672–14677 |
| 1466 | Patterson judgment | 14695–14700 |
| 1472 | Robinson judgment | 14735–14741 |

| | | |
|---|---|---|
| 1474 | Ussury judgment | 14746–14742 |
| 1478 | Ledbetter judgment | 14759–14765 |
| 1480 | Liston judgment | 14770–14776 |
| 1482 | Harris judgment | 14781–14787 |
| 1532 | Green judgment | 16417–16422 |
| 1544 | sentencing tr. | 16487–16537 |
| 1547 | trial transcript | 17050–17141 |
| 1548 | trial transcript | 17142–17369 |
| 1549 | trial transcript | 17370–17520 |
| 1550 | trial transcript | 17521–17620 |
| 1551 | trial transcript | 17621–17720 |
| 1567 | suppression transcript | 18466–18615 |
| 1604 | notice | 19264–19335 |

<u>2:15-cr-80</u>

| | | |
|---|---|---|
| 1 | indictment | 1–12 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on Defendant-Appellants by filing with the Court's CM/ECF system this 31st day of October, 2018.

/s/ Mary Beth Young
MARY BETH YOUNG
Assistant United States Attorney